AMY J. LONGO (Cal. Bar No. 198304)
Email: longoa@sec.gov
DAVID S. BROWN (Cal. Bar No. 134569)
Email: browndav@sec.gov
BRENT W. WILNER (Cal. Bar No. 230093)
Email: wilnerb@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission

Robert A. Cohen, Unit Chief (Cyber Unit)
Headquarters
100 "F" Street, N.E.
Washington, District of Columbia 20549

Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

**ORIGINAL**

**FILED**

OCT - 3 2018

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

SECURITIES AND EXCHANGE
COMMISSION,

  Plaintiff,

  vs.

BLOCKVEST, LLC and REGINALD
BUDDY RINGGOLD, III a/k/a
RASOOL ABDUL RAHIM EL,

  Defendants.

Case No. '18 CV 2287 GPC BLM

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDERS: (1) FREEZING ASSETS; (2) PROHIBITING THE DESTRUCTION OF DOCUMENTS; (3) GRANTING EXPEDITED DISCOVERY; AND, (4) REQUIRING ACCOUNTING; AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION**

(FILED UNDER SEAL)

# **TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................. 1

II.   STATEMENT OF FACTS ................................................................... 2

    A.   Background on Initial Coin Offerings............................................ 2

    B.   Defendants' Fraudulent ICO Scheme .......................................... 3

        1.   Ringgold and his affiliated entities ................................... 3

        2.   Blockvest's purported business........................................ 4

        3.   The Blockvest ICO............................................................ 5

        4.   Defendants' Materially False Statements ......................... 6

        5.   Defendants' Scheme to Defraud ....................................... 9

        6.   Defendants' Unregistered Securities Offering................. 11

III.  ARGUMENT ...................................................................................... 13

    A.   A Temporary Restraining Order Is Needed ................................ 13

        1.   The SEC is seeking a TRO in the public interest ............. 13

        2.   The SEC has made the necessary *prima facie* showing ..................... 14

            a.   Defendants are offering and selling securities ........................ 14

            b.   Defendants' offers and sales are unregistered.......................... 16

            c.   Defendants are committing fraud ............................................ 18

        3.   Defendants' violations are likely to be repeated................. 22

    B.   The Other Relief Sought By The SEC Is Needed ........................ 22

IV.  CONCLUSION.................................................................................... 25

i

# TABLE OF AUTHORITIES

## Cases

*Aaron v. SEC,*
446 U.S. 680 (1980)..................................................................21

*Avis Budget Group Inc. v. Cal. State Teachers' Ret. System,*
552 U.S. 1162 (2008)................................................................20

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988)..................................................................19

*FTC v. Affordable Media, LLC,*
179 F.3d 1228 (9th Cir. 1999)...................................................23

*FTC v. Dluca,*
No. 18-60379-CIV (Feb. 28, 2018 S.D. Fla.)............................24

*FTC v. H.N. Singer, Inc.*
668 F.2d 1107 (9th Cir. 1982)...................................................13

*FTC v. Inc21.com Corp.,*
688 F. Supp. 2d 927 (N.D. Cal. 2010).......................................24

*Hollinger v. Titan Capital Corp.,*
914 F.2d 1564 (9th Cir. 1990)...................................................21

*Janus Capital Group, Inc. v. First Derivative Trader,*
131 S. Ct. 2296 (2011)..............................................................19

*Johnson v. Couturier,*
572 F.3d 1067 (9th Cir. 2009)...................................................24

*Merrill Lynch, Pierce, Fenner & Smith Inc., v. Dabit,*
547 U.S. 71 (2006)....................................................................19

*Pennaluna & Co. v. SEC*
410 F.2d 861 (9th Cir. 1969) ....................................................17

*Reebok Int'l, Ltd v. Marnatech Enterprises, Inc.,*
970 F.2d 552 (9th Cir. 1992)....................................................23

*SEC v. Capital Cove Bancorp, LLC,*
Case No. 8:15-cv-00980-JLS-JC, 2015 U.S. Dist. LEXIS 174962 (C. D. Cal.
Sept. 1, 2015)............................................................................14

*SEC v. Cavanagh,*
155 F.3d 129 (2d Cir. 1998) .....................................................24

*SEC v. CKB168 Holdings, Ltd.*
F. Supp. 3d--, 2016 WL 6915859, at **14-15, 17 (E.D.N.Y. Sept. 28, 2016)
.................................................................................................20

*SEC v. Cooper*,
    142 F.Supp.3d, 316 (D.N.J. 2015) ...........................................................21

*SEC v. Dain Rauscher, Inc.*,
    254 F.3d 852 (9th Cir. 2001) .............................................. 18, 19, 21

*SEC v. Eadgear, Inc.*,
    No. 3:14-CV-04294-RS, 2014 WL 6900938 (N.D. Cal. Dec. 8, 2014)........14

*SEC v. Edwards*,
    540 U.S. 389 (2004).................................................................14

*SEC v. Eurobond Exchange, Ltd.*
    13 F.3d 1334, 1338 (9th Cir. 1994) .......................................17

*SEC v. Glenn W. Turner Enterprises, Inc.*
    474 U.S. 476 (9th Cir. 1973) ...............................................16

*SEC v. Hickey*,
    322 F.3d 1123 (9th Cir. 2003) ...................................... 23, 24

*SEC v. Holschuh*
    694 F.2d 130, 137 n.10 (9th Cir. 1982) ................................17

*SEC v. Hughes Capital Corp.*,
    124 F.3d 449 (3d Cir.1997) ...................................................21

*SEC v. Int'l Swiss Invest. Corp.*,
    895 F.2d 1272 (9th Cir. 1990) ...................................... 23, 25

*SEC v. Management Dynamics, Inc.*,
    515 F.2d 801 (2d Cir. 1975) .................................................13

*SEC v. Manor Nursing Ctrs., Inc.*,
    458 F.2d 1089 n.3 (2d Cir. 1972) .........................................21

*SEC v. Materia*,
    745 F.2d 197 (2d Cir. 1984) .................................................23

*SEC v. Muehler*,
    No. 2:18–cv–01677–CAS (SKx) 2018
    WL 1665637 (C.D. Cal. Apr. 4, 2018) .................................14

*SEC v. Murphy*,
    626 F.2d 633 (9th Cir. 1980) ...................................... 17, 22

*SEC v. Penn*,
    No. 14–CV–581 (VEC), 2017 WL 5515855 (S.D.N.Y. Aug. 22, 2017)......21

*SEC v. Phan*
    500 F.3d 895, 902 (9th Cir. 2007) .......................................17

*SEC v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ...................................... 19, 21

*SEC v. PlexCorps*
   No. 17 Civ. 7007 (CBA), 2017 WL 6398722 (E.D.N.Y. Dec. 14, 2017).....16

*SEC v. R.G. Reynolds Enters., Inc.*
   952 F.2d at 1130 (9th Cir. 1991) .................................................................15

*SEC v. Ralston Purina Co.*
   346 U.S. 119, 126 (1953) ................................................................. 17, 18

*SEC v. Rana Research, Inc.,*
   8 F.3d 1358 (9th Cir. 1993) .........................................................................19

*SEC v. Rubera,*
   350 F.3d 1084 (9th Cir. 2003) .....................................................................14

*SEC v. Schooler,*
   902 F. Supp. 2d 1341 (S.D. Cal. 2012) ................................................ 13, 14

*SEC v. Sells,*
   No. C-11-4941 CW, 2012 WL 3242551 (N.D. Cal. Aug. 10, 2012)...........20

*SEC v. Titanium Blockchain Infrastructure Svcs., Inc., et al.,*
   Civil Action No. 18-4315 (C.D. Cal. filed May 22, 2018) ...........................16

*SEC v. Trabulse,*
   526 F. Supp. 2d 1008 (N.D. Cal. 2007) .......................................................14

*SEC v. Unifund SAL,*
   910 F.2d 1028 (2d Cir. 1990) .............................................................. 23, 24

*SEC v. United Financial Group, Inc.*
   474 F.2d 354 (9th Cir. 1973) .......................................................................13

