UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　Plaintiff,<br><br>v.<br><br>BLOCKVEST, LLC and REGINALD BUDDY RINGGOLD, III a/k/a RASOOL ABDUL RAHIM EL,<br><br>　　　　　　　　　Defendants. | Case No.: 18CV2287-GPB(BLM)<br><br>**ORDER GRANTING PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY RESTRAINING ORDER**<br><br>**[FILED UNDER SEAL]** |

　　　Before the Court is Plaintiff's ex parte application for a temporary restraining order ("TRO") freezing assets, prohibiting the destruction of documents, granting expedited discovery and requiring an accounting seeking to halt Defendants' violations of federal securities law. Based on the reasoning below, the Court GRANTS Plaintiff's ex parte application for a TRO.

**Factual Background**

　　　Plaintiff Securities and Exchange Commission ("SEC" or "Plaintiff") filed a Complaint against Defendants Blockvest, LLC and Reginald Buddy Ringgold, III a/k/a Rasool Abdul Rahim El alleging violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act') and Rule 10b-5(b); violations under Section 10(b) of the

1  Exchange Act and Rule 10b-5(a) and Rule 10b-5(c); fraud in violation of Section
2  17(a)(2) of the Securities Act of 1933 ("Securities Act"), fraud in violation of Sections
3  17(a)(1) and 17(a)(3) of the Securities Act; and violations of Sections 5(a) and 5(c) of the
4  Securities Act for the offer and sale of unregistered securities. (Compl.)
5        Defendant Reginald Buddy Ringgold, III, is a resident of San Diego and is a self-
6  described "Financial Markets Investment Coach" and "professor" who claims to have
7  over 17 years of experience in the financial industry as an investment advisor, trader, and
8  investment banker. (Compl. ¶ 12.) Ringgold claims to be the founder of Blockvest,
9  LLC. Defendant Blockvest LLC was formed in April 2018, is based in San Diego and
10 purports to provide various digital asset-related financial products and services. (Id. ¶
11 11.)
12       The instant enforcement action is prompted by Defendants' offer and sale of
13 alleged unregistered securities in the form of digital assets called BLV's. It involves an
14 initial coin offering ("ICO"), which is a fundraising event where an entity offers
15 participants a unique digital "coin" or "token" or "digital asset" in exchange for
16 consideration, often in the form of virtual currency—most commonly Bitcoin and
17 Ether—or fiat currency. (Id. ¶ 18.) The tokens are issued on a "blockchain" or
18 cryptographically secured ledger. (Id. ¶ 19.)
19       The token may entitle its holders to certain rights related to a venture underlying
20 the ICO, such as rights to profits, shares of assets, rights to use certain services provided
21 by the issuer, and/or voting rights. (Id. ¶ 21.) These tokens may also be listed on online
22 trading platforms, often called virtual currency exchanges, and tradable for virtual or fiat
23 currencies. (Id.) ICOs are typically announced and promoted through online channels.
24 Issuers usually release a "whitepaper" describing the project and the terms of the ICO.
25 (Id. ¶ 22.) To participate, investors are generally required to transfer funds (often virtual
26 currency) to the issuer's address, online wallet, or other account. (Id.) After the
27 completion of the ICO, the issuer will distribute its unique "tokens" to the participants'
28 unique address on the blockchain. (Id.)

On July 25, 2017, the SEC issued a Report of Investigation pursuant to Section 21(a) of the Exchange Act that put the digital-asset industry on notice that many digital assets are securities and subject to the federal securities laws and the registration requirements. (Id. ¶ 23.)

Blockvest conducted pre-sales of BLVs in March 2018. According to the whitepaper, BLVs are being sold in several stages: 1) a private sale (with a 50% bonus) that ran through April 30, 2018; 2) currently, a "pre-sale" (with a 20% bonus) from July 1, 2018 through October 6, 2018; 3) the $100 million ICO launch on December 1, 2018. (Compl. ¶ 30; Wilner Decl., Ex. 10 at p. 93; Ex. 11 at p. 127.) On May 6, 2018, Blockvest claimed it raised $2.5 million in 7 days, (Wilner Decl., Ex. 10 at p. 96; Ex. 44 at p. 479), and by September 17, 2018, it had sold 18% of the tokens being offered or around 9 million tokens. (Id.) Blockvest purports to be the "First Licensed and Regulated Tokenized Crypto Currency Exchange & Index Fund based in the US". (Suppl. Wilner Decl., Ex. 1 at p. 3.)

