UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>　　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>BLOCKVEST, LLC and REGINALD BUDDY RINGGOLD, III a/k/a RASOOL ABDUL RAHIM EL,<br><br>　　　　　　　　　　　　Defendants. | Case No.: 18CV2287-GPB(BLM)<br><br>**ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>**[Dkt. No. 30]** |

　　　　Before the Court is Plaintiff's order to show cause why a preliminary injunction should not issue after the Court granted Plaintiff's ex parte application for a temporary restraining order freezing assets, prohibiting the destruction of documents, granting expedited discovery, requiring accounting and order to show cause why a preliminary injunction should not be granted on October 5, 2018.[1] (Dkt. No. 6.) The Court granted the parties' two joint motions to extend the temporary restraining order and hearing on the order to show cause to November 16, 2018. (Dkt. Nos. 15, 17.)

---

[1] The Court also granted Plaintiff's motion to seal all documents "until two business days after the Court issues its ruling on the TRO Application." (Dkt. No. 4.)

In compliance with the temporary restraining order, Defendants filed Ringgold's Declaration of Accounting on October 26, 2018, and a First Supplemental Declaration of Ringgold on November 2, 2018. (Dkt. Nos. 18, 21.) Defendants filed a response to the order to show cause on November 2, 2018. (Dkt. Nos. 23, 24, 25.) On November 7, 2018, Plaintiff filed a reply. (Dkt. Nos. 27, 28.)

A hearing was held on November 16, 2018. Amy Long, Esq., Brent Wilner, Esq., and David Brown, Esq. appeared on behalf of the SEC. (Dkt. No. 37.) Stanley Morris, Esq. and Brian Corrigan, Esq. appeared on behalf of Defendants. (Id.) Based on the review of the briefs, the supporting documentation and the applicable law, the Court DENIES Plaintiff's motion for preliminary injunction.

## Factual Background

Plaintiff Securities and Exchange Commission ("SEC" or "Plaintiff") filed a Complaint against Defendants Blockvest, LLC and Reginald Buddy Ringgold, III a/k/a Rasool Abdul Rahim El alleging violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act') and Rule 10b-5(b); violations under Section 10(b) of the Exchange Act and Rule 10b-5(a) and Rule 10b-5(c); fraud in violation of Section 17(a)(2) of the Securities Act of 1933 ("Securities Act"), fraud in violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act; and violations of Sections 5(a) and 5(c) of the Securities Act for the offer and sale of unregistered securities. (Dkt. No. 1, Compl.)

Defendant Reginald Buddy Ringgold, III ("Ringgold"), is the chairman and founder of Defendant Blockvest, LLC ("Blockvest") (collectively "Defendants"), a Wyoming limited liability company that was set up to exchange cryptocurrencies but has never become operational. (Dkt. No. 24, Ringgold Decl. ¶ 4.) Blockvest Investment Group, LLC owns 100% of Blockvest LLC. (Id.) Ringgold owns 51% of the membership interests of Blockvest Investment Group, LLC, 9% are unissued, 20% is owned by Michael Shepperd, and the remaining 20% is owned by Ringgold's mother. (Id.)

The complaint alleges that Defendants have been offering and selling alleged unregistered securities in the form of digital assets called BLV's. It involves an initial coin offering ("ICO"), which is a fundraising event where an entity offers participants a unique digital "coin" or "token" or "digital asset" in exchange for consideration, often in the form of virtual currency—most commonly Bitcoin and Ether—or fiat currency. (Dkt. No. 1, Compl. ¶ 18.) The tokens are issued on a "blockchain" or cryptographically secured ledger. (Id. ¶ 19.) The token may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights. (Id. ¶ 21.) These tokens may also be listed on online trading platforms, often called virtual currency exchanges, and tradable for virtual or fiat currencies. (Id.) ICOs are typically announced and promoted through online channels and issuers usually release a "whitepaper" describing the project and the terms of the ICO. (Id. ¶ 22.) To participate, investors are generally required to transfer funds (often virtual currency) to the issuer's address, online wallet, or other account. (Id.) After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain. (Id.)

