AMY J. LONGO (Cal. Bar No. 198304)
Email: longoa@sec.gov
DAVID S. BROWN (Cal. Bar No. 134569)
Email: browndav@sec.gov
BRENT W. WILNER (Cal. Bar No. 230093)
Email: wilnerb@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission

Robert A. Cohen, Unit Chief (Cyber Unit)
Headquarters
100 "F" Street, N.E.
Washington, District of Columbia 20549

Michele Wein Layne, Regional Director
John W. Berry, Associate Regional Director
Amy J. Longo, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> BLOCKVEST, LLC and REGINALD BUDDY RINGGOLD, III a/k/a RASOOL ABDUL RAHIM EL, <br><br> Defendants. | Case No. 18-cv-2287 GPC(MSB) <br><br> **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL RECONSIDERATION OF ORDER DENYING PRELIMINARY INJUNCTION (Dkt. No. 41)** <br><br> Date:    February 8, 2019 <br> Time:    1:30 p.m. <br> Ctrm.:   2D <br> Judge:   Hon. Gonzalo P. Curiel |

# **TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................. 1

II.   BACKGROUND ............................................................................................... 3

      A.   Procedural History ................................................................................. 3

      B.   The Uncontested Facts in Evidence ..................................................... 4

III.  ARGUMENT ..................................................................................................... 8

      A.   Legal Standard ....................................................................................... 8

      B.   The SEC Made A *Prima Facie* Showing That Defendants Violated
           Section 17(a) of the Securities Act ....................................................... 9

      C.   Defendants Offered An Investment Contract and Thus a "Security"
           under the Federal Securities Laws ..................................................... 10

           1.   Because *Howey* is an objective inquiry, the SEC does not
                have to show what specific investors relied on or whether
                they made a purchase in order to prove the tokens were
                securities ................................................................................... 11

           2.   Requiring the SEC to prove what individual investors relied
                on or that they made purchases would contravene the
                purposes of the Securities Act ................................................. 15

      D.   Defendants' Promises to Stop Their Offering Do Not Render An
           Injunction Unnecessary ....................................................................... 18

IV.   CONCLUSION ............................................................................................... 22

1

# TABLE OF AUTHORITIES

## Cases

*Aldrich v. McCulloch Props., In*c., 627 F.2d 1036 (10th Cir. 1980)......................12

*Berko v. SEC*, 316 F.2d 137 (2d Cir. 1963).........................................18

*Chris-Craft Indus., Inc. v. Bangor Punta Corp.*, 426 F.2d 569 (2d Cir. 1970).......16

*Diskin v. Lomasney & Co.*, 452 F.2d 871 (2d Cir. 1971)...............................16

*FTC v. Affordable Media LLC*, 179 F.3d 1228 (9th Cir.1999).............................21

*Hecht Co. v. Bowles*, 321 U.S. 321 (1944)............................................20

*Hocking v. Dubois*, 885 F.2d 1449 (9th Cir.1989).....................................12

*Hughes v. SEC*, 174 F.2d 969 (D.C. Cir. 1949)......................................17

*Landreth Timber Co. v. Landreth*, 471 U.S. 681 (1985)................................14

*McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087 (9th
    Cir. 2003).......................................................................16

*N. Sims Organ & Co. v. SEC*, 293 F.2d 78 (2d Cir. 1961).............................18

*School Dist. No. 1J v. ACandS, Inc.*,
    5 F.3d 1255 (9th Cir. 2003)......................................................8

*SEC v. ABS Manager, LLC*, No. 13-cv-319-GPC, Fed. Sec. L. Rep. ¶ 98,326 (S.D.
    Cal. Dec. 18, 2014)..............................................................8

*SEC v. Am. Commodity Exch., Inc.*, 546 F.2d 1361 (10th Cir. 1976)...................17

*SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577 (2d Cir. 1982)........................13

*SEC v. AriseBank,* No.18 Civ. 186 (BML) (N.D. Tex. Jan 30, 2018)....................2

*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943).............................13

*SEC v. Cavanagh*, 155 F.3d 129 (2d Cir.1998)......................................17

*SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137 (5th Cir. 2004)....................19

*SEC v. Feng*, Case No. 15-cv-09420, 2017 WL 6551107, (C.D. Cal. Aug. 10,
    2017), *appeal docketed*, No. 17-56522 (9th Cir. Oct. 10, 2017)..................12

*SEC v. Glt Dain Rauscher, Inc.*, 254 F.3d 852, 855 (9th Cir. 2001)..................9

*SEC v. Koracorp Indus.*, 575 F.2d 692 (9th Cir. 1978)..................................... 19, 20

*SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082 (2d Cir. 1972)..........................20

*SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801 (2d Cir. 1975)..................................20

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980)..................................................... 19, 20

*SEC v. PlexCorps,* No. 17 Civ. 7007 (CBA) (E.D.N.Y. Dec. 1, 2017)....................2

*SEC v. Presto Telecomms. Inc.*, No. 04cv163–IEG(WMc), 2010 WL 4314269

    (S.D. Cal. Oct. 26, 2010) ....................................................................................21

*SEC v. Pyne*, 39 F. Supp. 434 (D. Mass. 1941) ........................................................17

*SEC v. Rana Research, Inc.*, 8 F.3d 1358 (9th Cir. 1993)........................................17

*SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003)...............................................10

*SEC v. Sharma*, No. 1:18-cv-02909 (DLC) (S.D.N.Y. Apr. 2, 2018) ......................2

*SEC v. Thomas D. Kienlen Corp.*, 755 F. Supp. 936 (D. Or. 1991)........................17

*SEC v. Titanium Blockchain Infrastructure Servs., Inc.*, Case 2:18-cv-04315-DSF-

    JPR (C.D. Cal. May 22, 2018)...........................................................................2

*SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946)...................................................1, 10

*Smith v. Clark County Sch. Dist.*,

    727 F. 3d 950 (9th Cir. 2013) ..............................................................................8

*Teague v. Bakker*, No. 96-2186, slip op. at 8 (4th Cir. Apr. 8, 1998) ....................11

*United Hous. Found., Inc. v. Forman*, 421 U.S. 837 (1975)................................14

