1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                      Plaintiff,<br><br>v.<br><br>BLOCKVEST, LLC and REGINALD BUDDY RINGGOLD, III a/k/a RASOOL ABDUL RAHIM EL,<br><br>                                      Defendants. | Case No.:  18CV2287-GPB(BLM)<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL RECONSIDERATION**<br><br>**[Dkt. No. 44.]** |

Before the Court is Plaintiff's motion for partial reconsideration of the Court's order denying preliminary injunction.  (Dkt. No. 44.)  Defendants filed an opposition, (Dkt. No. 53), and Plaintiff replied.  (Dkt. No. 55.)  A hearing was held on February 8, 2019. (Dkt. No. 58.)  Amy Longo, Esq. and Brent Wilner, Esq. appeared on behalf of Plaintiff Securities Exchange Commission and Stanley Morris, Esq. and Brian Corrigan, Esq. appeared on behalf of Defendants.  (Dkt. No. 58.)  Based on the reasoning below, and the arguments at the hearing, the Court GRANTS Plaintiff's motion for partial reconsideration.

/ / /

1

## Procedural Background

On October 3, 2018, Plaintiff Securities and Exchange Commission ("SEC" or "Plaintiff") filed a Complaint against Defendants Blockvest, LLC and Reginald Buddy Ringgold, III a/k/a Rasool Abdul Rahim El alleging violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b); violations under Section 10(b) of the Exchange Act and Rule 10b-5(a) and Rule 10b-5(c); fraud in violation of Section 17(a)(2) of the Securities Act of 1933 ("Securities Act"), fraud in violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act; and violations of Sections 5(a) and 5(c) of the Securities Act for the offer and sale of unregistered securities. (Dkt. No. 1, Compl.) Plaintiff also concurrently filed an ex parte motion for temporary restraining order seeking to halt Defendants' fraudulent conduct and freezing their assets, prohibiting the destruction of documents, seeking expedited discovery and an accounting of Defendants' assets. (Dkt. No. 3.) On October 5, 2018, the Court granted Plaintiff's ex parte motion for temporary restraining order. (Dkt. Nos. 5, 6.) In compliance with the temporary restraining order, Defendants filed Ringgold's Declaration of Accounting on October 26, 2018, and a First Supplemental Declaration of Ringgold on November 2, 2018. (Dkt. Nos. 18, 21.) Defendants also filed a response to the order to show cause on November 2, 2018. (Dkt. Nos. 23, 24, 25.) On November 7, 2018, Plaintiff filed a reply. (Dkt. Nos. 27, 28.) A hearing on the order to show cause was held on November 16, 2018, (Dkt. No. 37), and on November 27, 2018, the Court denied a preliminary injunction. (Dkt. No. 41.)

In this fully briefed motion, Plaintiff moves for partial reconsideration pursuant to Federal Rule of Civil Procedure 59(e) of the Court's denial of a preliminary injunction against Defendants for future violations of Section 17(a) of the Securities Act and seeks an order preliminarily enjoining Defendants from violating Section 17(a). (Dkt. Nos. 44, 53, 55.)

/ / /

/ / /

18CV2287-GPB(BLM)

# Factual Background[1]

1
2
3
4
5
6
7
8
9

Defendant Reginald Buddy Ringgold, III ("Ringgold"), is the chairman and founder of Defendant Blockvest, LLC ("Blockvest") (collectively "Defendants"), a Wyoming limited liability company that was set up to exchange cryptocurrencies but has never become operational.  (Dkt. No. 24, Ringgold Decl. ¶ 4.)  Blockvest Investment Group, LLC owns 100% of Blockvest LLC.  (Id.)  Ringgold owns 51% of the membership interests of Blockvest Investment Group, LLC, 9% are unissued, 20% is owned by Michael Shepperd, and the remaining 20% is owned by Ringgold's mother.  (Id.)

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The complaint alleges that Defendants have been offering and selling unregistered securities in the form of digital assets called BLV's.  It involves an initial coin offering ("ICO"), which is a fundraising event where an entity offers participants a unique digital "coin" or "token" or "digital asset" in exchange for consideration, often in the form of virtual currency—most commonly Bitcoin and Ether—or fiat currency.  (Dkt. No. 1, Compl. ¶ 18.)  The tokens are issued on a "blockchain" or cryptographically secured ledger.  (Id. ¶ 19.)  The token may entitle its holders to certain rights related to a venture underlying the ICO, such as rights to profits, shares of assets, rights to use certain services provided by the issuer, and/or voting rights.  (Id. ¶ 21.)  These tokens may also be listed on online trading platforms, often called virtual currency exchanges, and tradable for virtual or fiat currencies.  (Id.)  ICOs are typically announced and promoted through online channels and issuers usually release a "Whitepaper" describing the project and the terms of the ICO.  (Id. ¶ 22.)  To participate, investors are generally required to transfer funds (often virtual currency) to the issuer's address, online wallet, or other account.  (Id.)  After the completion of the ICO, the issuer will distribute its unique "tokens" to the participants' unique address on the blockchain.  (Id.)

---

[1] The facts are taken from the Court's order on preliminary injunction.  (Dkt. No. 41.)