*SEC v. W.J. Howey Co.,*
   328 U.S. 293 (1946).....................................................................................14

*SEC v. Wencke,*
   622 F.2d 1363 (9th Cir. 1980) .............................................................. 23, 25

*Simpson v. AOL Time Warner, Inc.,*
   452 F.3d 1040 (9th Cir. 2006) .....................................................................20

*Superintendent of Ins. v. Bankers Life & Casualty Co.,*
   404 U.S. 6 (1971).........................................................................................19

*Tcherepnin v. Knight*
   389 U.S. 332, 336 (1967) .............................................................................16

*Transworld Airlines v. Catalano,*
   No. 78 Civ. 1590, 1979 WL 1258, Fed. Sec. L. Rep. P 97,159 (S.D.N.Y.
   Oct. 31, 1979) .............................................................................................20

*TSC Industries., Inc. v. Northway, Inc.,*
   426 U.S. 438 (1976).....................................................................................19

iv

*U.S. v. Nutri-Cology, Inc.,*
    982 F.2d 394 (9th Cir. 1992) ...................................................13

*U.S. v. Odessa Union Warehouse Co-op,*
    833 F.2d 172 (9th Cir. 1987) ............................................ 13, 22

*U.S. v. Zaslavskiy,*
    No. 17 CR 647, 2018 WL 4346339
    (E.D.N.Y. Sept. 11, 2018) .................................................15

*United Housing Found., Inc. v. Forman*
    421 U.S. 837, 849 (1975) ...................................................16

*Vernazza v. SEC,*
    327 F.3d 851 (9th Cir. 2003) ...............................................21

*Western Fed. Corp. v. Erickson*
    739 F.2d 1439, 1442 (9th Cir. 1984) ................................18

*Winter v. NRDC,* Inc.
    557 U.S. 7 (2008) ...............................................................24

## FEDERAL STATUTES

15 U.S.C. § 77q(a)
    [Securities Act of 1933, Section 17q(a)] .......................19

15 U.S.C. § 78j(b)
    [Exchange Act of 1934, Section 10b].......................... 19, 21

**Securities Act of 1933**

Section 20(b)
    [15 U.S.C. § 77t(b)] ...........................................................13

**Securities Exchange Act of 1934**

Section 21(d)
    [15 U.S.C. § 78u(d)] ...........................................................13

## FEDERAL REGULATIONS

17 C.F.R. § 240.10b-5
    [Rule 10b-5]................................................................ 19, 21

# I.  INTRODUCTION

Plaintiff Securities and Exchange Commission (the "SEC") brings this emergency action, under seal, to halt the fraudulent offer and sale of unregistered securities by defendants Blockvest LLC ("Blockvest") and Reginald Buddy Ringgold, III, aka Rasool Abdul Rahim El ("Ringgold"). Their offering is ongoing, and they are claiming government regulators have "approved" the offering and their investment fund, even using the SEC seal on their website. That's not true—none of what they are offering has been cleared or signed off by the SEC or any other regulator. Ringgold is scheduled to speak at events titled "VCs, Angels, Crypto and ICOs" in Los Angeles on October 9th and in Orange County on October 11th; based on what he has done in the past, he will continue making these blatantly false claims.

Blockvest and Ringgold are selling an investment in digital tokens called "BLVs." They claim to have raised more than $2.5 million in the last six months in "pre-sales," as they gear up for a planned $100 million initial coin offering ("ICO") in December 2018. They falsely advertise Blockvest as a "*licensed and regulated* tokenized fund," and market their offering as "*registered*" and "*approved*" by the SEC and other regulators. Ringgold also liberally invokes the seals and logos of the SEC, the Commodity Futures Trading Commission ("CFTC"), and the National Futures Association ("NFA"), though none have in any way approved or endorsed Blockvest's ICO. NFA sent Blockvest a cease-and-desist letter in June 2018, which they have ignored. Defendants also falsely claim that Blockvest is "audited" by and "partnered with Deloitte." Ringgold has even gone so far as to create a fictitious regulatory agency called the Blockchain Exchange Commission—the "BEC"—with its own fake government seal. Its logo and mission statement imitate the SEC's own, and it claims to be located at the same address as the SEC's headquarters in Washington D.C. In his frequent appearances on social media channels and at digital asset conferences, Ringgold promotes the BEC and Blockvest simultaneously, adding to the false veneer of regulatory supervision over the ICO.

1

The SEC seeks a temporary restraining order and order to show cause for a preliminary injunction, to end defendants' fraud and prevent them from engaging in further fraudulent sales of digital securities premised on claims of regulatory approval. Given their rampant falsehoods and ongoing scheme, including Ringgold's use of an alias in opening certain financial accounts, the SEC also seeks an asset freeze, accountings of defendants' assets, expedited discovery, and an order prohibiting the destruction or alteration of documents.

## II.   STATEMENT OF FACTS

### A.   Background on Initial Coin Offerings

An initial coin offering or "ICO" is a fundraising event in which an entity offers participants a unique digital "coin" or "token" in exchange for consideration (often in the form of virtual currency—most commonly Bitcoin and Ether—or fiat currency). *See* Declaration of Brent W. Wilner *filed concurrently herewith* ("Wilner Decl."), ¶ 5, Ex. 1, pp. 1-18.[1] The tokens are issued on a "blockchain" or cryptographically secured ledger. *Id.* at ¶¶ 6, 7, Exs. 2, 3, pp. 19-25.[2]

The token may entitle its holders to certain rights related to a venture

---

[1] The Financial Action Task Force, an inter-governmental agency that promotes laws combating anti-money laundering and in which the United States is a member, describes virtual currency as a "digital representation of value that can be digitally traded and functions as (1) a medium of exchange; and/or (2) a unit of account; and/or (3) a store of value, but does not have legal tender status . . . in any jurisdiction." Wilner Decl. ¶ 5, Ex. 1, p. 3, n. 5.

[2] A blockchain is a type of distributed ledger, or peer-to-peer database spread across a network, that records all transactions in the network in theoretically unchangeable, digitally-recorded data packages called blocks. Each block contains a batch of records of transactions, including a timestamp and a reference to the previous block, linking the blocks together in a chain. The system relies on cryptographic techniques for secure recording of transactions. A blockchain can be shared and accessed by anyone with appropriate permissions. The Bitcoin blockchain is an example of a "non-permissioned," or public blockchain. All participants share a single view of the Bitcoin blockchain, which is updated when participants reach a consensus on the validity of transactions under review. "Permissioned" or private blockchains require permissioned servers to be approved to participate on the network or to access particular information on the blockchain.

1  underlying the ICO, such as rights to profits, shares of assets, rights to use certain

2  services provided by the issuer, and/or voting rights. These tokens may also be listed

3  on online trading platforms, often called virtual currency exchanges, and tradable for

4  virtual or fiat currencies. *Id.* at ¶¶ 5-7, Exs. 1-3, pp. 1-25. ICOs are typically

5  announced and promoted through online channels. Issuers usually release a

6  "whitepaper" describing the project and the terms of the ICO. To participate,

7  investors are generally required to transfer funds (often virtual currency) to the

8  issuer's address, online wallet, or other account. After the completion of the ICO, the

9  issuer will distribute its unique "tokens" to the participants' unique address on the

10  blockchain. *See, e.g., id.*

11  **B.** **Defendants' Fraudulent ICO Scheme**

12  From March 2018 through the present, defendants claim to have raised more

13  than $2.5 million from investors through the fraudulent and unregistered sale of

14  BLVs,[3] misleading investors as to the safety of the investment by invoking the

15  imprimatur of the SEC and other regulators, and by promoting the phony "BEC."