According to the SEC, Blockvest and Ringgold falsely claim their ICO has been "registered" and "approved" by the SEC and even using the SEC's seal on their website. (Wilner Decl., Ex. 41 at p. 416; Suppl. Wilner Decl., Ex. 1 at p. 2.) But the SEC has not approved, authorized or endorsed Defendants, their entities or their ICO. They also falsely claim their ICO has been approved or endorsed by the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA") by utilizing their logos and seals and stating "Under the helpful eye of the CFTC and the NFA, . . the Fund will be managed by [BIG] a commodity pool operator registered with the Commodity Futures Trading Commission and a member of the National Futures Association. . . ." (Suppl. Wilner Decl., Ex. 1 at p.1; id. at p. 2.) But the CFTC and NFA has not approved their ICO. Defendants further falsely assert they are "partnered" with and "audited by" Deloitte Touche Tohmatsu Limited ("Deloitte) but that is also not true. (Barnes Decl. ¶ 7.) In order to create legitimacy and an impression that their investment is safe, Defendants also created a fictitious regulatory agency, the Blockchain Exchange

Commission ("BEC") creating its own fake government seal, logo and mission statement that are nearly identical to the SEC's seal, logo and mission statement. (Wilner Decl., Exs. 13-19 at p. 149-67.) Moreover, BEC's "office" is the same address as the SEC headquarters. (Wilner Decl., Ex. 14.)

Plaintiff contends that Ringgold is scheduled to appear at two events in Los Angeles on October 9, 2018 and in Orange County, on October 11, 2018 where he will likely continue promoting Blockvest and BEC in order to raise additional monies from investors for the intended December 2018 ICO. By lying to investors and perpetrating a fraudulent scheme through the Blockvest ICO, each of the defendants is violating the antifraud provisions of Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5, as well as the securities offering registration provisions of Section 5 of the Securities Act. In the instant application for temporary restraining, Plaintiff seeks to halt Defendants' fraudulent conduct by freezing their assets, prohibiting the destruction of documents, seeking expedited discovery and an accounting of Defendants' assets.

## Discussion

### A.   Temporary Restraining Order

The purpose of a TRO is to preserve the status quo before a preliminary injunction hearing may be held; its provisional remedial nature is designed merely to prevent irreparable loss of rights prior to judgment. Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, 415 U.S. 423, 439 (1974). The legal standard that applies to a motion for a TRO is the same as a motion for a preliminary injunction. See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001).

The party moving for an injunction bears the burden to demonstrate the factors justifying relief. Granny Goose Foods, 415 U.S. at 441. Because the SEC is a governmental agency acting as a "statutory guardian charged with safeguarding the public interest in enforcing the securities laws", SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975), courts have adopted a two part factor test requiring the SEC to

show "(1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1199 n. 2 (11th Cir. 1999) (citing Mgmt. Dynamics, Inc., 515 F.2d at 806–07; SEC v. Manor Nursing Ctrs, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972)); see also SEC v. Schooler, 902 F. Supp. 2d 1341, 1345 (S.D. Cal. 2012) (using the two-part standard when determining whether to issue a preliminary injunction requested by the SEC); SEC v. Capital Cove Bancorp LLC, SACV 15-980-JLS(JCx), 2015 WL 9704076, at *5 (C.D. Cal. Sept. 1, 2015) (same).

**B.   Prima Facie Case of Securities Violations**

  **1.   Sections 5(a) and 5(c) of the Securities Act**

Sections 5(a) and 5(c) of the Securities Act prohibit the interstate sale of unregistered securities. 15 U.S.C. §§ 773(a) & (c). "In order to establish a Section 5 violation, [plaintiff] must point to evidence that: (1) no registration statement was in effect as to the securities; (2) [defendant] sold or offered to sell the securities; and (3) the sale or offer was made through interstate commerce." SEC v. Phan, 500 F.3d 895, 908 (9th Cir. 2007) (quoting Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 212 (3d Cir. 2006)). Once the SEC provides evidence that the registration provisions have been violated, the burden shifts to the defendant to show that an exemption applies. SEC v. Murphy, 626 F.2d 633, 641 (9th Cir. 1980).