According to the complaint, Blockvest conducted pre-sales of BLVs in March 2018. According to the whitepaper, the BLVs are being sold in several stages: 1) a private sale (with a 50% bonus) that ran through April 30, 2018; 2) currently, a "pre-sale" (with a 20% bonus) from July 1, 2018 through October 6, 2018; and 3) the $100 million ICO launch on December 1, 2018. (Dkt. No. 1, Compl. ¶ 30; Dkt. No. 3-12, Wilner Decl., Ex. 10 at p. 93; Dkt. No. 3-13, Wilner Decl., Ex. 11 at p. 127.) On May 6, 2018, Blockvest claimed it raised $2.5 million in 7 days, (Dkt. No. 3-12, Wilner Decl., Ex. 10 at p. 96; Dkt. No. 3-19, Ex. 44 at p. 479), and by September 17, 2018, it had sold 18% of the tokens being offered or around 9 million tokens. (Id.) Blockvest purports to be the "First Licensed and Regulated Tokenized Crypto Currency Exchange & Index Fund based in the US". (Dkt. No. 3-23, Suppl. Wilner Decl., Ex. 1 at p. 3.)

According to the SEC, Blockvest and Ringgold falsely claim their ICO has been "registered" and "approved" by the SEC and using the SEC's seal on the website. (Dkt. No. 3-18, Wilner Decl., Ex. 41 at p. 416; Dkt. No. 3-23, Suppl. Wilner Decl., Ex. 1 at p. 2.) But the SEC has not approved, authorized or endorsed Defendants, their entities or their ICO. They also falsely claim their ICO has been approved or endorsed by the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA") by utilizing their logos and seals and stating "Under the helpful eye of the CFTC and the NFA . . . the Fund will be managed by Blockvest Investment Group, LLP, a commodity pool operator registered with the Commodity Futures Trading Commission and a member of the National Futures Association. . . ." (Dkt. No. 3-23, Suppl. Wilner Decl., Ex. 1 at p.1; id. at p. 2.) But the CFTC and NFA have not approved their ICO. Defendants further falsely assert they are "partnered" with and "audited by" Deloitte Touche Tohmatsu Limited ("Deloitte) but that is also not true. (Dkt. No. 3-3, Barnes Decl. ¶ 7.) In order to create legitimacy and an impression that their investment is safe, Defendants also created a fictitious regulatory agency, the Blockchain Exchange Commission ("BEC"), creating its own fake government seal, logo, and mission statement that are nearly identical to the SEC's seal, logo and mission statement. (Dkt. No. 3-13, Wilner Decl., Exs. 13-19 at p. 149-67.) Moreover, BEC's "office" is the same address as the SEC's headquarters. (Dkt. No. 3-13, Wilner Decl., Ex. 14.)

In response, Ringgold asserts that Blockvest has never sold any tokens to the public and has only investor, Rosegold Investments LLP, ("Rosegold") which is run by him where he has invested more than $175,000 of his own money. (Dkt. No. 24, Ringgold Decl. ¶ 5.) Blockvest utilized BLV tokens during the testing and development phase and a total of 32 partner testers were involved. (Id.)

During this testing, 32 testers put a total of less than $10,000 of Bitcoin and Ethereum onto the Blockvest Exchange where half of it remains today. (Id. ¶ 6.) The other half was used to pay transactional fees to unknown and unrelated third parties. (Id. ¶ 7.) No BLV tokens were ever released from the Blockvest platform to the 32

testing participants.  (Id. ¶ 6.)  The BLV tokens were only designed for testing the platform and the testers would not and could not keep or remove BLV tokens from the Blockvest Exchange.  (Id.)  Their plan was to eventually issue a "new utility Token BLVX on the NEM Blockchain for exclusive use on the BlockVest Exchange."  (Id.)  Ringgold never received any money from the sale of BLV tokens.  (Id. ¶ 7.)  The deposits are from digital wallet addresses and individuals that are not easily identifiable, but Ringgold believes that only affiliated persons would have deposited Bitcoin or Ethereum on the exchange and received nothing without complaining.  (Id.)  The Blockvest Exchange platform was never open for business.  (Id.)