*United States v. Martin*,

    226 F.3d 1042 (9th Cir. 2000) ..............................................................................8

*United States v. Naftalin*, 441 U.S. 768 (1970) ..................................................16

*United States v. Odessa Union Warehouse Co-Op*, 833 F.2d 172 (9th Cir. 1987) .20

*United States v. United States Gypsum Co.*,

    333 U.S. 364 (1948)................................................................................................8

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)........................................20

*Warfield v. Alaniz*, 569 F.3d 1015 (9th Cir. 2009) ........................................ 11, 12

**Statutes**

15 U.S.C. § 77q(a) ...................................................................9, 16

15 U.S.C. § 77(b)(3) .......................................................................15

17 C.F.R. §§ 230.500, et seq. ...........................................................6

17 C.F.R. §§ 23.025, et. seq. .............................................................6

**Other Authorities**

Securities Act Amendments of 1975, S. Rep. 94-75, 1975 U.S.C.A.A.N. 179, 1975
      WL 12347 (Apr. 14, 1975) .......................................................18

**Rules**

Fed. R. Civ. P. 54(b) .........................................................................8

Fed. R. Civ. P. 59(e) .........................................................................8

**Local Rules**

S.D. Local Civ. R. 7.1.i .....................................................................8

## I.   **INTRODUCTION**

The Securities and Exchange Commission ("SEC") respectfully asks the Court to reconsider its November 27, 2018 order denying the SEC's application for a preliminary injunction (the "Opinion"), and to enter an order enjoining defendants Reginald Ringgold and Blockvest, LLC ("Defendants") from violating Section 17(a) of the Securities Act of 1933.  The SEC recognizes that requests for reconsideration are governed by a high standard and should be pursued with prudence.  However, the SEC has grave concerns that the Opinion, as written, incorrectly requires the SEC to prove that an investment is a security based solely on the beliefs of some individual investors, rather than on the objective nature of the investment being offered to the public, and imposes an artificially high burden for injunctive relief.  These legal errors have jeopardized the SEC's ability to stop Defendants' planned offering of "BLV" digital tokens, even though Defendants repeatedly lied about the offering by promoting the tokens as SEC-approved "securities" and even posted an image of the SEC's seal on their website.

With respect to the first issue, the Opinion erred in holding that factual disputes precluded a finding that the BLV tokens are securities.  These factual disputes concerned whether any individual investors actually reviewed Blockvest's website and whitepaper, and whether any investors purchased tokens or expected to make money.  But the law in this Circuit and elsewhere is clear—the SEC does not have to prove what any particular investor may or may not have seen, relied on, or expected in order to demonstrate that an investment is a security.  Rather, the test for an investment contract under the Supreme Court's seminal decision, *SEC v. W.J. Howey Co.,* 328 U.S. 293 (1946), is an "objective inquiry."  The SEC, therefore, only needs to prove the economic realities of the transaction, including the investment terms, how they were presented to investors, and how a reasonable investor would have understood them.  The power of the SEC to seek to enjoin securities violations would be dramatically inhibited if the SEC had to prove what

1

particular investors thought, or what they bought, in order to show that an investment was a security.  The Securities Act expressly governs "offers," not just sales, and the SEC, by law, is not required to prove reliance; rather, the Act is specifically designed to empower the SEC to seek injunctions to stop frauds before they can harm investors.  To the extent the Opinion held otherwise, it was clearly erroneous and warrants reconsideration.

With respect to the second issue, the Opinion appears to have erred in holding that a preliminary injunction was unnecessary because Defendant Ringgold, through counsel, promised to "stop any pursuit" of the initial coin offering, or "ICO," and to give the SEC thirty days' notice before resuming.[1]  The SEC respectfully submits that such an unenforceable promise should not be grounds for denying an antifraud injunction, when a defendant repeatedly made false statements in multiple venues.  Indeed, governing Ninth Circuit authority explicitly rejects this type of defense.  As the Ninth Circuit explained, if a promise like Defendant Ringgold's is sufficient, then any defendant could avoid an injunction by "merely stat[ing] under oath that he will not commit violations in the future."  Ringgold has done no more than that here:  he promised to stop only after being caught lying to the public about government approvals and a fake regulator.  In these circumstances, the contempt remedy inherent to a preliminary injunction is necessary to ensure that Defendants will not continue to defraud prospective investors.

If the Court reconsiders these legal issues, then the undisputed record clearly supports a *prima facie* finding that the BLV tokens are securities under *Howey*,

---

[1] The SEC has been actively enforcing the federal securities laws in the ICO space. *See, e.g., SEC v. Sharma*, No. 1:18-cv-02909 (DLC) (S.D.N.Y. Apr. 2, 2018); *SEC v. Titanium Blockchain Infrastructure Servs., Inc.*, Case 2:18-cv-04315-DSF-JPR (C.D. Cal. May 22, 2018); *SEC v. AriseBank,* No.18 Civ. 186 (BML) (N.D. Tex. Jan 30, 2018); *SEC v. PlexCorps,* No. 17 Civ. 7007 (CBA) (E.D.N.Y. Dec. 1, 2017).

that Defendants violated Section 17(a), and that there is a reasonable likelihood
that Defendants' wrongs will be repeated.  Defendants admitted that they made
material misrepresentations about their BLV offering—including false claims of
SEC registration and a purported endorsement by a fake regulator with the SEC's
address—on their public website, in their whitepaper, at industry conferences, in
YouTube videos of those conferences, and via Twitter—all over a period of
months.  These misrepresentations were available to anyone with an internet
connection, and Blockvest's website had a countdown clock for a December
offering of their token and a button labelled "Buy Now."  This is precisely the sort
of fraudulent offering that Section 17(a) was drafted to enjoin **before** investors lose
money.  Thus, the uncontested facts in this case more than justify a preliminary
injunction under Section 17(a) even if, as Defendants claim, no one ever bought a
token.[2]

Accordingly, the SEC requests that the Court reconsider its ruling and issue
a preliminarily injunction prohibiting Defendants from engaging in any fraudulent
securities offerings in violation of Section17(a).