18CV2287-GPB(BLM)

1    Relying on Blockvest's website and Whitepaper posted online, the SEC claims that

2    Blockvest conducted pre-sales of BLVs in March 2018.  According to the Whitepaper,

3    the BLVs are being sold in several stages: 1) a private sale (with a 50% bonus) that ran

4    through April 30, 2018; 2), a "pre-sale" (with a 20% bonus) from July 1, 2018 through

5    October 6, 2018; and 3) the $100 million ICO launch on December 1, 2018.  (Dkt. No. 1,

6    Compl. ¶ 30; Dkt. No. 3-12, Wilner Decl., Ex. 10 at p. 93; Dkt. No. 3-13, Wilner Decl.,

7    Ex. 11 at p. 127.)  On its Twitter account, on May 8, 2018, Blockvest claimed it raised

8    $2.5 million in 7 days, (Dkt. No. 3-19, Ex. 44 at p. 479), and by September 17, 2018, the

9    Blockvest website stated that 18% of the tokens being offered or around 9 million token

10   were sold.  (Dkt. No. 3-12, Wilner Decl., Ex. 10 at p. 96.)  Blockvest purports to be the

11   "First Licensed and Regulated Tokenized Crypto Currency Exchange & Index Fund

12   based in the US".  (Dkt. No. 3-23, Suppl. Wilner Decl., Ex. 1 at p. 3.)

13       According to the SEC, Blockvest and Ringgold falsely claim their ICO has been

14   "registered" and "approved" by the SEC and uses the SEC's seal on the website.   (Dkt.

15   No. 3-18, Wilner Decl., Ex. 41 at p. 416;  Dkt. No. 3-23, Suppl. Wilner Decl., Ex. 1 at p.

16   2.)  But the SEC has not approved, authorized or endorsed Defendants, their entities or

17   their ICO.  They also falsely claim their ICO has been approved or endorsed by the

18   Commodity Futures Trading Commission ("CFTC") and the National Futures

19   Association ("NFA") by utilizing their logos and seals and stating "Under the helpful eye

20   of the CFTC and the NFA . . . the Fund will be managed by Blockvest Investment Group,

21   LLP, a commodity pool operator registered with the Commodity Futures Trading

22   Commission and a member of the National Futures Association. . . ."  (Dkt. No. 3-23,

23   Suppl. Wilner Decl., Ex. 1 at p.1; id. at p. 2.)  But the CFTC and NFA have not approved

24   the ICO.  Defendants further falsely assert they are "partnered" with and "audited by"

25   Deloitte Touche Tohmatsu Limited ("Deloitte") but that is also not true.  (Dkt. No. 3-3,

26   Barnes Decl. ¶ 7.)  In order to create legitimacy and an impression that their investment is

27   safe, Defendants also created a fictitious regulatory agency, the Blockchain Exchange

28   Commission ("BEC"), creating its own fake government seal, logo, and mission

4

statement that are nearly identical to the SEC's seal, logo and mission statement.  (Dkt. No. 3-13, Wilner Decl., Exs. 13-19 at p. 149-67.)  Moreover, it falsely lists BEC's "office" as the same address as the SEC's headquarters.  (Dkt. No. 3-13, Wilner Decl., Ex. 14.)

In response, Ringgold asserts that Blockvest has never sold any tokens to the public and has only one investor, Rosegold Investments LLP, ("Rosegold") which is run by him and in which he has invested more than $175,000 of his own money.  (Dkt. No. 24, Ringgold Decl. ¶ 5.)   Blockvest utilized BLV tokens during the testing and development phase and a total of 32 partner testers were involved.  (Id.)

During this testing, 32 testers put a total of less than $10,000 of Bitcoin and Ethereum onto the Blockvest Exchange where half of it remains today.  (Id. ¶ 6.) The other half was used to pay transactional fees to unknown and unrelated third parties. (Id. ¶ 7.)   No BLV tokens were ever released from the Blockvest platform to the 32 testing participants.  (Id. ¶ 6.)  The BLV tokens were only designed for testing the platform and the testers would not and could not keep or remove BLV tokens from the Blockvest Exchange.  (Id.)  Their plan was to eventually issue a "new utility Token BLVX on the NEM Blockchain for exclusive use on the BlockVest Exchange."  (Id.) Ringgold never received any money from the sale of BLV tokens.  (Id. ¶ 7.)  The deposits are from digital wallet addresses and individuals that are not easily identifiable, but Ringgold believes that only affiliated persons would have deposited Bitcoin or Ethereum on the exchange and received nothing without complaining.  (Id.)  The Blockvest Exchange platform was never open for business.  (Id.)

At his deposition, Ringgold testified he knows the identity of the 32 investors. (Dkt. No. 27-18, Brown Decl., Ex. 17, Ringgold Depo. at 132:15-20.)  He indicated it was clear to the 32 testers that they were testing the platform so Defendants did not obtain any earnings statements from them.  (Id. at 132:21-133:4.)  Ringgold explains that the 32 investor were vetted and chosen based on Defendants' prior relationship with them.  (Id. at 133:11-18; 135:1-23.)  During the vetting process, Defendants collected

18CV2287-GPB(BLM)

their name, email, address and their level of sophistication.  (Id. at 135:1-6.)  They held several conferences and a webinar where Ringgold explained his requirements for the group of test investors.  (Id. at 136:3-18.)

Ringgold is also a principal in Master Investment Group and a trustee of Rosegold Investment Trust, partners of Rosegold Investment, LLP, a Delaware limited liability partnership formed in April 2017.  (Dkt. No. 24, Ringgold Decl. ¶ 10.)  Rosegold manages Blockvest and finances Blockvest's activities, as Blockvest, itself, has no bank accounts or assets, other than the work-in-progress development of a cryptocurrency exchange of unknown value.  (Id.)  The Rosegold bank account was opened in September 2017.  (Id.)