16  **1.** **Ringgold and his affiliated entities**

17  Blockvest was incorporated in April 2018, and Ringgold holds himself out as

18  its founder and principal. *Id.* ¶¶ 12, 13, 49, 62, Exs. 8, 9, 45, 57, pp. 57-66, 741-747,

19  795-501. On his personal website, Ringgold describes himself as an "internationally

20  recognized financial industry strategist," "THE MOST EFFICIENT FINANCIAL

21  MARKET INVESTMENT COACH EVER," and a "Professor." *Id.* ¶ 37, Ex. 33, pp.

22  261-273; Declaration of Christine Roche, *filed concurrently herewith* ("Roche

23  Decl."), ¶ 7, Ex. 2, pp. 200-207. At 34 years old, he boasts of over 17 years'

24  experience in the financial markets. Wilner Decl. ¶¶ 37, 39, 62, Exs. 33, 35, 57, pp.

25

26  [3] Defendants claimed on May 8, 2018 to have raised $2.5 million from BLV
   investors; defendants claimed on October 2 to have sold 18% of the BLVs being
27  offered, or approximately 9 million tokens. Supplemental Declaration of Brent W.
   Wilner, *filed concurrently herewith* ("Supp. Wilner Decl.") ¶ 2, Ex.1, p. 6.
28

263, 268-271. Ringgold sometimes uses the alias Rasool Abdul Rahim El, including to open several financial accounts in late 2017. *Id.* ¶¶ 38, 39, 57, 58 Exs. 34, 35, 52, 53, pp. 274-279, 286-289, 681-682, 696.

In addition to Blockvest, Ringgold claims to be the founder and/or manager of several affiliated entities, including (1) the Blockchain Investment Group LLC, also called the Blockchain Investment Group LLP ("BIG"); (2) Rosegold Investments LLP, also called the Rosegold Investments Trust ("Rosegold"); and (3) the Master Investment Group, Inc. ("MIG"). *Id.* ¶¶ 34, 37, 62, Exs. 30, 33, 57, pp. 23, 193-194, 269-271, 741-745. Ringgold describes BIG as an "investment bank that focuses on Blockchain Asset Based companies" (*id.* ¶¶ 15, 23, Ex. 11, pp. 125-135, 178-179); Rosegold as a "CFTC-registered Commodity Trading Advisor firm" (which it is not – *see Id.* ¶ 44, Ex. 40, 327-330); and MIG as a portfolio manager. *Id.* ¶¶ 31, 37, 62, Exs. 27, 30, 33, 57, pp. 185, 261-271, 741-745.

Ringgold does not appear in the corporate formation documents of BIG, Rosegold or MIG; rather, they reflect the names of his associates, such as Blockvest's CFO. *Id.* ¶¶ 13, 25, 29, 30, 33, Exs. 9, 21, 25, 26, 29, pp. 61-66, 171-176, 182-189. Each is described as providing services to Blockvest for its ICO, and Blockvest's webpage features the logos of both MIG and Rosegold. *Id.* ¶ 14, 27, 34, Exs. 10, 23, 30, pp. 78, 80, 181, 193, 209. The affiliated entities share an address that Blockvest and Ringgold also use: 5694 Mission Center Road, San Diego, CA, which is a UPS store. Wilner Decl. ¶¶ 12, 13, 16, 25, 26, 30, 63-67, Exs. 8, 9, 12, 21, 22, 26, 58, pp. 57-59, 61-63, 145, 171-173, 177, 183, 749.[4]

### 2. Blockvest's purported business

Blockvest claims to be a financial services company, using "Blockchain technology." *Id.* ¶ 14, Ex. 10, pp. 78-79, 103-104; Roche Decl. ¶ 6, Ex. 1, pp. 12-13.

---

[4] Ringgold (or El) has also received payments from accounts in these affiliated entities' names. *See, e.g.,* Wilner Decl. ¶ 61, Ex. 56, p. 738.

1  Blockvest purports to "aim[] to solve one of the biggest problems in the
2  cryptocurrency industry—volatility" as well as the "problems of trust and
3  custodianship." Wilner Decl. ¶ 15, Ex. 11, pp. 126-127. In February 2018,
4  Blockvest issued a whitepaper—available on its website—for the BLV sale. *Id.* The
5  whitepaper and Blockvest's website describe four nascent product offerings: (1)
6  "Blockvest30," supposedly a "cryptocurrency index fund" that will be managed by
7  BIG (*id.* Ex. 10, pp. 103, 108); (2) "Yields," purportedly a digital token that is a
8  "stablecoin" linked to the U.S. dollar (*id.* Ex. 11, p. 127); (3) the "Blockvest
9  Interface" which supposedly "provides tools for investment portfolio structuring and
10  management as well as a holistic view of the available investment opportunities and
11  the fund's historical and current investment performance" (*id.* Ex. 11, p. 129); and
12  (4) the "Blockvest Decentralized Exchange" or "DEX," which purports to be a
13  "Bloomberg for crypto economics" (*id.* Ex. 11, p. 131). According to a timeline in
14  the whitepaper, the DEX is scheduled to "launch" in the fourth quarter of 2018; none
15  of the other products yet reflect any launch dates. *Id.* Ex. 11, p. 135.
16      To fund the products' creation, Blockvest is selling BLVs, a digital asset
17  issued pursuant to a smart contract developed using the Ethereum Blockchain. As
18  the whitepaper describes it, "The BLV token is a novel decentralized asset, whose
19  intrinsic value is derived from the fees generated in the network it collateralizes as
20  well as the right to receive quarterly earnings from the performance of the
21  Blockchain Investments Fund." *Id.*, p. 126. BLVs, priced at $1/token, were first
22  issued in a transfer dated March 30, 2018, and over 10 million tokens have been
23  issued in 233 transfers as of September 30, 2018. *See* Declaration of Roberto Grasso
24  *filed concurrently herewith* ¶ 9.
25          **3.    The Blockvest ICO**
26      Blockvest began conducting "pre-sales" of BLVs in March 2018. According
27  to the whitepaper and website, BLVs are being sold in several stages: (1) a private

28

5

sale (with a 50% bonus), that ran through April 30, 2018; (2) the current "pre-sale," or "Testing the Waters Phase" (with a 20% bonus), from July 1, 2018 through October 6, 2018; and (3) the $100 million ICO set to launch on December 1, 2018. Wilner Decl. ¶¶ 14, 15, Exs. 10, 11, pp. 93, 127. The number of BLVs is capped at 100 million, 50 million of which will be issued during the pre-ICO and ICO sales. *Id.* Ex. 10, p. 102, Ex. 11, p. 134. Blockvest plans to issue 32.5 million BLVs to investors, while reserving 10 million for management, 5 million for "Core Activities Reserves," and 2.5 million for promotional incentives. *Id.* ¶ 11, p. 134. Blockvest proclaimed on May 6, 2018 that it had raised $2.5 million in 7 days, and later, that by September 17, 2018, that it had sold 18% of the tokens being offered, or roughly 9 million tokens. *Id.* ¶¶ 14, 48, Exs. 10, 44, pp. 96, 479.

### 4.  Defendants' Materially False Statements

*Misrepresentations regarding SEC "approval" and registration.* Defendants' public statements are replete with references to the BLV ICO, Blockvest itself, or both, somehow being "approved" by or "registered" with the SEC—both of which are false. For example, Blockvest's website describes its ICO as an "***SEC Reg A+ Securities Offering Approved***" *Id.* ¶ 14, Ex. 10, p. 101 (emphasis added).[5] Blockvest's Facebook page states that: "Blockvest is a ***U.S. SEC approved*** platform that doubles as a decentralized cryptocurrency exchange as well as a hedge fund" (*id.* ¶ 45, Ex. 41, p. 340) (emphasis added). In fact, the SEC has not approved any Regulation A offering for Blockvest, nor has it approved a trading platform for the company. *Id.,* ¶ 10, Ex. 6, p. 48.

Ringgold echoes these misstatements in his frequent public talks. For example, he falsely stated at a June 2018 blockchain conference: "Good news, we just got our ***Reg A approval from the SEC.***" Wilner Decl. ¶ 52, Ex. 48, p. 567 (emphasis added). The next month, at another blockchain conference, he

---

[5] *See* Footnote 9, *infra,* for discussion of Regulation A.

remarked: "The SEC says it's a security so *we registered with the SEC*" (*id.* ¶ 51, Ex. 47, p. 539 (emphasis added) and that, "Now, we have the 'JCO' – JOBS Crypto Offering - ... a combination of Reg A, Reg A+, a little sprinkle of Reg S. It keeps you out [of] 'Reg Jail.'" *Id.*, p. 540.