On April 16, 2018, Blockvest filed Form D for a $100 million dollar securities offering of BLVs claiming an exemption from registration under Securities Act Regulation D, Rule 506(c). (Wilner Decl., Ex. 8.) Securities Act Regulation D provides exemptions from the registration requirements. 17 C.F.R. §§ 230.500 *et seq*. Specifically, Rule 506(c) allows an exemption if the purchasers of securities in the offering are accredited investors, and the company takes reasonable steps to verity that the investors are accredited investors. 17 C.F.R. § 230.506(c). On information and belief, the complaint claims that Blockvest did not take reasonable steps to ensure BLV investors are accredited. (Compl. ¶ 45.) Moreover, contrary to the exemption

requirements, its website states that it can offer securities to "unaccredited investors all over the globe." (Suppl. Wilner Decl., Ex. 1 at 201[1].)

Furthermore, despite the fact that Blockvest filed a Form D with the SEC, its website invokes the exemption under Securities Act Regulation A, 17 C.F.R. § 230.251 *et seq*. (Compl. ¶¶ 46, 47.) Its website states that the company is "now SEC Reg A+ compliant and can offer their securities offering to Unaccredited Investors all over the globe." (Compl. ¶ 49; Suppl. Wilner Decl., Ex. 1 at 201.) Despite these public assertions, Blockvest has not filed a Regulation A securities offering statement; therefore, this exemption does not apply. (Wilner Decl., Exs. 6, 8.)

The SEC's Office of Records Management Services attests that no filings have been received under the names of the Defendants as well as any of the officers of Blockvest in this case. (Wilner Decl. ¶¶ 9, 10; Exs. 6, 7.) Yet, around July 29, 2018, Ringgold posted a video online where he falsely stated, "The SEC says it's a security so we registered with the SEC." (Wilner Decl., Ex. 47.) Plaintiff has demonstrated a prima facie violation of Sections 5(a) and 5(c) of the Securities Act.

### 2. Securities Fraud

Plaintiff alleges securities violations under Sections 17(a)(1), (2) and (3) of the Securities Act and under Section 10 of the Exchange Act and Rules 10b-5(a), (b) and (c).

Section 17(a) provides,

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1) to employ any device, **scheme, or artifice to defraud**, or
>
> (2) to obtain money or property by means of any **untrue statement of a material fact** or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

---

[1] The Court notes that there are two pages numbered 201. It is the second page 201 that is referenced.

> (3) to engage in any transaction, practice, or course of business which operates or would operate **as a fraud or deceit upon the purchaser**.

15 U.S.C. § 77q (emphasis added).

Section 10(b) provides that it is unlawful "[t]o use of or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Relatedly, Rule 10b–5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, **scheme, or artifice to defraud**,
>
> (b) To make any **untrue statement of a material fact** or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a **fraud or deceit upon any person**,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (emphasis added).

"Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5, prohibit fraudulent conduct or practices in connection with the offer or sale of securities" by means of interstate commerce. <u>SEC v. Dain Rauscher, Inc.</u>, 254 F.3d 852, 855 (9th Cir. 2001). Allegations under Section 17 and Rule 12b-5 require that a defendant (1) made a material misrepresentation or omission, Section 17(a)(1) and Rule 12b-5(b); or employed a scheme to defraud, Section 17(a)(1) and Rule 12b-5(a); or

engaged in a practice that operates as a fraud or deceit upon the purchaser, Section 17(a)(3), and Rule 12b-5(c); (2) in connection with the purchase of a sale or security (3) with scienter, Section 17(a)(1), Rule 10b-5; or with negligence, Sections 17(a)(2) and (a)(3); and (4) in interstate commerce. See e.g., SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1092 (9th Cir. 2010) (citation omitted).

### a. Digital Coins As Securities

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Securities Exchange Act define "security" as *inter alia*, a "note, stock, treasury stock, bond, [or] investment contract." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). In determining whether the digital coin is a security, courts should examine the transaction in order to "determine the motivations that would prompt a reasonable seller and buyer to enter into it. If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a 'security.'" Reves v. Ernst & Young, 494 U.S. 56, 66 (1990). Courts should also examine the "plan of distribution" of the instrument "to determine whether it is an instrument in which there is 'common trading for speculation or investment.'" Id. Finally, courts should examine the "reasonable expectations of the investing public." Id.

Here, the purpose of the coin offering is to raise money, and in fact investors have spent more than $2.5 million to purchase the BLV tokens and have sold 18% of the offering. (Wilner Decl., Ex. 10 at 96; Ex. 44 at 479.) The whitepapers state that the investor's monies will fund Blockvest's planned products offerings. (Wilner Decl., Ex. 11 at p. 125-35.) The returns will be derived from Blockvest's management expertise as well as Ringgold's 17+ years experience in the financial markets. (Wilner Decl., Exs. 10, 33 at p. 66-67, 263.) The buyers are interested primarily in the profit the BLVs are expected to generate given that Blockvest's website promises that holding BLVs will generate passive income. (Wilner Decl., Ex. 11 at p. 126.) Moreover, Defendants also characterized the BLVs as securities by filing a Form D with the SEC, claimed to have

qualified for a Regulation A exempt securities offering; and publically stated in marketing and promotional materials that they have complied with the securities law. (Compl. ¶ 40.) Based on what has been presented, the Court concludes that the BLVs have the characteristics of securities.