Ringgold is also a principal in Master Investment Group and a trustee of Rosegold Investment Trust, partners of Rosegold Investment, LLP, a Delaware limited liability partnership formed in April 2017.  (Id. ¶ 10.)  Rosegold manages Blockvest and finances Blockvest's activities, as Blockvest, itself, has no bank accounts or assets, other than the work-in-progress development of a cryptocurrency exchange of unknown value.  (Id.)  The Rosegold bank account was opened in September 2017.  (Id.)

Ringgold personally invested over $175,000 in Rosegold and Michael Sheppard, Blockvest's CFO invested about $20,000.  (Id. ¶ 11.)  Other investors in Rosegold are his friends and family and Sheppard's friends and family.  (Id.)  At times, these investors loaned Ringgold or Sheppard money personally and they in turn, invested the money into Rosegold as their personal investment.  (Id.)  17 individuals have loaned or invested money in Rosegold Investments.  (Id. ¶ 12; id., Ex. 2.)  Most of these individuals confirm they did not buy BLV tokens or rely on any of the representations the SEC has alleged were false.[2]  (Id.)  Ringgold claims he never received anything of value from the offer or sale of BLV tokens to anyone.  (Id. ¶ 13.)

---

[2] Of the 17 individuals, nine individuals signed declarations asserting that they did not buy BLV tokens or rely on any representations by Defendants that the SEC asserts were false. (Dkt. No. 24, Ringgold Decl., Ex. 2.)  The SEC points out that the remaining eight individuals wrote "Blockvest" and/or "coins" on their checks.

Ringgold recognizes that mistakes were made but no representations or omissions were made in connection with the sale and purchase of securities. (Id. ¶ 14.) They were in the early stages of development as the Chief Compliance Officer had not yet reviewed all the materials. (Id. ¶ 16.) Ringgold states it was his intention to comply with "every possible regulation and regulatory agency." (Id.) Currently, he has ceased all efforts to proceed with the ICO and agrees not to proceed with an ICO until he gives SEC's counsel 30 days' notice. (Id. ¶ 17.) He claims that because all his assets are frozen, he is unable to pay his counsel or third party professionals for defending this litigation and to compensate Mike Sheppard and himself for living expenses and also to support his small children as he is their primary source of funds for living expenses. (Id. ¶¶ 18, 19.) Currently, the only assets Ringgold has is Rosegold's bank account which has less than $40,000. (Id. ¶ 18; see Dkt. No. 21-1, Ringgold First Suppl. Decl., Ex. 1.)

In reply, the SEC argues that Defendants admit to receiving funds from at least 32 investors in exchange for anticipated BLV tokens. While Defendants' accounting claims that less than $10,000 were received for BLV tokens from third parties, the documents shows transactions in excess of $180,000. (Dkt. No. 27-16, Brown Decl., Ex. 15.) The SEC claims that Defendants also admit that Rosegold, which "manages Blockvest and finances Blockvest's activities" had 17 other investors during the pre-ICO solicitations and at least eight investors wrote "coins" or "Blockvest" on the checks. (Dkt. No. 27-21, Brown Decl., Ex. 19.)