## II.   BACKGROUND

### A.   Procedural History

The SEC filed this action for violations of the securities registration and
antifraud provisions of the federal securities laws on October 3, 2018.  Dkt. No. 1.
The Complaint alleged that Defendants planned a fraudulent ICO to sell BLV
digital tokens and that defendants had raised more than $2.5 million in pre-ICO
sales of BLVs.  With its complaint, the SEC filed an application for a TRO to halt

---

[2] The SEC continues to maintain that Defendants did sell securities and that no
exemptions to registration for the securities offering were available, and reserves
the right to pursue claims based on that conduct.  The purpose of this Motion for
Reconsideration is to request an antifraud injunction under Section 17(a), because,
at the very least, this record supports that remedy, and the SEC believes that
investors need that protection during the pendency of this action.

Defendants' upcoming offering.  Dkt. No. 3.  On October 5, 2018, the Court granted a temporary restraining order and other ancillary relief.  Dkt. Nos. 5-6.

Following briefing and a hearing on the order to show cause, the Court issued the Opinion denying the SEC's request for a preliminary injunction.  Dkt. No. 41.  The Opinion was premised on two holdings.  First, the Opinion held that the SEC had not satisfied its burden to show, as part of its *prima facie* case, that the BLV tokens offered in the ICO were securities in the form of an investment contract.  Dkt. No. 41 at 6-7.  The Court focused on the specific investors who purchased BLVs, and those who invested through Blockvest affiliate, Rosegold.  The Opinion concluded that it could "not make a determination, at this stage of the proceedings, whether the BLV token offered to the 32 test investors was a 'security,'" nor "whether the 17 individuals who invested in Rosegold purchased 'securities.'"  *Id.* at 13-14.  Second, the Opinion found that the SEC had failed to show a reasonable likelihood that Defendants would repeat their violations because "it is disputed whether there have been past violations," and Defendants had agreed to "stop any pursuit of the ICO" without first providing the SEC with thirty days advance notice of their intent to resume.  *Id.* at 15-16.

## B.    The Uncontested Facts in Evidence

The SEC is relying only on uncontested facts in this motion because the Opinion was reluctant to resolve several factual disputes that arose at the preliminary injunction hearing.  These uncontested facts show that the investment offered was a security, and that Defendants' misconduct in their offering at least supports an antifraud injunction to protect investors.

The Opinion reflects that "Defendants solely challenged the SEC's claims arguing that the test BLV tokens are not 'securities' as defined under the federal securities laws."  *Id*. at 8-9.  In other words, Defendants did not refute that they had committed fraud.  *Id*. at 6-7 (stating that Defendants "do not dispute the other

elements for the alleged violations of Sections 5 and 17 of the Securities Act and Section 10(b) of the Securities Exchange Act and Rule 10b-5…").  Thus, Defendants did not deny that their marketing materials falsely used the SEC's and other regulators' logos in their misleading claims of regulatory oversight and approval; falsely claimed Blockvest was audited by Deloitte; and misleadingly promoted alongside the token offering their deceptively false creation, the Blockchain Exchange Commission ("BEC"), a fake regulator falsely promoted as being located at SEC headquarters, with a seal and mission statement that resembled the SEC's, and a web profile that linked to the SEC's actual website.

Importantly, there are several key undisputed facts that are germane to the issue of whether the BLV token offered by Defendants was a security.  First, Defendants did not dispute that they claimed to have sought to register their ICO with the SEC as a securities offering, nor that they falsely and publicly claimed the offering had been "registered" with and "approved" by the SEC.  Indeed, Defendants' behavior in connection with the ICO was consistent with a belief that the BLV tokens were securities.  Specifically, it was undisputed at the hearing that:

- Defendants filed a Form D with the SEC in April 2018 for a $100 million securities offering, claiming exemption from registration for a securities transaction under Regulation D Rule 506(c).  Ringgold signed the form and specifically identified the "type(s) of securities offered" as the "sale and issuance of BLV Tokens."  Wilner Decl. (Dkt. No. 3-11 through 22) ¶ 12, Ex. 8, pp. 56-60.

- Ringgold (falsely) tweeted, after filing the Form D, that Blockvest "received our notice from the SEC that Blockvest has been registered as an exempt offering of securities."  *Id.* ¶ 48, Ex. 44, p. 449.

- Until the TRO, Blockvest's publicly available website and whitepaper invoked Regulation A, a different provision that is used to exempt the

offer and sale of "securities" from the registration requirements of that the Securities Act, claiming (falsely) the ICO was "SEC Reg A+ Securities Offering Approved" and that "[t]he company is now SEC Reg A+ Compliant and can offer their securities offering to Unaccredited Investors all over the globe." Wilner Suppl. Decl. (Dkt. No. 3-23 through 24) ¶ 2, Ex. 1, pp. 13, 201; Wilner Decl. ¶ 15, Ex. 11, p. 135.

- Ringgold stated at conferences (videos of which were posted online) that the Blockvest ICO was either registered or exempt from registration under Regulation A, including stating (falsely) "Since we got our Reg A, we're able to take on investors from pretty much anywhere, any amount. They don't have to be accredited" and that "The SEC says it's a security. So we registered with the SEC." *Id*. ¶¶ 51-52, Exs. 47, 49, pp. 539, 569.

- Blockvest stated (falsely) on social media that the company had obtained an exemption from the registration requirements of a securities offering pursuant to Regulation A, for example, stating on Facebook that "Blockvest DEX gets SEC Reg A+ approval & plans to go with IPO." *Id.* ¶ 45, Ex. 41, p. 416. [3]

---

[3] As the SEC showed at the preliminary injunction hearing, Defendants' unregistered sales violated Section 5 because they were not exempt from registration pursuant to Securities Act Regulation D (17 C.F.R. §§ 230.500, *et seq.*) or Regulation A (17 C.F.R. §§ 23.025, *et. seq.*). Under Regulation D, Rule 506(c), a company that has filed a Form D with the SEC may broadly solicit and generally advertise the offering if the purchasers in the offering are all accredited and the company takes reasonable steps to verify that they are accredited. Defendants offered BLVs to "unaccredited investors all over the globe" (Suppl. Wilner Decl. ¶ 2, Ex. 1, p. 201) and admitted they took no steps to verify investors' accreditation. *See* Brown Decl. Ex. 17 (Ringgold Tr. 121:1-122:8, 145:23-136:3). Therefore, no exemption under Rule 506(c) could shield their sales. Similarly, under Regulation A, no sales may occur until the issuer has filed an offering statement on Form 1-A and the SEC has issued a notice of qualification. It is undisputed that Defendants never filed a Regulation A offering statement with the SEC. *Id.* (Ringgold Tr. 114:2-22). Their sales were thus also not exempt under Regulation A. The SEC adheres to its view that the Defendants' sales violated Section 5 and that there were no available exemptions. Given that this Court found factual disputes related to Defendants' sales and claimed exemptions, however, the