Ringgold personally invested over $175,000 in Rosegold and Michael Sheppard, Blockvest's Chief Financial Officer, invested about $20,000.  (Id. ¶ 11.)  Other investors in Rosegold are Ringgold's and Sheppard's friends and family.  (Id.)  At times, these investors loaned Ringgold or Sheppard money personally and they in turn, invested the money into Rosegold as their personal investment.  (Id.)  Seventeen individuals have loaned or invested money in Rosegold Investments.  (Id. ¶ 12; id., Ex. 2.)  Nine of these individuals confirm they did not buy BLV tokens or rely on any of the representations the SEC has alleged were false.[2]  (Id.)  His friends and family, as well as Mike Sheppard's friends and family who invested in Rosegold did not care what they were investing in because they trusted them based on their long-time familial and friend relationship.  (Dkt. No. 27-18, Brown Decl., Ex. 17, Ringgold Depo. at 86:3-6; 87:4-9; 89:1-3.)  Ringgold claims he never received anything of value from the offer or sale of BLV tokens to anyone.  (Dkt. No. 24, Ringgold Decl. ¶ 13.)

---

[2] Of the 17 individuals, nine individuals signed declarations asserting that they did not buy BLV tokens or rely on any representations by Defendants that the SEC asserts were false.  (Dkt. No. 24, Ringgold Decl., Ex. 2.)  The SEC points out that the remaining eight individuals wrote "Blockvest" and/or "coins" on their checks.

Ringgold recognizes that mistakes were made but no representations or omissions were made in connection with the sale and purchase of securities.  (<u>Id.</u> ¶ 14.)  They were in the early stages of development as the Chief Compliance Officer had not yet reviewed all the materials.  (<u>Id.</u> ¶ 16.)  Ringgold states it was his intention to comply with "every possible regulation and regulatory agency."  (<u>Id.</u>)  Currently, he has ceased all efforts to proceed with the ICO and agrees not to proceed with an ICO until he gives SEC's counsel 30 days' notice.  (<u>Id.</u> ¶ 17.)

**Discussion**

**A.    Legal Standard on Motion for Reconsideration**

Federal Rule of Civil Procedure 59(e) provides for the filing of a motion to alter or amend a judgment. Fed. R. Civ. P. 59(e). A motion for reconsideration, under Federal Rule of Civil Procedure 59(e), is "appropriate if the district court (1) is presented with newly discovered evidence; (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law." <u>Sch.Dist. No. 1J, Multnomah County, Or., v. ACandS, Inc.</u>, 5 F.3d 1255, 1263 (9th Cir. 1993); <u>see also</u> <u>Ybarra v. McDaniel</u>, 656 F.3d 984, 998 (9th Cir. 2011).  "Clear error occurs when 'the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed.'"  <u>Smith v. Clark Cnty. Sch. Dist.</u>, 727 F.3d 950, 955 (9th Cir. 2013) (quoting <u>United States v. U.S. Gypsum Co.</u>, 333 U.S. 364, 395 (1948)).

**B.    Preliminary Injunction**

The party moving for a preliminary injunction bears the burden to demonstrate the factors justifying relief.  <u>Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers</u>, 415 U.S. 423, 441 (1974).  Because the SEC is a governmental agency acting as a "statutory guardian charged with safeguarding the public interest in enforcing the securities laws", <u>SEC v. Mgmt. Dynamics, Inc.</u>, 515 F.2d 801, 808 (2d Cir. 1975), courts have adopted a two part factor test requiring the SEC to show "(1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that

7

the wrong will be repeated." SEC v. Unique Fin. Concepts, Inc., 196 F.3d 1195, 1199 n. 2 (11th Cir. 1999) (citing Mgmt. Dynamics, Inc., 515 F.2d at 806–07; SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1100 (2d Cir. 1972)); see also SEC v. Schooler, 902 F. Supp. 2d 1341, 1345 (S.D. Cal. 2012) (using the two-part standard when determining whether to issue a preliminary injunction requested by the SEC); SEC v. Capital Cove Bancorp LLC, SACV 15-980-JLS(JCx), 2015 WL 9704076, at *5 (C.D. Cal. Sept. 1, 2015) (same).

"The grant of a preliminary injunction is the exercise of a very far reaching power never to be indulged in except in a case clearly warranting it. . . . [O]n application for preliminary injunction the court is not bound to decide doubtful and difficult questions of law or disputed questions of fact." Dymo Indus., Inc. v. TapePrinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964) (citation omitted); see also Mayview Corp. v. Rodstein, 480 F.2d 714, 719 (9th Cir. 1973) (reversing grant of preliminary injunction based on existence of disputed factual issues).

Plaintiff moves for partial reconsideration arguing that the Court committed clear error on both prongs to support a preliminary injunction on the Section 17(a) violations. First it argues that it was error for the Court to require the SEC to prove that an investment is a security based solely on the beliefs of some individual investors, rather than the objective nature of the investment being offered to the public.  Second, the Court also erred on the second factor based on Defendants' promise not to commit any future securities fraud.  Defendants disagree with Plaintiff's arguments.  For the reasons that follow, the Court finds reconsideration is warranted based upon a prima facie showing of Defendants' past securities violation and newly developed evidence which supports the conclusion that there is a reasonable likelihood of future violations.