*Misrepresentations regarding the CFTC and NFA.* In addition to falsely claiming to have SEC "approval," defendants further claim that Blockvest's ICO is somehow "registered" with or subject to oversight by the CFTC and the NFA. But as with the SEC, neither the CFTC nor the NFA has approved the BLV ICO—in fact, the NFA has directed Blockvest to cease and desist from mentioning the NFA, a request defendants have disregarded. Roche Decl. ¶¶ 12, 19, Ex. 5, pp. 246-250; Declaration of Saraswati Joshi, *filed concurrently herewith* ("Joshi Decl."), ¶¶ 6a-n; Wilner Decl. ¶ 14, Ex. 10, p. 78.

The sole affiliation that Blockvest, Ringgold and his affiliated persons or entities have with the CFTC or the NFA are Blockvest's registration as a commodity trading advisor ("CTA") with the CFTC in July 2018. *Id.* ¶ 41, Ex.37, pp. 289-299.[6] Yet Blockvest's website misleadingly states, as to the BLV token, that: "'***Under the helpful eye of the CFTC and the NFA***, we look forward to providing certain qualified investors access to this evolving market', the Fund will be managed by [BIG], a commodity pool operator ***registered with the [CFTC] and a member of the [NFA]...***" Supp. Wilner Decl. ¶ 2, Ex. 1, p. 1 (emphasis added). Ringgold also advertises Rosegold as a "CFTC registered commodity trading advisor firm" (Roche Decl. ¶ 8, Ex. 3, p. 212), and Blockvest's website asserts that the company's "chief marketing strategist" George B. Freeman is "licensed" with FINRA and the NFA. *Id.*

---

[6] According to the NFA, a CTA is "an individual or organization that, for compensation or profit, advises others, directly or indirectly, as to the value of or the advisability of trading futures contracts, options on futures, retail off-exchange forex contracts or swaps." *See* https://www.nfa.futures.org/registration-membership/who-has-to-register/cta.html.. Blockvest also sought to register itself as a commodity pool operator ("CPO"), a request that is pending with the NFA. Roche Decl. ¶¶ 9, 19; Joshi Decl. ¶¶ 6a-n.

¶ 14, Ex. 10, p. 72. But neither BIG, Rosegold, Ringgold, or Freeman have such affiliations. Wilner Decl. ¶¶ 41-44, Exs. 37-40, pp. 298-303, 314-315.

In June 2018, the NFA demanded that Blockvest remove its logo, as well as the claim that Blockvest was operating under the NFA or CFTC's "helpful eye," from Blockvest's marketing materials. Roche Decl. ¶ 12, Ex. 5, pp. 249-250. Blockvest's chief financial officer indicated that the company would comply (*id.* Ex. 5, p. 246), yet as of October 2, they had not. Supp. Wilner Decl. ¶ 2, Ex. 1, p. 17. In the course of this correspondence, Blockvest's chief financial officer represented to the NFA that as of September 2018, Blockvest had not yet solicited investors nor received any investor funds (Joshi Decl. ¶6a-d; Roche Decl. ¶ 15, Ex. 8, pp. 287-290)—statements at odds with Blockvest's prior proclamations of millions in dollars raised and BLV tokens sold. Wilner Decl. ¶¶ 14, 48, Exs. 10, 44, pp. 96, 479.

***Misrepresentations regarding Deloitte.*** Like their fictitious affiliations with the SEC, CFTC and NFA, defendants also advertise a relationship with Deloitte that does not exist. Blockvest's website displays Deloitte's logo (Supp. Wilner Decl. ¶ 2, Ex. 1, p. 2; Wilner Decl. ¶ 14, Ex. 10, pp. 80, 104; Roche Decl. ¶ 6, Ex.1, p. 14) claiming that, "Blockchain Investment Funds will be ***Audited by Deloitte*** ...." *Id.* Wilner Decl. ¶ 14, Ex. 10, p. 78; Roche Decl. ¶ 6, Ex. 1, p. 35. Similarly, a Blockvest video that appeared on YouTube states that "...we have ***partnered with Deloitte*** and have built an innovative cryptographic audit technology." *Id.*¶ 50, Ex. 46, p. 515. According to Deloitte, however, the firm has no past or present association with Blockvest, BIG or Ringgold, as an audit client or otherwise, and defendants' use of Deloitte's logo is unauthorized. Declaration of Dale Barnes *filed concurrently herewith* ("Barnes Decl.") ¶¶ 5-7.[7]

---

[7] Though they do not claim direct affiliation with Vanguard, defendants misappropriate its logo, displaying it on Blockvest's website, stating: "Similar to a mutual fund[,] Blockvest is a closed-end hybrid fund with a profit-sharing smart contract that pays quarterly digital dividends." Wilner Decl. ¶ 14, Ex. 10, p. 100; Declaration of Michael I. White *filed concurrently herewith* ("White Decl.") ¶ 7.

### 5.    Defendants' Scheme to Defraud

In addition to their misstatements, Blockvest and Ringgold are perpetrating a pattern of deceptive conduct designed to give the false impression that the Blockvest ICO is a legitimate, safe investment.  First, animating their façade of SEC "approval," Ringgold makes liberal—and wholly unauthorized—use of the SEC's seal, for example on Blockvest's and BIG's webpages.  Wilner Decl. ¶¶ 14, 27, Exs. 10, 23, pp. 80, 179; Supp. Wilner Decl. ¶ 2, Ex. 1, p.2.  When Blockvest's website announced its fictitious SEC Regulation A "approval," it portrayed the SEC's seal behind a "thumbs-up":



*Id.* ¶ 45, Ex. 41, p. 416.  Given that the SEC has in no way "approved" or endorsed defendants' offering, nor authorized defendants to use the SEC's seal, these statements are patently false and misleading.  *Id.* ¶ 8, Ex. 4, pp. 26-28.  Similarly without authorization, Blockvest also currently displays the SEC seal and NFA logo on its website (Supp. Wilner Decl. ¶ 2, Ex. 1, p. 2) and has displayed the NFA logo and the SEC and CFTC seals at Ringgold's speaking engagements.  Wilner Decl. ¶ 21, Ex. 17, p. 163.  The CFTC expressly prohibits the use of its seal.  *Id.* ¶ 40, Ex. 36, pp. 294-297.

Second, defendants are engaging in a pattern of deception through the sham

regulatory agency Ringgold claims to have founded, the "BEC." The BEC purports to be an "independent, non-jurisdictional commission" that "regulate[s] one critical part of the securities industry—Exchanges, Blockchain Start-Ups & ICO firms...." *Id.* ¶¶ 17-23, Exs. 13-19, pp. 149-167. When he announced its launch, Ringgold touted the BEC as an "independent digital securities regulatory compliance firm involved in mitigating regulatory risk including US and Canadian securities/banking compliance." *Id.* ¶ 49, Ex. 45, pp. 495-510. The BEC's name and acronym are not its only features that are deceptively similar to the SEC's: when a user clicks on the BEC logo displayed on Blockvest's website, the hyperlink takes the user to the SEC's website, and the BEC's mission statement, headquarters address and logo mimic the SEC's:

| The SEC | The "BEC" |
|---|---|
| **Mission statement:** "The mission of the SEC is to protect investors; maintain fair, orderly, and efficient markets; and facilitate capital formation." | **Mission statement:** "The mission of the BEC is to protect investors; maintain fair, orderly, and efficient markets within the Blockchain Digital Asset Space; and facilitate capital formation." |
| **Address:** 100 F Street Northeast, Washington, D.C. 20549. | **Address:** 100 F Street Northeast, Washington, D.C. 20549. |
| **Logo:**  | **Logo:**  |

*Id.* ¶¶ 17, 18, 19, 20, 60, Exs. 13, 14, 15, 16, 55, pp. 149-162, 702-720. Fictitious regulators—impersonators of government commissions and agencies—are paradigmatic fraudulent conduct. *Id.* ¶ 9, Ex. 5, pp. 39-46.