### b. Material Misrepresentation/Scheme to Defraud/Fraud Upon the Purchaser

A "violation of Section 10(b) and Rule 10b–5[b] is established if the defendant (1) made a material misrepresentation or omission " 17 C.F.R. § 240.10b-5. Similarly, under Section 17(a)(2), a violation is demonstrated if defendant made any "untrue statement of a material fact." 15 U.S.C. § 77q. An omitted fact is material "if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." Id.

Defendants' ICO offering is based on a numerous material misrepresentations. They include that Blockvest and its ICO have been "approved" or "registered" with the SEC and even displaying the SEC's seal on Blockvest's website and social media posts. (Wilner Del., Ex. 41 at p. 416.) They also falsely represent that they have approvals from the CFTC and the NFA despite a cease and desist letter by the NFA. (Roche Decl. ¶¶ 11, 12, 19; Wilner Decl., Ex. 1 at p. 2; id., Ex. 17 at 163.) They also falsely claim a "partnership" and being "audited by" by Deloitte. (Barnes Decl. ¶ 7.) Defendants' public assertions are material misrepresentations.

Next, Section 17(a)(1) of the Securities Act and Rule 10b-5(a) of Section 10(b) of the Exchange Act prohibit any person from engaging in a scheme to defraud investors. 15 U.S.C. § 77q(a)(1); 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5(a). Section 17(a)(3) of the Securities Act and Rule 10b-5(c) of Section 10(b) of the Exchange Act prohibit a person from engaging in an act, practice, or course of business which operates as a fraud or deceit upon any person in connection with a security. 15 U.S.C. § 77q(a)(3); 15 U.S.C. § 78j(b); 17 C.F.R. §§ 240.10b-5(c).

To be liable for a scheme to defraud, a defendant must have "committed a manipulative or deceptive act in furtherance of the scheme." Cooper v. Pickett, 137 F.3d 616, 624 (9th Cir. 1997). Specifically,

> to be liable as a primary violator of § 10(b) for participation in a "scheme to defraud," the defendant must have engaged in conduct that had the principal purpose and effect of creating a false appearance of fact in furtherance of the scheme. It is not enough that a transaction in which a defendant was involved had a deceptive purpose and effect; the defendant's own conduct contributing to the transaction or overall scheme must have had a deceptive purpose and effect.

Simpson v. AOL Time Warner, Inc., 452 F.3d 1040, 1048 (9th Cir. 2006), vacated on other grounds by Simpson v. Homestore.com, 519 F.3d 1041, 1041-42 (9th Cir. 2008). On the other hand, Section 17(a)(3) "focuses upon the effect of particular conduct on members of the investing public, rather than upon the culpability of the person responsible. Aaron v. SEC, 446 U.S. 680, 697 (1980).

Here, Defendants' use of the SEC and CFTC's seals and the logos of the NFA and Deloitte create a false appearance of legitimacy for the Blockvest ICO. Moreover, Defendants' creation of the BEC, a false "regulator", to promote the validity of ICO as regulated is deceptive. Furthermore, BEC's adoption of the SEC's seal, the SEC's mission statements, the SEC's headquarters address, and even a link to the SEC's website create a false appearance that the ICOs are regulated when in fact, they are not. Defendants' conduct contributed to the scheme to deceive, and as a result, has the effect of deceiving potential investors. Therefore, Plaintiff has demonstrated a scheme to defraud and that Defendants' acts cause fraud or deceit upon potential investors.

### c. Scienter/Negligence

Violations of Section 17(a)(1), Section 10(b) and Rule 10b–5 require scienter. Dain Rauscher, 254 F.3d at 856. "Violations of Sections 17(a)(2) and (3) require a showing of negligence." Id.

"Scienter" refers to "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n. 12 (1976). Scienter requires "requires either 'deliberate recklessness' or 'conscious recklessness,' and that it includes a 'subjective inquiry' turning on 'the defendant's actual state of mind." SEC v. Platforms Wireless Intern. Corp., 617 F.3d 1072, 1093 (9th Cir. 2010) (citation omitted). To be reckless, conduct must be "an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must be aware of it." Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1569 (9th Cir. 2010). To establish negligence, Plaintiff must show Defendants failed to exercise reasonable care in obtaining or communicating the information. S.E.C. v. Hughes Capital Corp., 124 F.3d 449, 453 (3d Cir. 1997).