**Discussion**

**A.  Preliminary Injunction**

The legal standard that applies to a motion for a TRO is the same as a motion for a preliminary injunction. See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001). The party moving for an injunction bears the burden to demonstrate the factors justifying relief. Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers, 415 U.S. 423, 441 (1974). Because the SEC is a governmental agency acting as a "statutory guardian charged with safeguarding the

public interest in enforcing the securities laws", SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975), courts have adopted a two part factor test requiring the SEC to show "(1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1199 n. 2 (11th Cir. 1999) (citing Mgmt. Dynamics, Inc., 515 F.2d at 806–07; SEC v. Manor Nursing Ctrs, Inc., 458 F.2d 1082, 1100 (2d Cir. 1972)); see also SEC v. Schooler, 902 F. Supp. 2d 1341, 1345 (S.D. Cal. 2012) (using the two-part standard when determining whether to issue a preliminary injunction requested by the SEC); SEC v. Capital Cove Bancorp LLC, SACV 15-980-JLS(JCx), 2015 WL 9704076, at *5 (C.D. Cal. Sept. 1, 2015) (same).

"The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged in except in a case clearly warranting it. . . . [O]n application for preliminary injunction the court is not bound to decide doubtful and difficult questions of law or disputed questions of fact." Dymo Indus., Inc. v. TapePrinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964) (citation omitted); see also Mayview Corp. v. Rodstein, 480 F.2d 714, 719 (9th Cir. 1973) (reversing grant of preliminary injunction based on existence of disputed factual issues).

**B.      Prima Facie Case of Past Securities Violations**

Plaintiff alleges Defendants violated the registration requirements under Sections 5(a) and 5(c) of the Securities Act of 1933[3] as well as the antifraud provisions of Section 10(b) of the Securities Exchange Act of 1934 and Rules 10b-5(a), (b) and (c), and

---

[3] Sections 5(a) and 5(c) of the Securities Act prohibit the interstate sale of unregistered securities. 15 U.S.C. §§ 773(a) & (c). "In order to establish a Section 5 violation, [plaintiff] must point to evidence that: (1) no registration statement was in effect as to the securities; (2) [defendant] sold or offered to sell the securities; and (3) the sale or offer was made through interstate commerce." SEC v. Phan, 500 F.3d 895, 908 (9th Cir. 2007) (quoting Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 212 (3d Cir. 2006)).

Sections 17(a)(1), (2), and (3) of the Securities Act of 1933.[4] (Dkt. No. 1, Compl.) In their opposition, Defendants solely challenge the SEC's claims arguing that the test BLV

---

[4] Section 17(a) provides,

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q.

Section 10(b) provides that it is unlawful "[t]o use of or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Relatedly, Rule 10b–5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

tokens are not "securities" as defined under the federal securities law. Because they are not securities, Plaintiff's causes of action fail. Defendants do not dispute the other elements for alleged violations of Sections 5 and 17 of the Securities Act and Section 10(b) of the Securities Exchange Act and Rules 10b-5.

### 1. Whether the BLV Token is a "Security" Subject to Securities Law

Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Securities Exchange Act define "security" as *inter alia*, a "note, stock, treasury stock, bond, [or] investment contract." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). Although the definition of a "security" in the Securities Act of 1933 is slightly different than the Securities Exchange Act of 1934, the two definitions have been held to be "virtually identical." Amfac Mort. Corp. v Arizona Mall of Tempe, Inc., 583 F.2d 426, 431 (9th Cir. 1978) (citing Tcherepnin v. Knight, 389 U.S. 332, 335-336 (1967)); United California Bank v. THC Financial Corp., 557 F.2d 1351, 1356 (9th Cir. 1977) ("The two definitions, however, are considered functional equivalents.").

In its moving papers, the SEC claims that under the three-part test articulated in SEC v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946), the BLV tokens are "securities." Defendants argue that the BLV tokens are not "securities" as defined under Howey.

Congress defined "security" to be "sufficiently broad to encompass virtually any instrument that might be sold as an investment" but did not "intend to provide a broad federal remedy for all fraud." Reves v. Ernst & Young, 494 U.S. 45, 61 (1990) (internal quotations omitted). Courts should look not to the form but to the "economic realities of the transaction." United Hous. Fdn. v. Forman, 421 U.S. 837, 838 (1975).