Second, Defendants did not dispute that they publicly promoted the investment, nor **how** they did so.  From April 2018 until the TRO, Defendants advertised their token offering on Blockvest's website, indicating it would occur by December 2018.  *See* Roche Decl., Ex. 1, p. 143; Wilner Decl. ¶ 15, Ex. 11, p. 135].  Defendants' website contained a link to the ICO's whitepaper (Roche Decl., Ex. 1, p. 133; Wilner Decl. ¶ 14, Ex. 10, p. 82); had a "Buy Now" button that the general public could click on [Wilner Suppl. Decl. ¶ 2, Ex. 1, p. 4]; and had a countdown clock indicating how long until certain bonus discounts in the ICO pre-sale would expire [Wilner Decl. ¶ 14, Ex. 10, p. 93; Wilner Supp. Decl. ¶ 2, Ex. 1, p. 4; Brown Decl. ¶ 17, Ex. 16, p. 134 [Bandoy Tr. 146:24-148:5].  When a member of the public clicked on the "Buy Now" button, Blockvest would take down his or her name and contact information to record their interest in the ICO as part of a "whitelist" [Brown Decl. ¶ 18, Ex. 17 [Ringgold Tr. 131, 132, 147, 164-165, 229, 238]; Wilner Decl. ¶ 45, Ex. 41, pp. 355, 357, 361].  There was also no dispute that until the TRO, Blockvest's CFO advertised on public social media that "The only official place to purchase Blockvest tokens is on the website," providing a link to the company's website for purchase [Brown Decl. ¶ 5, Ex. 4, p. 23].

Third, Defendants did not dispute key facts concerning **what** they promoted to the public.  According to the whitepaper, investors' monies would fund Blockvest's planned product offerings—none of which yet existed [Wilner Decl. ¶ 15, Ex. 11, pp. 125-135], while investor returns would derive from Blockvest's management's expertise, including Ringgold's "17+ years of experience in the financial markets" [*id.* ¶¶ 10, 14, Exs. 10, 33, pp. 67-77, 263].  Blockvest's website stated that "Simply holding 1000 BLV . . . generates passive income" [*id.* ¶ 15, Ex. 11, p. 126; *see also id.* (comparing Blockvest to a Vanguard mutual fund – a

SEC focuses its reconsideration request solely on Defendants' Section 17(a) violations.

1  securities portfolio)].  Blockvest's whitepaper further stated that "As a Blockvest

2  token holder, your Blockvest will generate a pro-rated share of 50% of the profit

3  generated quarterly as well as fees for processing transactions" [*id.* ¶ 15, Ex. 11, p.

4  134].  Blockvest's whitepaper advertised "digidends"—something like a

5  dividend—that BLV investors would enjoy by merely holding tokens.  *Id.*

6          Finally, it was uncontested that Defendants' false statements did not stop

7  when the TRO was issued, but only after they retained counsel in this action.  *See*

8  *e.g.* Brown Decl. Exs. 4-6 (Dkt. Nos. 27-4 through 27-7) (collecting Defendants'

9  public statements regarding the ICO and the SEC's action between October 8,

10  2018 through October 11, 2018).

11  **III.   ARGUMENT**

12          **A.   Legal Standard**

13          District courts have the discretion to reconsider interlocutory rulings until a

14  final judgment is entered.  *See* FED. R. CIV. P. 54(b); *United States v. Martin*, 226

15  F.3d 1042, 1048-49 (9th Cir. 2000).  Under Rule 59(e), the Court may properly

16  reconsider its decision if, among other things, it "committed clear error or the

17  initial decision was manifestly unjust."  *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d

18  1255, 1263 (9th Cir. 2003); FED. R. CIV. P. 59(e).  Clear error occurs when "the

19  reviewing court on the entire record is left with the definite and firm conviction

20  that a mistake has been committed."  *United States v. United States Gypsum Co.*,

21  333 U.S. 364, 395 (1948); *see also Smith v. Clark Cnty. Sch. Dist.*, 727 F. 3d 950

22  (9th Cir. 2013) ("It is common for both trial and appellate courts to reconsider and

23  change positions when they conclude they made a mistake."); *SEC v. ABS*

24  *Manager, LLC*, No. 13-cv-319-GPC, Fed. Sec. L. Rep. ¶ 98,326 (S.D. Cal. Dec.

25  18, 2014) (granting motion for reconsideration on summary judgment ruling); *see*

26  *also* S.D. Local Civ. R. 7.1.i  (reconsideration motion must include affidavit

27  concerning the circumstances of the prior application and the grounds for seeking

28

reconsideration).

**B.** **The SEC Made A *Prima Facie* Showing That Defendants Violated Section 17(a) of the Securities Act**

To establish a violation of Section 17(a), the SEC is required to show materially false or misleading statements to obtain money or property (for Section 17(a)(2)) and/or a scheme to defraud (for Sections 17(a)(1) and (3)); made with the requisite culpability (scienter for Section 17(a)(1), and at least negligence for Sections 17(a)(2) and (3)); in the offer or sale of securities. *See* 15 U.S.C. § 77q(a); *SEC v. Glt Dain Rauscher, Inc.*, 254 F.3d 852, 855 (9th Cir. 2001). The SEC's motion and reply papers in support of its application for a preliminary injunction set forth substantial evidence as to each of these elements. *See generally* Dkt. Nos. 3 through 3-24, 27 through 27-28.