///

///

///

///

## C.     Prima Facie Case of Past Securities Violations

Plaintiff alleges Defendants violated Sections 17(a)(1), (2), and (3) of the Securities Act.[3]  (Dkt. No. 1, Compl.)  Section 2(a)(1) of the Securities Act defines "security" as *inter alia*, a "note, stock, treasury stock, bond, [or] investment contract."  15 U.S.C. § 77b(a)(1).  Congress defined "security" to be "sufficiently broad to encompass virtually any instrument that might be sold as an investment" but did not "intend to provide a broad federal remedy for all fraud."  Reves v. Ernst & Young, 494 U.S. 45, 61 (1990) (internal quotations omitted).   Courts should look not to the form but to the "economic realities of the transaction."  United Hous. Fdn. v. Forman, 421 U.S. 837, 838 (1975).

In Howey, the Court defined whether an investment contract is a security under the Securities Act and held that an investment contract is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party."  SEC v. W.J. Howey Co., 328 U.S. 293, 298-99 (1946).  The Court noted that the Securities Act prohibits not only the sale but also the offer of an unregistered, non-exempt security so the fact that purchasers choose not to accept the full offer is not relevant.  Id. at 300-01.  Although Howey's

---

[3] Section 17(a) provides,

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1)  to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q.

holding was limited to "investment contracts," the Supreme Court later found that this test "embodies the essential attributes that run through all of the Court's decisions defining a security." Forman, 421 U.S. at 852; but see Reves, 494 U.S. at 64 (establishing approach to determine whether a "note" is a "security" and rejecting circuit court's analysis of note under Howey test as the instrument in Howey being an "entirely different variety of instrument").

Howey's three-part test requires "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." SEC v. Rubera, 350 F.3d 1084, 1090 (9th Cir. 2003) (internal quotation marks omitted); SEC v. Shavers, Case No. 13cv416, 2014 WL 12622292, at *6 (E.D. Texas Aug. 26, 2014) (district court found investment in Bitcoin Savings and Trust to be an investment contract under Howey). The Howey test is an "objective inquiry into the character of the instrument or transaction offered based on what the purchasers were 'led to expect.'" Warfield v. Alaniz, 569 F.3d 1015, 1021 (9th Cir. 2009).

The Court agrees with the SEC that the Howey test is unquestionably an objective one. However, the Court disputes the SEC's assertion that the Court applied a subjective test so as to require the SEC to demonstrate a security "solely on the beliefs of some individual investors, rather than on the objective nature of the investment being offered to the public . . . ." and for it to show what specific investors relied on before they purchased the test BLV tokens. (Dkt. No. 44-1 at 6, 15.) Instead, the Court, relying on Ninth Circuit authority, recognized it was required to objectively inquire into the "terms of promotional materials, information, economic inducements or oral representations at the seminars", (Dkt. No. 41 at 13), or in other words, an inquiry into the "character of the instrument or transaction offered" to the "purchasers." See Warfield, 569 F.3d at 1021. However, because there were disputed factual issues as to the nature of the investment being offered to the alleged investors, the Court denied the preliminary injunction as to these purchasers. See Mayview Corp., 480 F.2d at 719 (reversing preliminary injunction based on existence of disputed factual issues).

18CV2287-GPB(BLM)

At the beginning of this litigation, the SEC requested a TRO premised upon Defendants' alleged offer and sale of unregistered securities.  In granting Plaintiff's *ex parte* TRO application without notice to Defendants, the Court determined that the SEC had presented a prima facie showing based on Defendants' marketing and advertising through their websites and social media posts that BLV tokens were "securities."  (Dkt. No. 5 at 8-9.)  Relying on Defendants' postings on the internet, the SEC asserted that Blockvest raised more than $2.5 million from investors, there was a "common enterprise" because Blockvest claimed that the funds raised will be pooled and there would be a profit sharing formula.  (Id.)  Finally, as described on their website and Whitepaper, the investors in Blockvest would be passive as they would depend entirely on Defendants' efforts.  (Id.)

After the TRO was granted, Defendants, in their opposition to the order to show cause, presented evidence which contradicted the SEC claim that Defendants' raised more than $2.5 million from investors.  Defendants explained that they did not raise $2.5 million from the public but instead the $2.5 million was based on a transaction with David Drake which collapsed.  (Dkt. No. 24, Ringgold Decl. ¶ 15.)  Ringgold asserted he had not sold any BLV tokens to the public but instead used the BLV tokens for purposes of testing during the development phase.  (Id. ¶ 5.)  During this testing phase, 32 testers put a total of less than $10,000 of Bitcoin and Ethereum onto the Blockvest Exchange and no tokens were released to the 32 testing participants.  (Id. ¶ 6.)  At his deposition, Ringgold testified he knows the identity of the 32 investors. (Dkt. No. 27-18, Brown Decl., Ex. 17, Ringgold Depo. at 132:15-20.)  He indicated it was clear to the 32 testers that they were testing the platform so Defendants did not obtain any earnings statements from them.  (Id. at 132:21-133:4.)  Ringgold explained that the 32 investor were vetted and chosen based on Defendants' prior relationship with them.  (Id. at 133:11-18; 135:1-23.)  During the vetting process, Defendants collected their name, email, address and their level of sophistication.  (Id. at 135:1-6.)  They held several conferences and a

1   webinar where Ringgold explained his requirements for the group of test investors.  (Id.
2   at 136:3-18.)