In addition to giving the false appearance that the BEC is somehow like or related to the SEC, defendants use the BEC to promote the illusion of safety and security in the Blockvest ICO. Not only does Blockvest display the BEC logo on its webpage (*id.* ¶ 19, Ex. 15, p. 158) but Ringgold promotes the BEC where he sells Blockvest, including on social media channels and at digital asset conferences—such as where he presented at Digi Con, in front of a slide presentation displaying the BEC's, Blockvest's, the CFTC's, and the NFA's logos. *Id.* ¶¶ 21-22, 49, Exs. 17-18, 45, pp. 163-165, 495-508. Or in July 2018, where Ringgold posted on Facebook that BEC and Blockvest DEX were cosponsoring a digital currency conference in Utah. *Id.* ¶ 22, Ex. 18, pp. 164-165. Like their misrepresentations regarding regulatory "approvals," defendants use this mirage of BEC "protection" to deceive investors into believing that the BLVs are a safe investment.

### 6. Defendants' Unregistered Securities Offering

Defendants embrace the notion that BLVs are securities—even claiming, though a misnomer, to have "registered" the offering with the SEC, under one or more exemptions from the registration requirements of the Securities Act. First, defendants in April 2018 filed a Form D with the SEC for a $100 million securities offering, claiming exemption from registration under Regulation D Rule 506(c). *Id.* ¶ 12, Ex. 8, pp. 56-60. Rule 506(c) offerings must be limited to accredited investors, a limitation that Blockvest clearly ignores.[8] Blockvest's ICO and presales are offered on its website without any apparent effort to ascertain investors'

---

[8] Under the federal securities laws, any offer or sale of a security must either be registered with the SEC or meet an exemption. Securities Act Regulation D [17 C.F.R. §§ 230.500 *et seq.*] provides exemptions from the registration requirements, allowing some companies to offer and sell their securities without having to register the offering. When relying on such an exemption, companies must file what is known as a "Form D" after they first sell their securities. Form D includes basic information about the company and the offering. One of the exemptions, Regulation D, Rule 506(c), provides that a company can broadly solicit and generally advertise the offering if the investors in the offering are all accredited; and the company takes reasonable steps to verify that they are accredited.

accreditation status, and Blockvest's website currently boasts that it can offer securities to "***unaccredited*** investors all over the globe". Supp. Wilner Decl. ¶ 2, Ex. 1, p. 201 (emphasis added). Ringgold even tweeted, after filing the Form D, that Blockvest "received our notice from the SEC that ***Blockvest has been registered as an exempt offering of securities.***" *Id.* ¶ 48, Ex. 44, p. 449 (emphasis added). Second, Blockvest's website and Ringgold's presentations invoke Regulation A, claiming exemption from registration under a provision for small-size, qualified offerings.[9] Since Blockvest has not filed a Regulation A securities offering statement, this exemption, too, does not apply. *Id.* ¶¶ 10, 12, Exs. 6, 8, pp. 48, 56-60.

The BLVs indeed have all the characteristics of securities. The BLVs are investments, as evidenced by defendants' claims to have raised $2.5 million from their pre-ICO sales, and to have sold 18% of the offering in this phase. *Id.* ¶¶ 14, 48, Exs. 10, 44, pp. 96, 479. According to Blockvest's whitepaper, investors' ICO and pre-ICO monies will fund Blockvest's planned product offerings. *Id.* ¶ 15, Ex. 11, pp. 125-135. The promised returns will purportedly derive from Blockvest's management's expertise, including Ringgold's "17+ years of experience in the financial markets." *Id.* ¶¶ 10, 14, Exs. 10, 33, pp. 67-77, 263. Highlighting the lack of effort required by investors, Blockvest's website promises that "Simply holding 1000 BLV . . . generates passive income." *Id.* ¶ 15, Ex. 11, p. 126; *see also id.* (comparing Blockvest to a Vanguard mutual fund; White Decl. ¶ 7). Defendants have not registered any offers or sales with the SEC. *Id.* ¶ 10, Ex. 6, pp. 48-50.

---

[9] SEC Regulation A [17 C.F.R. §§ 230.251 *et seq.*] is an exemption from Section 5 registration , limited to eligible issuers as defined in the regulation. The SEC amended Regulation A pursuant to Section 401 of the Jumpstart Our Business Startups (JOBS) Act of 2012 [15 U.S.C. § 77c(b)(2)-(5)]. Section 401 directed the SEC to adopt rules expanding the previous Regulation A by, among other things, exempting public offerings of up to $50 million annually (Regulation A, as amended, is commonly known as "Regulation A+"). Under Regulation A, issuers must comply with different requirements depending on whether the offering is a Tier 1 offering (up to $20 million) or a Tier 2 offering (up to $50 million); in either case, no sale may occur under Regulation A until the issuer has filed an offering statement on Form 1-A and the SEC has issued a notice of qualification.

III.   **ARGUMENT**

   **A.   A Temporary Restraining Order Is Needed**

      **1.   The SEC is seeking a TRO in the public interest**

   Section 20(b) of the Securities Act and Section 21(d) of the Exchange Act authorize the SEC to obtain a restraining order without a bond. *See* 15 U.S.C. §§ 77t(b) & 78u(d). In the Ninth Circuit, emergency injunctive relief may be ordered if there is "either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in the applicant's favor." *U.S. v. Nutri-Cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992) (quotations and citations omitted).[10]

   The SEC appears before the Court "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *Management Dynamics, Inc.*, 515 F.2d at 808. Because this enforcement action is brought in the public interest, the Court's "equitable powers assume an even broader and more flexible character than when only a private controversy is at stake." *Sahni*, 868 F.2d at 1097 (*quoting FTC v. H.N. Singer, Inc.*, 668 F.2d 1107, 1112 (9th Cir. 1982)); *see also U.S. v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 174-75 (9th Cir. 1987) ("The function of a court in deciding whether to issue an injunction authorized by a statute of the [U.S.] to enforce and implement Congressional policy is a different one from that of the court when weighing claims of two private litigants.")

---

[10] Courts have held that it would be "'crucial error'" to "'assum[e] that SEC enforcement actions seeking injunctions are governed by criteria identical to those which apply in private injunction suits'" *SEC v. Schooler*, 902 F. Supp. 2d 1341, 1344 (S.D. Cal. 2012) (*quoting SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975)). In SEC enforcement actions, "[a] *prima facie* case of the probable existence of fraud ... is sufficient to call into play the equitable powers of the court." *SEC v. United Financial Group, Inc.*, 474 F.2d 354, 358 (9th Cir. 1973); *see also Nutri-Cology*, 982 F.2d at 398 ("In statutory enforcement cases where the government has met the 'probability of success' prong of the preliminary injunction test, we presume it has met the 'possibility of irreparable injury' prong because the passage of the statute is itself an implied finding by Congress that violations will harm the public.").

1    District courts in the Ninth Circuit have interpreted the preliminary injunctive
2  relief standard in SEC emergency actions to require that the SEC make only make a
3  two-pronged showing: (1) a *prima facie* case that the defendants have violated the
4  federal securities laws, and (2) a reasonable likelihood that the defendants will repeat
5  their violations. *See, e.g., SEC v. Muehler*, No. 2:18–cv–01677–CAS (SKx) 2018
6  WL 1665637, at **4-5 (C.D. Cal. Apr. 4, 2018); *SEC v. Schooler*, 902 F. Supp. 2d
7  1341, 1345 (S.D. Cal. 2012). Here, the SEC has submitted compelling evidence to
8  establish a *prima facie* case that defendants have violated, and are continuing to
9  violate, the antifraud and registration provisions of the federal securities laws. The
10  SEC has also established that the fraudulent conduct is likely to continue, given
11  defendants' pattern of deception in the planned BLV ICO and its ongoing pre-sales.