Plaintiff claims that Defendants' fraud is knowing and reckless and that their conduct and actions lack reasonable care. Ringgold knows the Blockvest's ICO has not received any regulatory approvals or registrations, was not audited by Deloitte, and that the BEC is not a legitimate regulatory agency. The SEC has shown a prima facie case of scienter in addition to the lesser negligence standard.

### d. Interstate Commerce

The term "interstate commerce" means trade or commerce in securities or any transportation or communication relating thereto among the several States . . . ." 15 U.S.C. § 77b(7). "The interstate commerce element of a Section 17(a) claim is satisfied where the defendant uses the telephone, Internet, or e-mail to accomplish the alleged fraud." SEC v. Tourre, No. 10 Civ. 3229(KBF), 2013 WL 2407172, at *11 (S.D.N.Y. June 4, 2013) (citing SEC v. Shehyn, No. 04 Civ.2003, 2010 WL 3290977, at *4–5 (S.D.N.Y. Aug. 9, 2010)).

Here, Plaintiff alleges that Defendants are using the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange. (Comp. ¶¶ 146, 150, 154, 158, 162.) Defendants' ICO is marketed and advertised at

conferences, on the internet such as Facebook, Twitter and their website. Plaintiff has demonstrated that Defendants' conduct satisfies the interstate commerce prong.

In sum, the Court concludes the SEC has made a prima facie showing that Defendants are violating the anti-fraud provisions of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and related Rule 10b-5.

### C. Reasonable Likelihood that the Wrong will be Repeated

On the second factor for injunctive relief, in determining a reasonable likelihood of future violations, the court must look at the totality of the circumstances concerning Defendants and their violations. See SEC v. Murphy, 626 F.2d 633, 655 (9th Cir. 1980) (addressing permanent injunction). Past violations "may give rise to an inference that there will be future violations" and courts should factors such as "degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations." Id.

Plaintiff has shown that the securities violations will be repeated as Defendants' fraud is ongoing as they are planning for a large ICO in December. Defendants are also planning to speak at events entitled "VCs, Angels, Crypto and ICOs" in Los Angeles on October 9, 2018 and Orange County on October 11, 2018 to garner more investors.

Because Plaintiff has demonstrated the two factor test to warrant a temporary restraining order, the Court GRANTS Plaintiff's application for a TRO.

### D. Ex Parte Application for TRO Without Notice to Defendants

Plaintiff seeks an ex parte TRO without notice to Defendants as provided under Rule 65(b)(1).

Federal Rule of Civil Procedure 65(b)(1) provides that a "court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the

adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65.  The United States Supreme Court has held that there are stringent restrictions imposed by Rule 65 because "our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and an opportunity to be heard has been granted both sides of a dispute."  Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Almeda Cnty., 415 U.S. 423, 438-49 (1974).

Here, Plaintiff's counsel states that the Court should consider this ex parte TRO without prior notice to Defendants due to immediate and irreparable injury if Defendants are made aware of the TRO application.  Because Defendants have violated and continue to violate the antifraud provisions of the federal securities laws, if they become aware of the ex parte application, they will likely continue their fraudulent conduct by dissipating funds or placing them beyond the reach of the Court.  (Wilner Decl. ¶¶ 68, 70.)  This concern is heightened because the case concerns digital assets which can be transferred or secreted instantly and are difficult to trace.  (Brief in Support of Waiver of Notice at p. 3.)

The Court concludes that the SEC has sufficiently demonstrated that notice to Defendants would cause irreparable harm to innocent investors and will grant the request to hear the ex parte TRO application without prior notice to Defendants in order to preserve investor funds and assets as well as to prevent the destruction of documents and evidence.  See Fed. R. Civ. P. 65(b)(1).

**Conclusion**

Based on the above, the Court GRANTS Plaintiff's ex parte application for temporary restraining order freezing assets, prohibiting destruction of documents,

/ / / /

/ / / /

/ / / /

/ / / /

1  granting expedited discovery and requiring an accounting.  An accompanying order
2  detailing the temporary restraining order shall be filed.
3       IT IS SO ORDERED.
4  Dated:  October 5, 2018

Hon. Gonzalo P. Curiel
United States District Judge