In Howey, the Court defined whether an investment contract is a security under the Securities Act and held that an investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." SEC v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946). The Court noted that the Securities Act prohibits not only the sale but also the offer of an unregistered, non-exempt security so the fact that purchasers

choose not to accept the full offer is not relevant. Id. at 300-01. Although Howey's holding was limited to "investment contracts," the Supreme Court later found that this three-prong test "embodies the essential attributes that run through all of the Court's decisions defining a security." Forman, 421 U.S. at 852; but see Reves, 494 U.S. at 64 (establishing approach to determine whether a "note" is a "security" and rejecting circuit court's analysis of note under Howey test as the instrument in Howey being an "entirely different variety of instrument").

Howey's three-part test requires "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." SEC v. Rubera, 350 F.3d 1084, 1090 (9th Cir. 2003) (internal quotation marks omitted); SEC v. Shavers, Case No. 13cv416, 2014 WL 12622292, at *6 (E.D. Texas Aug. 26, 2014) (district court found investment in Bitcoin Savings and Trust to be an investment contract under Howey).

In granting Plaintiff's ex parte TRO application, the Court found that the SEC had presented a prima facie showing based on Defendants' marketing and advertising through its websites and media posts of Blockvest and its ICO, that BLV tokens were "securities." (Dkt. No. 5 at 8-9.) Based on Defendants' postings on the internet, the SEC asserted that Blockvest raised more than $2.5 million from investors, there was a "common enterprise" because Blockvest claimed that the funds raised will be pooled and there would be a profit sharing formula. (Id.) Finally, as described on its website and whitepaper, the investors in Blockvest would be passive investors and they would depend entirely on Defendants' efforts. (Id.)

In opposition, Defendants present a different rendering of facts than the SEC. They explain that they did not raise $2.5 million from the public but instead the $2.5 million was supposed to be based on a transaction with David Drake. (Dkt. No. 24, Ringgold Decl. ¶ 15.) However, the transaction eventually collapsed and they admit the social media posts were overly optimistic. (Id.) They assert they have not sold any BLV tokens to the public but instead used the BLV tokens for purposes of testing during the

development phase. (Dkt. No. 24, Ringgold Decl. ¶ 5.) During this phase, 32 testers put a total of less than $10,000 of Bitcoin and Ethereum onto the Blockvest Exchange. (Id. ¶ 6.) The BLV tokens were only designed for testing the platform and no tokens were released to the 32 testing participants. (Id.) In the future, they intended to issue a new utility Token BLVX on the NEM Blockchain for exclusive use on the Blockvest Exchange. (Id.) Moreover, Defendants argue there is no common enterprise and the tokens do not represent an interest in or obligation of a corporation or other business. Therefore, Defendants argue the BLV token is not a "security."

In reply, Plaintiff contends that Defendants marketed Blockvest ICO as a securities offering and while they argue BLVs were utility tokens, their intent of the offering was to fund Blockvest's future business. Moreover, Defendants admit that tokens were sold on Blockvest's website for money or ether and whether investors received the tokens is not relevant in determining whether the tokens are securities.

The first "investment of money" prong of Howey "requires that the investor 'commit his assets to the enterprise in such a manner as to subject himself to financial loss.'" SEC v. Rubera, 350 F.3d 1084, 1090 (9th Cir. 2003) (quoting Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976) (per curiam)). In Rubera, the investors "turned over substantial amounts of money . . . with the hope that [the investment managers' efforts] would yield financial gains." Id. "At the outset, we note that, while the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts, we must focus our inquiry on what the purchasers were offered or promised." Warfield v. Alaniz, 569 F.3d 1015, 1021 (9th Cir. 2009). The focus on this "investment of money" prong is "what the purchasers were offered or promised." Id. (courts frequently examine promotional material associated with the transaction); SEC v. C.M. Joiner Leasing Corp., 320 U.S. 344, 352–53 (1943) ("The test [for determining whether an instrument is a security] . . . is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect."). As explained in Hocking, before applying the

Howey test, "we must determine what exactly [the defendant] offered to [the plaintiff]." Hocking v. Dubois, 885 F.2d 1449, 1457 (9th Cir. 1989) (concerning sale of real estate). The Ninth Circuit in Hocking explained, "[c]haracterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the sale. Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract case." Id. (quoting Aldrich v. McCulloch Properties, Inc., 627 F.2d 1036, 1039-40 (10th Cir. 1980)).