Focusing solely on evidence the Court found to be undisputed, the SEC's showing at the preliminary injunction hearing addressed each element of Section 17(a). First, Defendants falsely represented that their ICO was a securities offering approved by and registered with the SEC and that Blockvest was audited by Deloitte—each of which are significant and undisputed misrepresentations. Second, Defendants, in a misleadingly deceptive fashion, promoted Blockvest using the SEC's and the Commodity Futures Trading Commission's ("CFTC's") government seals, the National Future Association's ("NFA's") and Deloitte's logos, and the phony regulator that Defendants concededly made up, the BEC. Third, it was uncontested that reasonable investors would have found it important to know that Blockvest's offering was not registered with nor approved by the SEC or any other regulator, and that the BEC was actually not located at SEC's headquarters, nor does it share the agency's website. Fourth, it was not seriously contested that Defendants acted culpably with respect to these misstatements and deceptive acts. Last, it was admitted that Defendants' actions coincided with their

advertising the planned Blockvest ICO to the general public on the internet—with the stated invitation to "Buy Now" and ever-resetting countdown clock—right up until the TRO. If the Court reconsiders its ruling on the issue of whether the BLV, as promoted, is a security, then this evidence is more than sufficient to establish a *prima facie* showing that Defendants violated Section 17(a).

## C. Defendants Offered An Investment Contract and Thus a "Security" under the Federal Securities Laws

The Opinion erred in its analysis of whether Defendants' investment scheme involved the offer of a security. Under *Howey*, an investment contract exists when it contemplates "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits induced by the efforts of others." 328 U.S. at 298-99; *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003). The Court held that the SEC failed to make a *prima facie* showing for the first and third *Howey* elements—that the BLV tokens involved an investment of money with an expectation of profit. *See* Dkt. No. 41 at 11-13.

In reaching this conclusion, the Opinion appears to have focused on whether the SEC could prove what specific investors saw or did. For example, the Court assessed whether "the 32 test investors reviewed the Blockvest website, the whitepaper and media posts when they clicked the 'buy now' button on Blockvest's website," finding that there were "different facts as to what the 32 investors **relied on**, in terms of promotional materials, information, economic inducements or oral representations at the seminars, before they purchased the test BLV tokens." *Id.* at 13 (emphasis added). The Opinion further found "a disputed issue of fact whether the 17 [other] individuals who invested in Rosegold purchased 'securities,'" analyzing "what promotional materials or economic inducements [the Rosegold] investors were presented with." *Id.* at 14 (also noting nine Rosegold investors who "assert that they did not buy BLV tokens or **rely on**

any representations that the SEC has alleged are false") (emphasis added).  The SEC asks the Court to reconsider this ruling because the question of whether or not the BLV token is a security does not, as a matter of law, depend on the SEC's ability to prove what any one investor subjectively relied on or received, nor that any investor actually made a purchase.

> **1.    Because *Howey* is an objective inquiry, the SEC does not have to show what specific investors relied on or whether they made a purchase in order to prove the tokens were securities**

The Court's ruling appears to acknowledge that in determining whether Defendants offered securities, it is necessary to review the nature of the investment scheme they offered.  Dkt. No. 41 at 11.  However, the SEC respectfully submits that the Court erred in then construing the *Howey* test to turn on whether anyone actually relied on the offering materials or purchased tokens.  *Id.* at 12-15.

As the Ninth Circuit has made clear, *Howey* requires "an objective inquiry into the character of the instrument or transaction offered based on what the purchasers were led to expect."  *Warfield v. Alaniz*, 569 F.3d 1015, 1021 (9th Cir. 2009).  This necessarily means that any party trying to establish the existence of a security does not have to prove the subjective understanding of a particular investor.  In *Warfield*, the Ninth Circuit explained that "while the subjective intent of the purchasers may have some bearing on the issue of whether they entered into investment contracts, we must focus our inquiry on what the purchasers were offered or promised."  *Id.* at 1022-23.  That makes sense.  If courts were to focus only on the perspectives of different investors, rather than on the economic realities of what was being offered by the defendant, then the issue of whether an investment was a security would depend on the subjective experiences and views of different investors.  *See, e.g., Teague v. Bakker*, No. 96-2186, slip op. at 8 (4th

Cir. Apr. 8, 1998) ("The subjective intention of a given purchaser cannot control whether something is a 'security,' else some might have purchased securities while others did not.  The proper focuses of the inquiry are on the transaction itself and the manner in which it is offered.").

Therefore, when applying the objective *Howey* test, courts routinely and correctly examine how the investment was offered—the prospectus and other offering materials, or what the defendants said in touting the investment—rather than what one investor thought or did.  For example, in *Warfield*, the Ninth Circuit's review of the record focused only on how the investments were marketed in brochures; it did not review at all what individual investors relied on or thought or did.  *See* 569 F.3d 1022; *see also Hocking v. Dubois*, 885 F.2d 1449, 1457 (9th Cir. 1989) (*en banc*), *cert. denied*, 494 U.S. 1078 (1990) (reviewing "promotional materials" to determine whether the investment is a security).  Likewise, in *SEC v. Feng*, the defendants argued that investments in the federal EB-5 visa program were not securities because individual investors testified they only expected to receive visas and were not expecting to make money.  But Judge Carney correctly looked instead to the objective terms of the offer, which made clear that profits were part of the investment package, and thus held that the investments were securities under *Howey*.  *See* Case No. 15-cv-09420, 2017 WL 6551107, at *6 (C.D. Cal. Aug. 10, 2017), *appeal docketed*, No. 17-56522 (9th Cir. Oct. 10, 2017).  As the *Feng* court explained, "the issue is not whether investors actually received a profit, but whether there was an expectation of profit based on the objective terms of the offerings."  *Id.* (citing *Warfield*, 569 F.3d at 1020); *see also, e.g., Aldrich v. McCulloch Props., In*c., 627 F.2d 1036, 1039-1040 (10th Cir. 1980) ("Central to this test [what is a security] is the promotional emphasis of the developer.... Characterization of the inducement cannot be accomplished without a thorough examination of the representations made by the defendants as the basis of the

sale.... Promotional materials, merchandising approaches, oral assurances and contractual agreements were considered in testing the nature of the product in virtually every relevant investment contract case"); *SEC v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 584 (2d Cir. 1982) ("[I]n determining whether the offering is an investment contract courts are to examine the offering from an objective perspective…").