3        As to the 17 individual investors in Rosegold, Ringgold stated they were his and
4   Sheppard's friends and family.  (Dkt. No. 24, Ringgold Decl. ¶ 11.)  They loaned money
5   to Ringgold and Sheppard personally and they in turn, invested the money into Rosegold
6   as Ringgold and Sheppard's personal investment.  (Id.)  Their friends and family who
7   invested in Rosegold did not care what they were investing in because they trusted them
8   based on their long-time familial and friend relationship.  (Dkt. No. 27-18, Brown Decl.,
9   Ex. 17, Ringgold Depo. at 86:3-6; 87:4-9; 89:1-3.)  Most of these individuals confirm that
10  they did not buy BLV tokens or rely on any representations that SEC has alleged were
11  false.  (Dkt. No. 24, Ringgold Decl. ¶ 12, Ex. 2.)  Therefore, Defendants argued the BLV
12  tokens "purchased" by the 32 test investors were not "securities" and 17 individuals who
13  invested in Rosegold did not purchase "securities."

14       Despite Defendants having raised disputed facts as to what was offered to the 32
15  test investors and 17 individual investors in Rosegold, in reply, the SEC repeated its
16  argument that Defendants sold "securities" to them.  The SEC argued that "defendants'
17  own evidence confirms that investors provided funds to Blockvest in exchange for
18  anticipated BLV tokens."  (Dkt. No. 27 at 3.)  The SEC's argument was premised on the
19  offer and/or sale of the BLV tokens to the 32 test investors as well as the 17 individuals
20  who invested in Rosegold.  Because Defendants' facts challenged the SEC's prima facie
21  showing on its TRO on whether a "security" was offered to the alleged "investors," the
22  Court denied the preliminary injunction.  (Dkt. No. 41 at 9-15.)

23       The cases cited by the Court as well as the SEC support the Court's ruling as it
24  relates to the offer to the alleged "investors."  In determining whether a transaction
25  constituted a "security" based on an offer and/or sale to investors, the Ninth Circuit looks
26  to the specific promotional materials presented to the "investors."  In Warfield, the court
27  had to determine whether a Foundation's charitable gift annuities were investment
28  contracts under federal securities law.  The Foundation had raised $55 million dollars

18CV2287-GPB(BLM)

from the sale of more than 400 charitable gift annuities.  Warfield, 569 F.3d at 1018.  The

defendants argued that there was no investment of money because they lacked the intent

to realize a financial gain and were motivated solely to make charitable contributions.

The court noted that the subjective intent of the purchasers may have some bearing but

Howey is an objective inquiry into the character of the instrument or transaction based on

what the purchasers were "led to expect."  Id. at 1021.  This requires an inquiry into what

the purchasers were offered or promised.  Id. (courts frequently examine promotional

material associated with the transaction); see SEC v. C.M. Joiner Leasing Corp., 320 U.S.

344, 352–53 (1943) ("The test [for determining whether an instrument is a security] . . . is

what character the instrument is given in commerce by the terms of the offer, the plan of

distribution, and the economic inducements held out to the prospect.").

        As explained in Hocking, before applying the Howey test, "we must determine

what exactly [the defendant] offered to [the plaintiff]."  Hocking v. Dubois, 885 F.2d

1449, 1457 (9th Cir. 1989) (concerning sale of real estate).  The Ninth Circuit in Hocking

explained, "[c]haracterization of the inducement cannot be accomplished without a

thorough examination of the representations made by the defendants as the basis of the

sale.  Promotional materials, merchandising approaches, oral assurances and contractual

agreements were considered in testing the nature of the product in virtually every relevant

investment contract case."  Id. (quoting Aldrich v. McCulloch Props., Inc., 627 F.2d

1036, 1039-40 (10th Cir. 1980)).

        Similarly, in this case, based on the SEC's primary argument, the Court was

required to look at all that was offered or promised to the 32 test investors and 17

individual investors in Rosegold related to the BLV tokens.  As to the 32 test investors,

Ringgold testified that he knew them all and made oral presentations to them at seminars

to explain the test tokens and provided declarations from nine of the test investors

indicating they did not intend to make an investment when it tested the Blockvest

exchange platform.  (Dkt. No. 32, Ringgold Decl. ¶ 28; Dkt. No. 32-8.)  As to the 17

individual investors, Ringgold stated that they made personal loans to him and Sheppard,

which they, in turn, invested into Rosegold as their personal investment.  (Dkt. No. 24, Ringgold Decl. ¶ 12.)  Contrary to the SEC's argument, the Court did not require that the SEC prove the subjective beliefs of the alleged investors.   Instead, disputed issues of fact precluded the issuance of a preliminary injunction.  The Court denies Plaintiff's motion for reconsideration as to the offers or promises made to the 32 test investors and 17 individual investors.

The SEC provided a separate theory to support its request for a preliminary injunction.  The SEC alleged, in the alternative, that the promotional materials presented on Defendants' website, the Whitepaper posted online and social media accounts concerning the ICO of the BLV token constitute an "offer" of unregistered "securities," that contain materially false statements and thus, constitute violations of Section 17(a). (Dkt. No. 3-1 at 25, No. 27 at 10.)  Defendants oppose the reconsideration motion arguing that the term "offer" requires a manifestation of intent to be bound which the SEC failed to demonstrate.  (Dkt. No. 53 at 9.)  The Court did not directly address this alternative theory in its original order and based upon the additional submitted briefing concludes that Defendants made an "offer" of unregistered securities which violated Section 17(a).

Section 17(a) applies to the "offer" or "sale" of securities.  15 U.S.C. § 77q.  A violation of Section 17(a) does not require a completed sale of securities.  See SEC v. American Commodity Exch., 546 F.2d 1361, 1366 (10th Cir. 1976) ("actual sales [are] not essential" for liability to attach under § 17(a) and § 10(b)); S.E.C. v. Tambone, 550 F.3d 106, 122 (1st Cir. 2008) (noting that "because section 17(a) applies to both sales and offers to sell securities, the SEC need not base its claim of liability on any completed transaction at all").