12           **2.      The SEC has made the necessary *prima facie* showing**
13                **a.      Defendants are offering and selling securities**

14    Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act
15  define "security" to include "investment contract[s]." As a threshold matter, the
16  interests offered and sold here—whether termed "tokens" or whatever else—are
17  "securities" under the seminal test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293
18  (1946). The *Howey* test looks to whether there is an investment of money in a
19  common enterprise, with a reasonable expectation of profits to be derived from the
20  entrepreneurial or managerial efforts of others. *Id.* at 301; *see also SEC v. Edwards*,
21  540 U.S. 389, 393 (2004); *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1130
22  (9th Cir. 1991). This definition embodies a "flexible rather than a static principle,
23  one that is capable of adaptation to meet the countless and variable schemes devised
24  by those who seek the use of the money of others on the promise of profits." *Howey*,
25  328 U.S. at 299.

26    Here, all three factors are met. First, Blockvest has raised more than $2.5
27  million from investors (including offers and solicitations in the U.S.), for the
28

purchase of BLV tokens (of which they later claimed to have sold 9 million). That some of the investments are in the form of digital assets does not diminish their significance under the first prong of *Howey*. *See U.S. v. Zaslavskiy*, No. 17 CR 647, 2018 WL 4346339, at *5 (E.D.N.Y. Sept. 11, 2018) (denying motion to dismiss criminal claims against promoter of virtual currency ICO, noting under first prong of *Howey* that the investors "invested money (and other forms of payment) to participate in [defendant's] schemes... in exchange for investments in what they were told were investment-backed virtual tokens or coins").

In the Ninth Circuit, the second element, a "common enterprise," is satisfied by the existence of either horizontal commonality (a pooling of investor funds and interests) or strict vertical commonality (the fortunes of the investor are linked with those of the promoter). *See R.G. Reynolds Enters.*, 952 F.2d at 1130. Both are present in this case. Horizontal commonality exists because Blockvest claims that the funds raised will be pooled to form Blockvest's financial products, including describing "[a] profit sharing formula that allows token holders to share in additional revenue"—on a pro-rata basis—"your Blockvest will generate a pro-rated share of 50% of the profit generated quarterly as well as fees for processing transaction." This profit-sharing structure also supports the conclusion that strict vertical commonality exists, as it entails that BLV holders' prospects are interwoven with the Blockvest promoters'. *See Zaslavskiy*, 2018 WL 4346339, at *6 ("That [defendant] promised investors tokens in exchange for their investments does not undercut our conclusion that the Indictment sufficiently alleges a pooling of assets in a common enterprise.").

Relevant to the third prong—the dependence on the efforts of others— Blockvest investors are passive, depending entirely on the efforts of defendants. *See R.G. Reynolds Enters.*, 952 F.2d at 1131 (the third element of *Howey* is met if the actions of others are "undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise"). Blockvest's website and

whitepaper describe that investors can earn "passive income" just by holding BLVs. Defendants' solicitation materials further emphasize that the success of the enterprise will derive from Ringgold's and his associates' financial acumen and experience. Thus, investors have no choice but to rely on defendants' efforts. *See, e.g., SEC v. Glenn W. Turner Enters., Inc.*, 474 U.S. 476, 482 (9th Cir. 1973) (issue in assessing efforts of others is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise").

Defendants themselves characterize BLVs as securities, given that they: (1) filed, albeit improperly, a Form D with the SEC for an exempt securities offering; (2) claim, wrongly, to have qualified a Regulation A exempt securities offering; and (3) state publicly that they registered with the SEC to comply with the securities laws. Nevertheless, in analyzing whether something is a security, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), "and the emphasis should be on economic realities underlying a transaction, and not on the name appended thereto." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975). Defendants are selling the BLVs as an investment, and under *Howey*, they are clearly securities under the federal securities laws. *See ,e.g., SEC v. Titanium Blockchain Infrastructure Svcs., Inc., et al.*, Civil Action No. 18-4315 (C.D. Cal. filed May 22, 2018), Dkt. No. 2 (Slip Opin.) (TRO against digital "tokens" fraud, finding *prima facie* showing investments were securities); *SEC v. PlexCorps*, No. 17 Civ. 7007 (CBA), 2017 WL 6398722, at *2 (E.D.N.Y. Dec. 14, 2017) (same).

### b.  Defendants' offers and sales are unregistered

The SEC has made a *prima facie* showing that defendants Blockvest and Ringgold are violating the registration provisions of the Securities Act. Section 5 prohibits the unregistered offer or sale of securities in interstate commerce, unless an exemption from registration applies. *See SEC v. Eurobond Exchange, Ltd.*, 13 F.3d

1  1334, 1338 (9th Cir. 1994). A defendant violates Section 5 when (i) the defendant,

2  directly or indirectly, offers or sells securities; (ii) no registration is in effect or filed

3  with the SEC for those securities; and (iii) interstate transportation or communication

4  or the mails are used in connection with the offer and sale. *See* 15 U.S.C. §§ 77e(a),

5  77e(c); *SEC v. Phan*, 500 F.3d 895, 902 (9th Cir. 2007).

6      It is beyond dispute that defendants did not register the offer or sale of

7  securities with the SEC. Whether or not they believed that their offering was exempt,

8  the state of defendants' belief as to whether the securities needed to be registered is

9  immaterial, since the SEC does not have to prove their scienter, or even negligence,

10  to sustain a Section 5 claim. *See SEC v. Holschuh*, 694 F.2d 130, 137 n.10 (9th Cir.

11  1982) (scienter and negligence not required for Section 5 claims). Blockvest directly

12  offered and sold BLVs, while Ringgold, Blockvest's control person, is actively and

13  publicly promoting the offering, appearing regularly online, at conferences, and in

14  interviews, to promote the ICO. *See, e.g., Holschuh*, 694 F.2d at140 (holding that

15  while Section 5 applies to persons selling securities directly to others, "[t]o hold that

16  proof of direct contact is necessary would ignore and render meaningless the

17  language of Section 5, which prohibits any person from 'directly or indirectly'

18  engaging in the offer or sale of unregistered securities" (emphasis in original); *SEC v.

19  Murphy*, 626 F.2d 633, 650-51 (9th Cir. 1980) ("[T]hose who ha[ve] a necessary role

20  in the transaction are held liable as participants") (citations omitted); *Pennaluna &

21  Co. v. SEC*, 410 F.2d 861, 864 n.1, 868 (9th Cir. 1969).

22      Once the SEC has established the registration violations, the burden shifts to

23  defendants to prove that an exemption to registration applies. *See CMKM Diamonds,

24  Inc.*, 729 F.3d at1255; *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953); *Murphy*,

25  626 F.2d at 641. Defendants cannot make that showing here. As discussed above, the

26  exemptions referenced in Blockvest's Form D and promotional materials do not

27  apply. Rule 506(c) does not apply because Blockvest has made no apparent effort to

28

ascertain investors' accreditation status, and Ringgold claims that the offering can be sold to "unaccredited investors all over the globe." Supp. Wilner Decl. ¶ 2, Ex. 1, p.201. Regulation A does not apply, among other reasons, because Blockvest has not filed a Regulation A securities offering statement. Nor do any other exemptions apply. The intrastate exemption under Securities Act Section 3(a)(11) of the Securities Act does not apply because the ICO is offered on the internet, to investors across the U.S. and globally. And the offering is not a private placement under Section 4(a)(2), but an ongoing general solicitation. Blockvest sets no minimum investment—indicative of an offering to unaccredited and unsophisticated investors without access to the kind of information a registration statement would disclose. *See Western Fed. Corp. v. Erickson*, 739 F.2d 1439, 1442 (9th Cir. 1984); *Ralston Purina*, 346 U.S. at 125-127.