The SEC argues that Blockvest's website and whitepaper presented an offer of a unregistered security in violation of Sections 5 of the Securities Act; however, its argument presumes, without evidentiary support, that the 32 test investors reviewed the Blockvest website, the whitepaper and media posts when they clicked the "buy now" button on Blockvest's website.[5]

At his deposition, Ringgold explained that the Blockvest website was available to the public for pre-registration for the upcoming exchange. (Dkt. No. 27-18, Brown Decl., Ex. 17, Ringgold Depo. at 131:6-9.) There were also testers working on the functionality of the exchange. (Id. at 131:10-14.) The "buy now" button on the website did not disclose that it was only for testors and management but once a person moved forward, he or she could not buy any coins because the platform was not "live." (Id. at 131:15-20.) But the "buy now" button was accepting cryptocurrency and 32 "internal" people who were sophisticated investors helped Defendants with managing the different functions needed to test the platform. (Id. at 132:4-14.) Ringgold states he knows the identity of the 32 investors. (Id. at 132:15-20.) He indicated it was clear to the 32 testers that they were testing the platform so Defendants did not obtain any earnings statements

---

[5] While the SEC argues that an "offer" is sufficient to demonstrate a violation of Section 5, the Court notes an "offer or sale" is not a factor under Howey; it is a factor to determine violations of the federal securities laws. The Court must first determine whether the offer involved a "security."

from them. (Id. at 132:21-133:4.) Ringgold explains that the 32 investor were vetted and chosen based on Defendants' prior relationship with them. (Id. at 133:11-18; 135:1-23.) During the vetting process, Defendants collected their name, email, address and their level of sophistication. (Id. at 135:1-6.) They held several conferences and a webinar where Ringgold explained his requirements for the group of test investors. (Id. at 136:3-18.) Ringgold also testified that there was also a time when the credit card function with the "buy now" button on the Blockvest website was being tested but after four transactions with people Defendants knew or referred to them by somebody on the team, they shut it down because there were issues with the functionality. (Id. at 136:24-137:10.)

      Plaintiff and Defendants provide starkly different facts as to what the 32 test investors relied on, in terms of promotional materials, information, economic inducements or oral representations at the seminars, before they purchased the test BLV tokens. Therefore, because there are disputed issues of fact, the Court cannot make a determination whether the test BLV tokens were "securities" under the first prong of Howey.

      As to the second prong of Howey, Plaintiff has not demonstrated that the 32 test investors had an "expectation of profits." While Defendants claim that they had an expectation in Blockvest's future business, no evidence is provided to support the test investors' expectation of profits. "By profits, the Court has meant either capital appreciation resulting from the development of the initial investment . . . or a participation in earnings resulting from the use of investors' funds." Forman, 421 U.S. at 852.

      At this stage, without full discovery and disputed issues of material facts, the Court cannot make a determination whether the BLV token offered to the 32 test investors was

a "security." Thus, Plaintiff has not demonstrated that the BLV tokens purchased by the 32 test investors were "securities" as defined under the securities laws.[6]

The SEC also argues that Defendants have identified 17 individuals who invested money in Rosegold. Defendants present the declarations of nine individuals who assert that they did not buy BLV tokens or rely on any representations that the SEC has alleged are false. In reply, Plaintiff notes that eight individuals wrote "Blockvest" or "coins" on their checks and Defendants admitted to providing some of them the Blockvest ICO whitepaper.