Accordingly, *Howey* requires the Court to consider the "character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements" offered to the public to persuade it to purchase the ICO. *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 352-53 (1943). As such, it is improper for a court to require the SEC to establish the *Howey* elements based on what individual prospective investors actually "received and reviewed before making their investment." Dkt. No. 41 at 12-13. Similarly, it is improper to make a plaintiff prove the "expectations of profit" that individual investors may (or may not) have had at the time they clicked the buy button on the website. *Id.* Rather, to determine whether Defendants' offering was an investment contract requires an objective evaluation of the economic realities of the offering, as advertised and as would be by an objective, reasonable investor. It would be legal error to require the SEC to prove any more than that.

When *Howey* is properly applied as an objective test, the uncontested evidence shows that the BLV tokens Defendants offered to the public were investment contracts—a notion Defendants embraced in their promotional materials and their Form D. Ringgold tweeted that "Blockvest has been registered as an exempt offering of securities" and falsely stated at a conference that "[t]he SEC says it's a security. So we registered with the SEC." He even signed a Form D publicly filed with the SEC and, under the heading "Type(s) of Securities Offered," wrote "[s]ale and issuance of BLV tokens." Dkt. No. 3-12, Ex. 8, p. 59.

Although how a party treats or names an investment is not dispositive, it is clearly relevant to the *Howey* inquiry and should not be ignored.  *See United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 850 (1975); *see also Landreth Timber Co. v. Landreth*, 471 U.S. 681, 690 (1985) ("*Forman* does not, however, eliminate the Court's ability to hold that an instrument is covered when its characteristics bear out the label.").

Consistent with Defendants' own characterizations of their investment offering, an objective *Howey* analysis of the undisputed record clearly establishes the first and third *Howey* elements that the Court held the SEC failed to prove.  *See* Dkt. No. 41 at 11-13.  As for the first prong, which requires that a product contemplate an investment of money, Defendants' website and whitepaper both described the ICO as a mechanism for funding Blockvest's planned business activities.  Putative investors were invited to provide digital or other currency— assets of clear tangible value—in return for BLV tokens even if the tokens were, as Defendants claimed, to be provided at a later date.

The offering materials that were available to the public also clearly satisfied *Howey*'s second requirement of a common enterprise.  Blockvest's whitepaper and website described four products Blockvest would offer, none of which yet existed, and all of which would be funded by BLV investors.  The whitepaper stated that "[a]s a Blockvest token holder, your Blockvest will generate a pro-rated share of 50% of the profit generated quarterly as well as fees for processing transactions" [*id.* ¶ 15, Ex. 11, p. 134].  Finally, with respect to the third requirement of an expectation of profits induced by the efforts of others, Blockvest's website promised that simply holding BLV tokens would generate "passive income."  [Wilner Decl. ¶ 15, Ex. 11, p. 126].  According to Defendants' whitepaper, the value of the BLV tokens would develop from the Blockvest management team's purported expertise in the securities industry.  The offering materials promised BLV holders "digidends"—passive

income from merely holding the BLVs; rather than from any efforts the token-holders would undertake.  The offering materials promoted various bonuses for putative investors, depending on how quickly they responded to Defendants' invitation.  Along with these economic inducements, Defendants marketed the ICO as an offering of "securities" that was either "registered" and/or "exempt" from registration.

> **2.    Requiring the SEC to prove what individual investors relied on or that they made purchases would contravene the purposes of the Securities Act**

The Court further appeared to limit its interpretation of the *Howey* test based on what individual investors may have relied on.  Dkt. No. 41 at 13-14 (noting that the parties presented "starkly different facts as to what the 32 test investors relied on" and that the Rosegold investors' "[m]erely writing 'Blockvest' or 'coins' on their checks is not sufficient to demonstrate what promotional materials these purchasers were presented with prior to their investments").  But to the extent the Court was requiring the SEC to prove what individual investors may have relied on or seen, or whether any investors actually made a purchase, such a requirement would impermissibly restrict the reach of the federal securities laws and the scope of the SEC's enforcement powers.   Even if no one had invested, the SEC could pursue Defendants for violating Section 17(a) based on their fraudulent offering.

The Securities Act regulates both offers and sales of securities.  Whether a defendant was able or unable to consummate a transaction with a potential investor does not bear on whether the offering was of a security as defined by the Securities Act.  An "offer" or an "offer to sell" is defined broadly by the statute, and includes "every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security, for value."  15 U.S.C. § 77(b)(3).  Section 17(a) likewise prohibits fraudulent conduct in the offer of securities:  "It shall be unlawful for any

person ***in the offer*** or sale of any securities" to employ a scheme to defraud or material misstatements.  15 U.S.C. § 77q(a) (emphasis added).  As the Supreme Court held in *United States v. Naftalin*, Congress intended a broad construction of the phrase "in the offer or sale," which is "expansive enough to encompass the entire selling process."  441 U.S. 768 (1970) (noting that Section 2(3) provides that "'offer' shall include *every attempt* or offer to dispose of . . . a security or interest in a security, for value" and that "[t]his language does not require that the fraud occur in any particular phase of the selling transaction.") (emphasis in original).

Through such a broad definition of offer, Congress subjected offerings—not just sales—of securities to the antifraud provisions of the Securities Act.  And whereas contract law may consider whether an offeree has the ability to accept before there can be a *bona fide* offer, "[t]he term 'offer' has a different and far broader meaning in securities law than in contract law."  *McKesson HBOC, Inc. v. N.Y. State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1092 (9th Cir. 2003); *Diskin v. Lomasney & Co.*, 452 F.2d 871, 875 (2d Cir. 1971) ("[T]he statutory language defining 'offer' . . . goes well beyond the common law concept of offer.").