The Court first considers the Howey factors to consider whether Defendants' promotion of the BLV token on their website and the Whitepaper constitutes a "security." On the first "investment of money" prong, Defendants' website and Whitepaper invited or enticed potential investors to provide digital or other currency in exchange for BLV

tokens.  (Dkt. No. 3-12, Wilner Decl., Ex. 10; Dkt. No. 3-13, Wilner Decl., Ex. 11.)  This includes having a "Buy Now" button.  (Dkt. No. 3-23, Suppl. Wilner Decl., Ex. 1 at p. 4.)  An "investment of money" can take the form of "goods and services", <u>Int'l Bhd. of Teamsters v. Daniel</u>, 439 U.S. 551, 560 n. 12 (1979) ("This is not to say that a person's 'investment,' in order to meet the definition of an investment contract, must take the form of cash only, rather than of goods and services"); or "exchange of value."  <u>Hocking</u>, 885 F.2d at 1471.  Defendants' website and their Whitepaper's invitation to potential investors to provide digital currency in return for BLV tokens satisfies the first "investment of money" prong.

Here, the website promoted a "common enterprise" because Blockvest claimed that the funds raised will be pooled and there would be a profit sharing formula.  <u>See Hocking</u>, 885 F.2d at 1459 ("The participants pool their assets; they give up any claim to profits or losses attributable to their particular investments in return for a pro rata share of the profits of the enterprise; and they make their collective fortunes dependent on the success of a single common enterprise.").  Specifically, the Whitepaper stated that "[a]s a Blockvest token holder, your Blockvest will generate a pro-rated share of 50% of the profit generated quarterly as well as fees for processing transactions."  (Dkt. No. 3-13, Wilner Decl., Ex. 11, p. 126.)  The second <u>Howey</u> factor has been met.

Finally, as described on the website and Whitepaper, the investors in Blockvest would be "passive" investors and the BLV tokens would generate "passive income."  (Dtk. No. 3-13, Wilner Decl., Ex. 11 at p. 126, 127); <u>see</u> <u>Forman</u>, 421 U.S. at 852 (third prong is "premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others").  In conclusion, the Court determines that the SEC has demonstrated that the promotion of the ICO of the BLV token was a "security" and satisfies the <u>Howey</u> test.

Next, the Court determines whether there was an "offer" of the BLV tokens subject to Section 17(a).  The Securities Act defines "offer" to "include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value."

15 U.S.C. § 77b(a)(3).  Section 17(a) is "intended to cover any fraudulent scheme in an offer or sale of securities, whether in the course of an initial distribution or in the course of ordinary market trading."  United States v. Naftalin, 441 U.S. 768, 778 (1979).  In Naftalin, the Court found that the statutory phrase, "in the offer or sale of any securities," was intended to be "define[d] broadly" and is "expansive enough to encompass the entire selling process, including the seller/agent transaction."  Id. at 773; see Rubin v. United States, 449 U.S. 424, 431 (1981) (noting that section 17(a) was enacted "to protect against fraud and promote the free flow of information in the public dissemination of securities" and holding that pledge of shares of stock constitutes an "offer" or "sale" of a security).

Further, the term "offer" in securities law has a "different and far broader" meaning than contract law.  Hocking, 885 F.2d at 1457-58; SEC v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998) (the definition of "offer" under 15 U.S.C. § 77b(a)(3) "extends beyond the common law contract concept of an offer" and covers the negotiations); SEC v. Comm. Inv. & Dev. Corp. of Fla., 373 F. Supp. 1153, 1164 (S.D. Fla. 1974) ("the import of the August 10, 1971 letter was to solicit CIDC shareholders to offer to buy part of the proposed public offering, and to encourage CIDC shareholders to solicit non-shareholders to buy CIDC stock. The letter constituted an 'offer to sell' within the meaning of the Securities Act.").

In Hocking, an en banc panel of the Ninth Circuit held there were genuine issues of material fact whether the sale of a condominium and a rental pool arrangement by a real estate broker constituted a "security" under the federal securities laws.  Hocking, 885 F.2d at 1455.  The plaintiff purchased a unit in a condominium complex in Hawaii from the defendant real estate broker who sold the property.  Id. at 1451.  The offer of the condominium unit also included the availability of a rental pool arrangement ("RPA") where the broker told the plaintiff that the average rental of the unit was $100 a day.  Id. at 1452.  While the broker did not require the plaintiff to participate in the RPA, the plaintiff testified that he would not have purchased the condominium if there was no

16

RPA.  Id. 1453.  The plaintiff entered into an agreement to purchase a unit from a prior owner and entered into several agreements with Hotel Corporation of the Pacific ("HCP") regarding the condominium's rental.   He signed a rental management agreement (RMA") appointing HCP as the exclusive agent to manage the condominium; an Individual Agency Rental Agreement for Pooled Operation, the RPA, which placed the unit in HCP's rental pool; and he also subsequently signed an addendum to the RPA.  Id. at 1453.