### c. Defendants are committing fraud

The SEC has made a *prima facie* showing that defendants are violating the antifraud provisions of Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Section 17(a) prohibits fraud in the offer or sale of securities, and Section 10(b)/Rule 10b-5 prohibit fraud in connection with the purchase or sale of any security. *See* 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; *SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 855 (9th Cir. 2001).

***Material misstatements.*** Defendants are making and obtaining money through a litany of false and misleading statements in the Blockvest ICO, in violation of Section 10(b)/Rule 10b-5 (b) of the Exchange Act and Section 17(a)(2) of the Securities Act. To establish a *prima facie* showing of these violations, the SEC must show: (1) a material misrepresentation, misleading statement, or omission (2) made in connection with the purchase or sale of a security (for the SEC's Section 10(b) claim), or that money was obtained by means of these misrepresentations or omissions in the offer or sale of a security (for the SEC's Section 17(a)(2) claim); (3)

1  with the requisite state of mind; and (4) in interstate commerce. *SEC v. Platforms*

2  *Wireless Int'l Corp.*, 617 F.3d 1072, 1092 (9th Cir. 2010); *see also SEC v. Rana*

3  *Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993).[11] A misrepresented or omitted

4  fact is material if there is a substantial likelihood that a reasonable investor would

5  consider it important in making an investment decision. *See Basic Inc. v. Levinson*,

6  485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449

7  (1976); *Platforms Wireless*, 617 F.2d at 1092. Liability arises from affirmative

8  representations and from failures to disclose material information. *Dain Rauscher*,

9  254 F.3d at 855-56. These provisions impose "'a duty to disclose material facts that

10  are necessary to make disclosed statements, whether mandatory or volunteered, not

11  misleading.'" *SEC v. Fehn*, 97 F.3d 1276, 1290 n.12 (9th Cir. 1996).[12]

12      Defendants' entire offering is premised on a series of material falsehoods.

13  Defendants are misrepresenting that Blockvest and/or its ICO have been "approved"

14  by or "registered" with the SEC—even displaying the SEC's seal on Blockvest's

15  website and social media posts. They misleadingly represent that they have

16  approvals from the CFTC and the NFA, notwithstanding the cease-and-desist letter

17

18  [11] Under *Janus Capital Group, Inc. v. First Derivative Traders*, the SEC must show that defendants "made" the misleading statements and omissions for liability

19  under Section 10(b)/Rule 10b-5(b). *See* 131 S. Ct. 2296, 2302 (2011) ("[f]or purposes of Rule 10b-5, the maker of a statement is the person or entity with

20  ultimate authority over the statement, including its content and whether and how to communicate it"). *Janus*, however, does not apply to the SEC's claim that

21  defendants are liable for misrepresentations in violation of Section 17(a)(2). Rather, it is enough that the SEC has established a *prima facie* case that each

22  obtained money by means of misleading statements that they knew, or should have known, were misleading. *See SEC v. Sells*, No. C-11-4941 CW, 2012 WL

23  3242551, at *7 ("*Janus* does not apply to claims premised on §17(a)").

24  [12] Defendants' activities are clearly occurring "in the offer or sale," and "in connection with the purchase or sale" of securities and in interstate commerce.

25  The phrase "in connection with the purchase or sale" of a security is met when the fraud alleged "coincides with a securities transaction." *Merrill Lynch, Pierce,*

26  *Fenner & Smith Inc., v. Dabit*, 547 U.S. 71, 85 (2006). Moreover, "in connection with" requires only that there be "deceptive practices touching" the purchase or

27  sale of securities. *See Superintendent of Ins. v. Bankers Life & Casualty Co.*, 404 U.S. 6, 12-13 (1971); *see also SEC v. Zandford*, 535 U.S. 813, 819 (2002).

28

19

they received. Defendants claim a fake auditing "partnership" with Deloitte, which has nothing to do with Blockvest, Ringgold, or their affiliates. Blockvest and Ringgold are the makers of these statements under *Janus* because the statements appear on Blockvest's online materials, and were made by Ringgold personally. Both defendants have obtained money by means of these statements, based on their public announcements of funds raised, and Ringgold's status as Blockvest's and its' affiliates principal. That Blockvest, Ringgold, and their affiliates are neither "SEC approved," nor "under the helpful eye" of the CFTC or NFA, nor "audited" by Deloitte, would plainly matter to a reasonable investor. *See, e.g., Transworld Airlines v. Catalano,* No. 78 Civ. 1590, 1979 WL 1258, at *2, Fed. Sec. L. Rep. P 97,159 (S.D.N.Y. Oct. 31, 1979) (unauthorized use of name and logo was a material violation of proxy rules); *SEC v. CKB168 Holdings, Ltd.,* 210 F. Supp. 3d 421, 2016 WL 6915859, at **14-15, 17 (E.D.N.Y. Sept. 28, 2016) (finding "no doubt that [the] promoters' false claims of [] legitimacy… were material").

**Scheme to defraud.** Defendants are also engaged in an ongoing scheme to defraud. Sections 17(a)(1) and 17(a)(3) of the Securities Act, and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder, prohibit any person from engaging in a scheme to defraud investors. 15 U.S.C. §§ 77q(a)(1), (a)(3); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a), (c). To be liable, a defendant "must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme." *Simpson v. AOL Time Warner, Inc.,* 452 F.3d 1040, 1048 (9th Cir. 2006), *vacated on other grounds sub nom., Avis Budget Group Inc. v. Cal. State Teachers' Ret. System,* 552 U.S. 1162 (2008) .

Defendants' unauthorized use of the SEC's and CFTC's seals, and the logos of the NFA and Deloitte, create a false appearance of legitimacy for the Blockvest ICO. Further, defendants' creation of a faux "regulator," the BEC, in promoting the Blockvest ICO is inherently deceptive. Ringgold's self-appointed "compliance"

commission disingenuously coopts the SEC's seal, the SEC's mission statement, the SEC's headquarters address, and even a link to the SEC's website. By actively linking the BEC to Blockvest in presentations at conferences, on Blockvest's website, and in social media posts, defendants are purposefully seeking to enhance the false appearance that the Blockvest ICO is subject to some form of oversight, when it is plainly not. Courts have deemed the deceptive use of fake websites part of a scheme to defraud. *See, e.g., SEC v. Penn*, No. 14–CV–581 (VEC), 2017 WL 5515855, at *2 (S.D.N.Y. Aug. 22, 2017) (noting, as part of egregiousness of scheme, creation of "fake website" to promote offering); *SEC v. Cooper*, 142 F.Supp.3d 302, 316 (D.N.J. 2015) (fake website one aspect of scheme).

**_Defendants' scienter and negligence._** While claims under Section 10(b) and Section 17(a)(1) require a showing of scienter, Sections 17(a)(2) and (3) only require a showing of negligence. *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980); *Vernazza v. SEC*, 327 F.3d 851, 859-60 (9th Cir. 2003). Scienter is proven with "'knowing or reckless conduct,' without a showing of 'willful intent to defraud.'" *Vernazza*, 327 F.3d at 860; *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990). To establish negligence, the SEC must show that the defendants failed to conform to the standard of care of a reasonable person. *See Dain Rauscher*, 254 F.3d at 856; *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453–54 (3d Cir.1997).

Defendants fraud is knowing or reckless. Ringgold knows, or is reckless in not knowing, that Blockvest's ICO lacks any regulatory approvals or registrations. Similarly, Ringgold knows, or is reckless in not knowing, that the BEC is not located at SEC headquarters and that its very name, logo and mission statement are confusingly similar to the SEC's. Alternatively, Ringgold's conduct and statements lack reasonable care.[13]

---

[13] As Blockvest's principal, Ringgold's mental state is imputed to it. *See Platforms Wireless Int'l Corp.*, 559 F. Supp. 2d at 1096, *aff'd.*, 617 F.3d 1072 (9th Cir. 2010), citing *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972).