Ringgold testified that he raised around $150,000 through friends and family that invested in Rosegold. (Dkt. No. 27-18, Brown Decl., Ex. 17, Ringgold Depo. at 82:11-19.) Ringgold, himself, also invested $200,000 in Rosegold. (Id. at 83:1.) His friends and family, as well as Mike Sheppard's friends and family who invested in Rosegold did not care what they were investing in because they trusted them based on their long-time familial and friend relationship. (Id. at 86:3-6; 87:4-9; 89:1-3.) He admitted he showed the Blockvest whitepaper to his family and close friends to get an honest opinion on the design and content of it but not to solicit an investment. (Id. at 98:24:88:15; 90:5-18.) He testified that none of the close friends and family who he shared the whitepaper with invested because they did not have the means. (Id. at 92:20-93:1.)

Here, there is a disputed issue of fact whether the 17 individuals who invested in Rosegold purchased "securities' as defined under the federal securities law. Merely writing "Blockvest" or "coins" on their checks is not sufficient to demonstrate what promotional materials or economic inducements these purchasers were presented with

---

[6] Plaintiff also asserts that Defendants made the same misrepresentations to a third party, Stoks.Market with whom Blockvest contracted for services and paid the vendor 250,000 BLV tokens with no indication they were "test" tokens." (Dkt. No. 27-22, White Decl.) However, the SEC, at the hearing, conceded that the there was no sale or offer of a security to Stoks.Market but explained it provides first-hand knowledge of Defendants' misrepresentations. However, misrepresentations made to Stoks.Market do not demonstrate that the test BLV tokens were "securities."

14

prior to their investments. See Warfield, 569 F.3d at 1021. Accordingly, Plaintiff has not demonstrated that "securities" were sold to the 17 individuals.

In sum, the Court concludes that Plaintiff has not demonstrated a prima facie showing that there has been a previous violation of the federal securities laws.

## C. Reasonable Likelihood that the Wrong will be Repeated

On the second factor for injunctive relief, in determining a reasonable likelihood of future violations, the court must look at the totality of the circumstances concerning Defendants and their violations. See SEC v. Murphy, 626 F.2d 633, 655 (9th Cir. 1980). Past violations "may give rise to an inference that there will be future violations" and courts should factors such as "degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations." Id.

Here, it is disputed whether there have been past violations of the securities laws as it is disputed whether the "sale" or "offer" of the BLV token was a security. Ringgold acknowledges mistakes were made and states he has ceased all efforts to proceed with the ICO. (Dkt. No. 24, Ringgold Decl. ¶ 17.) He states he always intended to comply with all regulations and will not proceed until his securities compliance counsel is capable of ensuring compliance with every press release and filing and give SEC's counsel at least 30 days' notice. (Id. ¶ 16.) In response, the SEC claims that despite the TRO, Ringgold, on October 11, 2018, continued to make representations that the "exchange . . . is registered with the SEC and NFA". (Dkt. No. 27-5, Brown Decl., Ex. 4 at p. 38.) He also acknowledged they are not partners with Deloitte but once launched, they falsely assert they will be using "Stratnum Indigo Trace Platform powered by Deloitte." (Id., Ex. 4 at p. 41.[7]) Also, they stated "[w]e cannot make up our registrations and affiliations

---

[7] The SEC incorrectly cites to Exhibit 5 of the Brown Declaration. (Dkt. No. 27 at 5.)

with SEC NFA or any other regulatory authority as you can see our due diligence efforts to be in compliance with them since launching BlockVest." (Id., Ex. 4 at p. 40.[8]) Ringgold also referenced the token sale as "BlockVest Private Token sale." (Id., Ex. 4 at 34.[9]) These representations by Ringgold are from Telegram Chat dated October 8-11, 2018. (Dkt. No. 27-1, Brown Decl. ¶ 5.) The Court notes Defendants were not served with the Complaint until October 10, 2018 and had not yet retained counsel in this matter. Plaintiff has not presented any misrepresentations by Defendants since they have retained counsel.