Numerous decisions interpreting the Securities Act reflect that offerees need not consummate a securities transaction for there to be an "offer."  For example, in *Chris-Craft Indus., Inc. v. Bangor Punta Corp*., 426 F.2d 569 (2d Cir. 1970), the Second Circuit held that an announcement "that securities will be sold at some date in the future" accompanied by an "attractive description of these securities and of the issuer" was an offer to sell securities because "it seem[ed] clear that such an announcement provides much the same kind of information as that contained in a prospectus."  *Id*. at 574.  This is directly analogous to the countdown clock on Blockvest's website.  And, as the Second Circuit noted in *Chris-Craft Industries*, "one of the evils of a premature offer is its tendency to encourage the formation by the offeree of the opinion of the value of the securities before a registration

statement and prospectus are filed." *Id.*; *see also SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir.1998) (the definition of "offer" in 15 U.S.C. § 77b(a)(3) "extends beyond the common law contract concept of an offer"); *SEC v. Thomas D. Kienlen Corp.*, 755 F. Supp. 936, 940-941 (D. Or. 1991) ("Impossibility of performance is not dispositive to the court's determination of whether defendants' conduct constituted an 'offer to sell.'  What is dispositive to the court's determination is whether defendants' conduct conditioned the public mind."); *SEC v. Pyne*, 39 F. Supp. 434, 435-36 (D. Mass. 1941) (enjoining offers of shares in fishing vessels yet to be built, concluding that defendants were "offering for sale, attempted and are attempting to dispose of, and solicited and are soliciting offers to buy" unregistered and fraudulent securities, and that conduct "will operate" as a fraud). Thus, courts have rejected asserted defenses to liability under Section 17(a) of the Securities Act based on the lack of any completed sales.  *See, e.g., SEC v. Am. Commodity Exch., Inc.*, 546 F.2d 1361, 1366 (10th Cir. 1976) (affirming injunction against violations of Section 17(a):  "Defendant emphasizes that he never sold or attempted to sell any commodity option contracts to the public. Since actual sales were not essential and were not charged, this was immaterial.").

Moreover, it is well-established in this Circuit and elsewhere that the SEC need not prove reliance when it seeks injunctive relief under the securities laws. *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363-64 (9th Cir. 1993).  This is so because "restrictions on who may invoke the power of the federal judiciary to enforce the securities laws by collecting damages do not bear on the determination of whether a violation of the securities laws has been committed" and the SEC brings civil actions to enforce the law, not to collect damages.  Thus, unlike private litigants, the SEC does not have to prove whether individual investors actually relied on or were harmed by a defendant's misrepresentations to enforce the anti-fraud provisions of the securities laws.  *See Hughes v. SEC*, 174 F.2d 969, 974

(D.C. Cir. 1949) (affirming SEC's revocation order based on violations of Sections 17(a)(1-3) and 10(b), stating that "revocation is proper even if one, or none, of the particular clients here involved has been misled or has suffered injury."); *N. Sims Organ & Co. v. SEC*, 293 F.2d 78 (2d Cir. 1961) (affirming revocation for violations of 17(a)(1-3) and 10(b), finding that reliance is not an element of either provision even where the purchaser cancelled the sale and testified that he did not rely on defendant's statement); *Berko v. SEC*, 316 F.2d 137 (2d Cir. 1963) ("The Commission's duty is to enforce the remedial and preventative terms of the statute in the public interest, and not merely to police those whose plain violations have already caused demonstrable loss or injury.").[4]

The Opinion appears to require proof of actual purchases and sales in order to show that the tokens at issue are securities.  *See, e.g.*, Dkt. No. 41 at 14.  But it would subvert the purpose of the Securities Act if the SEC were required to show that specific investors relied on offering materials, to establish that an investment is a security.  Such a requirement would effectively limit the SEC's jurisdiction to claims only for illegal sales, not fraudulent offers.  Section 17(a) is specifically designed, and universally understood, to prohibit unlawful offers—not just sales.  If other courts were to impose this kind of requirement, the SEC could not sue to enjoin fraudulent offerings until investors are actually injured.  Such a legal regime would be at odds with the SEC's core mission to protect investors.

**D.**   **Defendants' Promises to Stop Their Offering Do Not Render An Injunction Unnecessary**

---

[4]  Since the enactment of the federal securities laws in the 1930s, Congress has likewise noted that SEC injunctive actions do not require proof of damages or causation.  *See* Securities Act Amendments of 1975, S. Rep. 94-75, 1975 U.S.C.A.A.N. 179, 1975 WL 12347, at *76 (Apr. 14, 1975) (enactment of Section 21(g) to preclude consolidation of private securities fraud cases with SEC equitable enforcement actions necessary to prevent unduly prolonging or adding complexity when causation and damages are not required in an SEC injunctive action) (citing *SEC v. Everest Mgmt. Corp.*, 475 F.2d 1236, 1240 (2d Cir. 1972)).

The Opinion contains a second clear error that warrants reconsideration pursuant to Rule 59(e). Specifically, the Opinion held that Defendants' vow to stop violating the law rendered an injunction unnecessary. Dkt. No. 41 at 16. Under Ninth Circuit precedent, the fact that a defendant promises to cease its illegal conduct does not dispense with the need for an injunction. Particularly given Defendants' past admitted falsehoods, an injunction is necessary here to protect future investors; to ensure that Defendants refrain from further fraud; and to ensure their compliance with the Securities Act should they persist in making similar offerings in the future.

Section 20(b) of the Securities Act specifically vests the SEC with the power to seek injunctions whenever a person is about to engage in a securities law violation. *See SEC v. Koracorp Indus.*, 575 F.2d 692, 697 (9th Cir. 1978). The critical question in determining whether a preliminary injunction is appropriate, "'is whether there is a reasonable expectation that the defendants will thwart the policy of the [Securities] Act by engaging in activities proscribed thereby.'" *SEC v. Cont'l Tobacco Co. of S.C.*, 463 F.2d 137, 162 (5th Cir. 2004) (internal citations omitted). "The existence of past violations may give rise to an inference that there will be future violations"; however, whether the defendant is likely to thwart the securities laws in the future ultimately requires "assess[ing] the totality of the circumstances surrounding the defendant and his violations." *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980).

That Defendants stopped their planned offering (after retaining counsel to defend them in this action) does not relieve them, under applicable Ninth Circuit precedent, from being enjoined. *See id.*; *Koracorp Indus.,* 575 F.2d at 698 (9th Cir. 1978). The Ninth Circuit rejected this very notion in *Murphy*. There, the defendant had "presented the trial court with an affidavit in which he stated that he intended to comply with the registration requirements in the future." *Murphy*, 626

F.2d at 655.  Although the defendant argued that "such statements of reform give rise to an inference that there will be no future violations," the Ninth Circuit affirmed the injunction, holding that it could not "sanction a rule that would establish such a ritualistic dodge around a permanent injunction," since "[o]ne obvious problem" with accepting such a defense is that it would mean that a defendant would always be able to avoid an injunction "if he merely states under oath that he will not commit violations in the future." *Id*. at 656; *accord United States v. Odessa Union Warehouse Co-Op*, 833 F.2d 172, 176 (9th Cir. 1987) ("Courts must beware of attempts to forestall injunctions through remedial efforts and promises of reform that seem timed to anticipate legal action, especially where there is the likelihood of recurrence.").