"In attempting to determine whether a scheme involves a security, the inquiry is not limited to the contract or other written instrument."  Id. at 1457.  The panel looked at the package that was offered to the plaintiff and held that there was a fact issue where Hocking had "put forward numerous facts concerning whether the condominium sale and rental agreements were presented to him as parts of one transaction."  Id. at 1458. In its defense, the defendant argued that while the broker offered the plaintiff the condominium, the broker could not "offer" the RPA or other rental agreements to him. Id.  The court recognized that in terms of common law contract, the broker could not "offer" the RPA because the broker could not legally bind HCP to enter into the RPA with the plaintiff and the prior owners had not transferred a legally enforceable option to join the RPA to the plaintiff.  Id. at 1457.  But the Ninth Circuit stated that the term "offer" under securities law is broader than common law contract and even if the defendant broker could not legally bind HCP to enter into the rental arrangements with the plaintiff, it was "not inappropriate that [the defendant's] offerings be judged as being what they were represented to be."  Id. at 1458.  "Taken together these facts are sufficient to raise an issue of material fact for the trier to decide whether the RPA and other agreements were part of one scheme or transaction [the broker] offered [the plaintiff]." Id. at 1458.

As described by one district judge, "[i]mpossibility of performance is not dispositive to the court's determination of whether defendants' conduct constituted an 'offer to sell.'  What is dispositive to the court's determination is whether defendants'

conduct conditioned the public mind." SEC v. Thomas D. Kienlen Corp., 755 F. Supp. 936, 940 (D. Or. 1991) (addressing "offer" under Section 5[4] of the Securities Act).  In Kienlen Corp., the district court found that a notice mailed to clients and a brochure handed out at a meeting constituted "offers to sell" where the defendants promoted the "[g]reater safety,", "improved performance," and "[l]ower costs," of their offering.  Id. at 940-41.

In SEC v. Arvida Corp., 169 F. Supp. 211 (S.D.N.Y. 1958), the court found that there was an "offer to sell" under Section 2(3) of the Securities Act, 15 U.S.C. § 77b(a)(3), where the defendant conducted a press conference where a spokesperson for the issuer answered reporters' questions, including questions regarding the proposed offering price per share.  Id. at 215.  The court found "the furnishing to the press by representatives of the issuer and the underwriters of written and oral communications concerning the forthcoming public offering of the issuer's securities, thereby causing the public distribution of such information through news media, constituted an 'offer to sell.'"  Id.

Defendants, in their briefs and at the hearing, argued that an offer requires a "manifestation of intent to be bound" but only cite to California state contract law in support.  Based on caselaw defining an "offer" under the securities laws, Defendants' argument seeks to improperly narrow the definition of "offer".  Under securities law and caselaw, the definition of "offer" is broad and there is no requirement that performance must be possible or that the issuer must be able to legally bind a purchaser.  See Hocking, 885 F.2d at 1457; Kienlen Corp., 755 F. Supp. at 940-41.  Thus, the Court concludes that the contents of Defendants' website, the Whitepaper and social media posts concerning

---

[4] Sections 5(a) and 5(c) of the Securities Act prohibit the interstate sale of unregistered securities. 15 U.S.C. §§ 773(a) & (c). "In order to establish a Section 5 violation, [plaintiff] must point to evidence that: (1) no registration statement was in effect as to the securities; (2) [defendant] sold or offered to sell the securities; and (3) the sale or offer was made through interstate commerce." SEC v. Phan, 500 F.3d 895, 908 (9th Cir. 2007) (quoting Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 212 (3d Cir. 2006)).

the ICO of the BLV tokens to the public at large constitute an "offer" of "securities" under the Securities Act.

In responding to the TRO, Defendants only challenged whether the BLV tokens were "securities" and did not dispute the remaining elements of a Section 17(a) violation. (Dkt. No. 41 at 9.)   In its opposition to the motion for reconsideration, Defendants now challenge the other elements required to demonstrate a violation under Section 17(a) by contending that Plaintiff failed to demonstrate scienter[5] under Section 17(a); failed to point to a defrauded "purchaser" under Section 17(a)(3) and did not receive value for the sale of the security under Section 17(a)(2).   The Court declines to consider new arguments raised in an opposition to a motion for reconsideration and not raised on preliminary injunction.   See Dodds v. BAC Home Loans Serv., LP, CV. No. 10-00371 DAE, KSC, 2011 WL 1483971, at *9 (D. Haw.  Apr. 19, 2011) ("Plaintiff may not raise new arguments in his Opposition for the first time.")  Consequently, on reconsideration, the Court concludes that Plaintiff has presented a prima facie showing of previous violations of Section 17(a).

**D.**     **Reasonable Likelihood that the Wrong will be Repeated**

Second, the SEC argues that the Court erred by relying on promises made by Defendant Ringgold that he would stop the initial coin offering and provide the SEC 30 days' notice before resuming the offering because an unenforceable promise is not a sufficient ground for denying the injunction in light of the fact Ringgold repeatedly made false statements in multiple venues.  Defendants argue that Plaintiff has not presented any evidence that the wrong will likely be repeated and, in fact, no wrongdoing has occurred since the preliminary injunction order.

---

[5]  Scienter is a required element of a Section 17(a)(1) violation but not an element of a violation of Sections 17(a)(2) or (3).  Aaron v. SEC, 446 U.S. 680, 697 (1980).

18CV2287-GPB(BLM)

On the second factor for injunctive relief, in determining a reasonable likelihood of future violations, the Court must look at the totality of the circumstances concerning Defendants and their violations.  See SEC v. Murphy, 626 F.2d 633, 655 (9th Cir. 1980). "[T]he fact that illegal conduct has ceased does not foreclose injunctive relief." SEC v. Koracorp Industries, Inc., 575 F.2d 692, 698 (9th Cir. 1978).  "Promises of reformation and acts of contrition are relevant in deciding whether an injunction shall issue, but neither is conclusive or even necessarily persuasive, especially if no evidence of remorse surfaces until the violator is caught." Id.  In considering the totality of the circumstances, courts should consider factors such as "degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations." Murphy, 626 F.2d at 655.  Past violations "may give rise to an inference that there will be future violations." Id.; SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975) ("[t]he commission of past illegal conduct is highly suggestive of the likelihood of future violations.").