### 3. Defendants' violations are likely to be repeated

In addition to making a *prima facie* showing of defendants' securities laws violations, the record also shows a likelihood that these violations will be repeated. Whether a likelihood of future violations exists depends upon the totality of the circumstances. *See Murphy*, 626 F.2d at 655; *Fehn*, 97 F.3d at 1295-96. The existence of past violations may give rise to an inference that there will be future violations. *See Murphy*, 626 F.2d at 655; *SEC v. United Financial Group, Inc.*, 474 F.2d 354, 358-59 (9th Cir. 1973); *see also Odessa Union Warehouse Co-Op*, 833 F.2d at 176. Courts also consider factors such as the degree of scienter involved, the isolated or recurrent nature of the violative conduct, the defendant's recognition of the wrongful nature of the conduct, the likelihood that, because of the defendant's occupation, future violations may occur, and the sincerity of a defendant's assurances (if any) against future violations. *See Murphy*, 626 F.2d at 655.

This is an ongoing fraudulent offering with a planned ICO. Defendants have acted with a high level of scienter. Defendants are blatantly misrepresenting that their ICO is approved by regulators; using the SEC, CFTC and NFA seals and logos without permission; and tricking investors into confusing their "BEC" entity with the SEC—down to the BEC's very street address. They assured the NFA they would remove misleading statements from their website (they have not), and that they have not solicited any funds yet (they have). They pretend to be audited by Deloitte, while comparing themselves to Vanguard—two companies whose logos they also misappropriate. In short, defendants are raising millions under egregiously false pretenses, and they show no signs of stopping absent this emergency relief.

### B. The Other Relief Sought By The SEC Is Needed

In addition to a restraining order, the SEC also seeks a conduct-based injunction, an asset freeze, an accounting, an order prohibiting the destruction of documents, and expedited discovery, which are well justified here. Federal courts

have "inherent equitable power to issue provisional remedies ancillary to its authority to provide final equitable relief." *Reebok Int'l, Ltd v. Marnatech Enters., Inc.*, 970 F.2d 552, 559 (9th Cir. 1992); *SEC v. Wencke*, 622 F.2d 1363, 1369 (9th Cir. 1980). "[O]nce the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances." *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984).

**Conduct-based injunction**. Enjoining Ringgold from participating in offering digital or other securities, and from making misrepresentations about regulatory approval as to any such offerings, is necessary to prevent Ringgold from duping other investors with similar schemes. Section 21(d)(5) of the Exchange Act permits the Court to grant "any equitable relief that may appropriate or necessary for the benefit of investors." Ringgold's fraudulent conduct and flouting of the NFA's cease-and-desist letter demonstrates that, absent a court order, he will likely continue raising digital funds by misleading investors about the regulatory status of his ventures.

**Asset freeze**. The Court's equitable powers include the authority to freeze assets of both parties and nonparties. *See SEC v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003); *SEC v. Int'l Swiss Invest. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990). The purpose of a freeze order is to prevent the dissipation of assets so they may be available to be paid as disgorgement for the benefit of victims, and to pay a penalty. *See, e.g.*, *Hickey*, 322 F.3d at 1132 (affirming asset freeze over nonparty brokerage controlled by defendant to effectuate disgorgement order); *Manor Nursing*, 458 F.2d at 1105-06 ; *see also SEC v. Unifund SAL*, 910 F.2d 1028, 1041-42 (2d Cir. 1990) (freeze order on an account in an amount equal to the potential disgorgement and civil monetary penalty was appropriate relief). The Ninth Circuit has found that "the public interest in preserving the illicit proceeds [of a defendant's fraud] for restitution to the victims is great" (*FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999); courts have similarly recognized that a disgorgement order may be

1  rendered meaningless unless an asset freeze is imposed prior to the entry of final

2  judgment. *See Unifund SAL*, 910 F.2d at 1041.

3        "A party seeking an asset freeze must show a likelihood of dissipation of the

4  claimed assets, or other inability to recover monetary damages if relief is not

5  granted." *Johnson v. Couturier*, 572 F.3d 1067, 1085 (9th Cir. 2009).[14]  Courts

6  consider the location of the assets in considering whether an asset freeze is

7  warranted. *See, e.g., id.* at 1085; *Manor Nursing*, 458 F.2d at 1106 ("uncertainty

8  existed with respect to the total amount of proceeds received and their location," thus

9  asset freeze was warranted).  Asset freezes can extend to non-parties under common

10  control with the named defendants. *See, e.g., Hickey*, 322 F.3d at 1133 (upholding

11  asset freeze over nonparty where defendant "dominate[d] the entire management of

12  the [non-party] and [could] use its assets for personal, as well as business, ends"

13  showing "absolute control [that] justified" the freeze).

14        Here, Blockvest claims to have raised more than $2.5 million through the sale

15  of BLVs.  At least some of the funds raised appear to be digital assets, which can be

16  transferred and/or secreted almost instantaneously, and are extremely difficult to

17  trace.[15]  Just prior to founding Blockvest, Ringgold opened several accounts under

---

18  [14] In *FSLIC v. Sahni*, the Ninth Circuit held that to obtain an asset freeze, a
19  government agency need only establish that it is likely to succeed on the merits and
   that the mere "possibility" of dissipation of assets exists. 868 F.2d 1096, (9th Cir.
20  1989), *overruled by Winter v. NRDC, Inc.*, 557 U.S. 7 (2008).  The Ninth Circuit
21  then held that *Sahni* was overruled in this respect because the Supreme Court held in
   *Winter* that a private plaintiff must establish a "likelihood of irreparable harm" to
22  obtain a preliminary injunction. *Johnson*, 572 F.3d at 1085 n.11 (9th Cir. 2009).
   For this reason the Ninth Circuit held that to obtain an asset freeze, a private plaintiff
23  must establish likelihood of dissipation of assets rather than a possibility. *Id.*  The
   SEC, unlike a private plaintiff, does not need to establish a likelihood of irreparable
24  harm to obtain interim injunctive relief. *FTC v. Inc21.com Corp.*, 688 F. Supp. 2d
   927, 936 n.17 (N.D. Cal. 2010), *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir.
25  1998).  But under either standard, an asset freeze is warranted.

26  [15] *See, e.g., FTC v. Dluca*, No. 18-60379-CIV (Feb. 28, 2018 S.D. Fla.) (Dkt. No.
   17) (Report of Magistrate on TRO) ("The use of cryptocurrency in the programs
27  promoted by Defendants poses a heightened risk of asset dissipation.  Bitcoin and
   other cryptocurrencies are circulated through a decentralized computer network,
28  without relying on traditional banking institutions or other clearinghouses. This

his pseudonym, El. Accounts in Blockvest's affiliated entities' names, which may hold Blockvest investor funds, show payments to Ringgold (or El). Without a freeze as to Ringgold and his affiliated entities' accounts, it is likely that defendants' pattern of deception will lead to the dissipation of investor funds.

*Accountings, preservation, and expedited discovery.* The Court should also require each of the defendants to prepare accountings—including of particular import any digital assets held by defendants, which might otherwise be untraceable—so the SEC can identify all available assets, to help ensure that funds and assets are frozen properly and available to satisfy any future order of disgorgement or civil penalties against defendants. *See Wencke*, 622 F.2d at 1369; *Int'l Swiss Invest. Corp.*, 895 F.2d at 1276 (ordering an accounting). The Court's broad equitable powers in SEC enforcement actions also include the ability to prohibit document destruction. *See Wencke*, 622 F.2d at 1369. The SEC asks the Court to enter an order prohibiting the destruction of documents to prevent defendants from destroying evidence of their violations. The SEC further requests expedited discovery in support of its application for preliminary injunction.

## IV.  **CONCLUSION**

For the foregoing reasons, the SEC respectfully requests that the Court grant the requested relief.

Dated:  October 2, 2018                Respectfully submitted,


                                       */s/ Amy Jane Longo*
                                       Amy Jane Longo
                                       David S. Brown
                                       Brent W. Wilner
                                       Attorneys for Plaintiff
                                       Securities and Exchange Commission

independence from traditional custodians makes it difficult for law enforcement to trace or freeze cryptocurrencies in the event of fraud or theft."); Wilner Decl. ¶ 7, Ex. 3, p.24.