While there is evidence that Ringgold made misrepresentations shortly after the complaint was filed and prior to having retained counsel, Ringgold, with counsel, now asserts he will not pursue the ICO and will provide SEC's counsel with 30 days' notice in the event they decide to proceed. By agreeing to stop any pursuit of the ICO, Plaintiff does not oppose the preliminary injunction concerning compliance with federal securities laws. Therefore, Plaintiff has not demonstrated a reasonable likelihood that the wrong will be repeated.

Because Plaintiff has not demonstrated the two factor test to warrant a preliminary injunction, the Court DENIES Plaintiff's motion for preliminary injunction.

## D. Evidentiary Objections

Defendants filed evidentiary objections to the entirety of the Wilner Declaration in support of the ex parte temporary restraining order as well as the Grasso and Roche declarations. (Dkt. No. 25.) Plaintiff filed an opposition and its own objections to Defendants' evidence. (Dkt. No. 28.)

"[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." Univ. of Texas v. Camenisch, 451 U.S. 390, 395 (1981); Disney Enters., Inc. v. VidAngel, Inc.,

---

[8] The SEC incorrectly cites to page 42 of Exhibit 4. (Dkt. No. 27 at 4.)
[9] The SEC incorrectly cites to page 38 of Exhibit 4. (Dkt. No. 27 at 4.)

224 F. Supp. 3d 957, 966 (C.D. Cal. 2016), aff'd, 869 F.3d 848 (9th Cir. 2017) ("[T]he Federal Rules of Evidence do not strictly apply to preliminary injunction proceedings . . . ."); Flynt Distrib. Co. v. Harvey, 734 F.2d 1389, 1394 (9th Cir. 1984); Citizens for Quality Education San Diego v. Barrera, No. 17-cv-1054-BAS-JMA, --F. Supp. 3d--, 2018 WL 4599700, at *3 n.2 (S.D. Cal. Sept. 25, 2018) (summarily overruling evidentiary objections on preliminary injunction application). "The form of the evidence simply impacts the weight the evidence is accorded in assessing the merits of equitable relief." Barrera, 2018 WL 4599700, at 3 n.2.

Accordingly, based on the more lenient standard in considering evidence on a motion for preliminary injunction, the Court overrules both parties' evidentiary objections.

**E.     Defendants' Ex Parte Motion for an Evidentiary Hearing and Seeking Leave of Court to File Supplemental Declarations and Plaintiff's Supplemental Declaration of David Brown**

On November, 13, 2018, Defendants' filed an ex parte motion for an evidentiary hearing and sought leave to file supplemental declarations. (Dkt. Nos. 30, 31, 32.) On November, 14, 2018, the SEC filed an opposition to both the evidentiary hearing and allowing supplemental declarations past the court's scheduling deadlines. (Dkt. No. 35.) Because the Court DENIES the preliminary injunction based on the evidence presented to the Court under the scheduling order, the Court DENIES Defendants' ex parte motion for an evidentiary hearing and DENIES their request for permission to file supplemental declarations as moot. On November 19, 2018, the SEC filed a supplemental declaration of David Brown without leave of court. (Dkt. No. 39.) On November 20, 2018, Defendants filed an opposition and response to the supplemental declaration. (Dkt. No. 40.) Because the parties did not seek leave of court to file a supplemental declaration and response, the Court strikes these documents from the docket.

/ / / /

/ / / /

## Conclusion

Based on the above, the Court DENIES Plaintiff's motion for preliminary injunction. The Court also DENIES Defendants' ex parte motion for evidentiary hearing and leave of court to file supplemental declarations. (Dkt. No. 30.) The Court also STRIKES Plaintiff's Supplemental Declaration of David Brown and Defendants' Opposition and Response. (Dkt. Nos. 39, 40.)

IT IS SO ORDERED.

Dated: November 27, 2018

Hon. Gonzalo P. Curiel
United States District Judge