Simply put, a defendant who has broken the law cannot avoid an injunction merely by promising that he will not do it again.  *See SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir. 1975) ("appellate courts have repeatedly cautioned that cessation of illegal activity does not *ipso facto* justify the denial of an injunction"); *see generally Hecht Co. v. Bowles*, 321 U.S. 321, 327 (1944) ("[T]he cessation of violations, whether before or after the institution of a suit" is "no bar to the issuance of an injunction."); *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) ("[T]he court's power to grant injunctive relief survives discontinuance of the illegal conduct.").  And the need for an injunction is especially compelling when the only reason a defendant allegedly stopped breaking the law is because it was under investigation or was sued.  *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1100-01 (2d Cir. 1972) ("fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations," and "the drawing of such an inference was particularly appropriate here where appellants did not attempt to cease or undo the effects of their unlawful activity until the institution of an investigation.") (citations omitted); *Koracorp Indus.*, 575 F.2d at 698 (same)

(citations omitted).  Further, where the court issues an injunction, the defendant's subsequent violations of the securities laws are enforceable through the contempt remedy, a significant deterrent to future violations.  *See, e.g.*, *FTC v. Affordable Media LLC*, 179 F.3d 1228, 1239 (9th Cir.1999) (noting that upon a clear and convincing showing, burden shifts to defendant to show an inability to comply); *SEC v. Presto Telecomms. Inc.*, No. 04cv163–IEG(WMc), 2010 WL 4314269 (S.D. Cal. Oct. 26, 2010) (issuing order to show cause and referring matter to criminal authorities for defendant's "continued conduct in violation of the federal securities laws").

Moreover, Defendants' unenforceable commitment to give the SEC thirty days' notice of any planned offering impermissibly shifts Defendants' burden to comply with the law to the SEC.  This poses particular risk to investors in the digital asset space, where investor harm can occur with great alacrity and little transparency.  It is uncontested that Defendants planned, until the Court issued its TRO, to offer their fraudulent ICO in December 2018.  Their mere promise to halt the offering—for now—does not alter the fact that their anticipated ICO is for securities, nor that they have repeatedly lied about it being either "registered," "exempt," and/or "approved" under the federal securities laws.  Absent a preliminary injunction, the burden would be on the SEC to assess and prove whether any future offering by Defendants would violate the Securities Act.  On the other hand, if this court were to grant a preliminary injunction requiring Defendants to comply with Section 17(a), the burden would be on Defendants to ensure their own compliance.

It is particularly problematic to assume the Defendants will comply with the securities laws going forward in this case because the offering materials they initially published contained such outlandish misrepresentations.  Defendants claimed oversight by the SEC, CFTC and NFA, all the while creating and

promoting a fictitious regulatory agency of their own.  Dkt. 41 at 4.  These misrepresentations were available on Blockvest's public website *for months* and were only taken down after the SEC filed a complaint and Defendants retained counsel in this action.  And Ringgold personally repeated many of these misrepresentations in tweets and at industry conferences.  Defendants' obvious intent was to reassure offerees that the investment scheme involved securities subject to the federal securities laws and that offerees were thereby protected.  Defendants' misconduct was blatant, recurring, and enduring.

The SEC therefore urges the Court to reconsider the reasonable likelihood that Defendants' wrongs will be repeated without giving undue weight to Defendants' self-serving promises of future compliance with the securities laws.  Here, the litany of Defendants' false statements to investors they solicited over a span of months show a sustained fraudulent effort and establish a likelihood of future violations.

## IV.   <u>CONCLUSION</u>

The Opinion contained two rulings that were clear error under Ninth Circuit law and lead to a manifestly unjust result, making reconsideration appropriate pursuant to Rule 59(e).  The uncontested facts establish that Defendants offered a security to the general public, and misrepresented that the SEC had approved the securities offering as either registered and/or exempt from registration.  The SEC is authorized by statute to seek to enjoin this misconduct.  That statutory authority does not turn on identifying any particular offeree, what any particular offeree considered or relied on, nor whether any offeree was able to or did make any purchase.  Defendants' actions in promoting their fraudulent, unregistered offering to the public are conduct that this Court should enjoin, before investors are harmed, during the pendency of this action.  Defendants' promises to cease their offering once they retained counsel do not compel a different result.

For the foregoing reasons, the SEC respectfully requests that the Court reconsider, in part, its denial of the SEC's application for preliminary injunction, and preliminarily enjoin Defendants from violating 17(a) of the Securities Act.

Dated:  December 17, 2018                    Respectfully submitted,

                                             */s/ Amy Jane Longo*
                                             Amy Jane Longo
                                             David S. Brown
                                             Brent W. Wilner
                                             Attorney for Plaintiff
                                             Securities and Exchange Commission

# PROOF OF SERVICE

I am over the age of 18 years and not a party to this action.  My business address is:

       U.S. SECURITIES AND EXCHANGE COMMISSION,
       400 S. Flower Street, Suite 900, Los Angeles, California 90071
       Telephone No. (323) 965-3998; Facsimile No. (213) 443-1904.

On December 17, 2018, I caused to be served the document entitled **PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL RECONSIDERATION OF ORDER DENYING PRELIMINARY INJUNCTION (Dkt. No. 41)** on all the parties to this action addressed as stated on the attached service list:

☐    **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

      ☐    **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

      ☐    **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐    **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐    **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☐    **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒    **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐    **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

///

///

I declare under penalty of perjury that the foregoing is true and correct.

Date: December 17, 2018                    */s/ Amy Jane Longo*
                                            Amy Jane Longo

*SEC v. Blockvest LLC, et al.*
**United States District Court – Southern District of California**
**Case No. 3:18-cv-02287-GPC-MSB**

## <u>SERVICE LIST</u>

Stanley C. Morris **(served by ECF only)**
Corrigan & Morris LLP
12300 Wilshire Blvd., Suite 210
Los Angeles, California 90025
Attorneys for Defendants Reginald Buddy Ringgold, III and
Blockvest LLC