In Koracorp, the Ninth Circuit reversed the summary judgment ruling in favor of the defendants on the issue of whether there will be future violations.  The court noted that on the issue of the "extent of the culpability of the several defendants" in relation to likelihood of recurrent securities laws violations, the court is required "to prove the defendants' states of mind" which requires an inquiry into the "the character of past violations" and the "bona fides of the expressed intent to comply." 575 F.2d at 698-99 ("Neither the character of a defendant's past violations nor the bona fides of an expressed intent to comply can be ascertained without determination of the acts and conduct of each of these defendants in connection with the securities violations.").  Similarly, in Murphy, the Ninth Circuit affirmed the district court grant of permanent injunction on a summary judgment motion noting that the evidence supported an injunction where the evidence shows that defendant had "acted recklessly" and had repeated violations but insisted he

18CV2287-GPB(BLM)

1   had done nothing wrong.  <u>Murphy</u>, 626 F.2d at 655.  Moreover, the defendant's new

2   venture provided him with ample opportunity for continued violations.  <u>Id.</u>

3         In its prior order, the Court considered the totality of the circumstances, without

4   the benefit of full discovery, and concluded that the wrong would not be likely repeated

5   because Ringgold recognized that mistakes were made and he intended to comply with

6   the securities law and stated in a declaration that he had ceased all efforts to proceed with

7   the ICO.  Moreover, the Court noted that after Defendants had retained counsel, they

8   stopped making false statements about the ICO of the BLV tokens.  The Court also

9   concluded that the SEC had not demonstrated a prima facie case of past violations of

10   securities laws.

11         In the instant motion, the Court grants a partial reconsideration and concludes that

12   Plaintiff has presented a prima facie case of violations of Section 17(a), which creates an

13   inference that Defendants will likely violate the securities law in the future if not

14   enjoined.  <u>See</u> <u>Mgmt. Dynamics, Inc.</u>, 515 F.2d at 807.  The misrepresentations on

15   Defendants' website postings include falsely claiming their ICO has been "registered"

16   and "approved" by the SEC, falsely claiming their ICO has been approved or endorsed by

17   the CFTC and the NFA by utilizing their logos and seals, falsely asserting they are

18   "partnered" with and "audited by" Deloitte, and falsely creating a fictitious regulatory

19   agency, the BEC, with a fake government seal, logo, and mission statement that are

20   nearly identical to the SEC's seal, logo and mission statement.  Ringgold does not dispute

21   that these false representations were on the website; instead, he claims that mistakes were

22   made.  (Dkt. No. 24, Ringgold Decl. ¶ 14.)  The Court recognizes that Defendants could

23   have reasonably made a mistake as to their SEC filings as they had hired a compliance

24   attorney; however, the Court questions Defendants' mistake concerning the creation of

25   fictitious agency, BEC, utilizing a nearly identical seal, logo and mission statement as the

26   SEC to provide a false appearance that the ICO had regulatory approval and was safe.

27         Moreover, in the motion to withdraw as counsel, defense counsel explained that

28   the firm found it necessary to terminate representation due to, *inter alia*, Defendants

18CV2287-GPB(BLM)

instructing defense counsel to file certain documents that counsel could not certify under Federal Rule of Civil Procedure 11.[6]  (Dkt. No. 47-1, Morris Decl. ¶¶ 8, 9.)  In fact, when defense counsel declined to file the documents, Defendants attempted to file such documents with the Court without counsel's permission or signature and the documents were rejected by the Court Clerk.  (Id. ¶ 9.)  While Defendants have been notified of defense counsel's intention to withdraw as well as the pending motion to withdraw as counsel, they have yet to find substitute counsel.  In light of the Court's order granting defense counsel's motion to withdraw as counsel, the Court has concerns whether Defendants will resume their prior alleged fraudulent conduct.

Thus, in consideration the totality of the circumstances concerning Defendants and their alleged Section 17(a) violations, and because Ringgold sought to file documents that were not in compliance with Rule 11, the Court reconsiders its ruling and concludes that there is a reasonable likelihood of future violations of Section 17(a) based on newly developed facts under Rule 59.  Moreover, because Ringgold, in his opposition, agreed to stop pursuing the ICO and to stop violating securities laws, (Dkt. No. 24, Ringgold Decl. ¶¶ 16, 17), a narrow injunction limited to Section 17(a) violations until a trial is held will not be burdensome on Defendants.

---

[6] Rule 11 provides,

By presenting to the court a pleading, written motion, or other paper--whether by signing, filing, submitting, or later advocating it--an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11

18CV2287-GPB(BLM)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Conclusion

Based on the above, the Court GRANTS Plaintiff's motion for partial reconsideration on Section 17(a) of the Securities Act of 1933 and GRANTS Plaintiff's motion for preliminary injunction.  Accordingly, IT IS HEREBY FURTHER ORDERED that Defendants Blockvest and Ringgold are preliminarily enjoined from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

(a) to employ any device, scheme, or artifice to defraud;
(b) to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
(c) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

IT IS SO ORDERED.

Dated:  February 14, 2019

Hon. Gonzalo P. Curiel
United States District Judge

23

18CV2287-GPB(BLM)