1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        SOUTHERN DISTRICT OF CALIFORNIA

10

11   SECURITIES AND EXCHANGE              Case No.:  18cv2287-GPC (MSB)
     COMMISSION,
12                                        **REPORT AND RECOMMENDATION FOR**
                              Plaintiff,  **ORDER GRANTING PLAINTIFF'S MOTION**
13                                        **FOR TERMINATING SANCTIONS**
     v.                                   **[ECF No. 93]**
14
     BLOCKVEST, LLC, et al.,
15
                              Defendants.
16

17

18        Pending before the Court is Plaintiff's Securities and Exchange Commission's

19   "Motion for Terminating Sanctions" [ECF No. 93], Defendants' Opposition [ECF No. 99],

20   and Plaintiff's Reply in support of its motion for terminating sanction [ECF No. 102].  This

21   Report and Recommendation is submitted to the United States District Judge Gonzalo P.

22   Curiel pursuant to 28 U.S.C. § 636(b) and Civil Local Rule 72.1(c) of the United States

23   District Court for the Southern District of California.  For the reasons set forth below, the

24   Court **RECOMMENDS** that Plaintiff's motion for terminating sanctions be **GRANTED**.

25   / / /

26   / / /

27   / / /

28   / / /

# I.  RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

On October 3, 2018, Plaintiff Securities and Exchange Commission ("SEC") filed a Complaint against Defendants Blockvest, LLC ("Blockvest") and Reginald Buddy Ringgold, III a/k/a Rasool Abdul Rahim El ("Ringgold").  (Compl., ECF No. 1.)  Plaintiff states that Defendant Blockvest, a limited liability company, and Defendant Ringgold, Blockvest's founder and principal, offer and sell unregistered securities in the form of digital assets called "BLVs," and seeks to stop investment fraud involving an initial coin offering ("ICO")[1] by Defendants.  (See id.; see also id. at 2, 4-5.)  The Complaint further alleges that Blockvest claims to be the "first [U.S.] **licensed and regulated** tokenized crypto currency exchange and index fund," that it has already raised more than $2.5 million in pre-ICO sales of its BLVs, and it will raise $100 million during its ICO to fund Blockvest's digital asset-related financial products and services.  (Id. at 2.)  Plaintiff contends that Defendants falsely claim that their ICO has been "registered" and "approved" by the SEC and other regulators, and that Defendants have partnered with and are audited by Deloitte Touche Tohmatsu Limited.  (Id.)  Plaintiff further alleges that Defendants created a fictitious regulatory agency, the Blockchain Exchange Commission ("BEC"), in order to create legitimacy and an impression that their investment is safe.  (Id.)

Plaintiff claims that Defendants do not have the required regulatory approvals and the established business relationships they claim to have, because the BLV offering is not

---

[1] An ICO is a fundraising event where an entity offers participants a unique digital coin, token, or digital asset in exchange for consideration, frequently in the form of virtual currency, such as Bitcoin and Ether, or fiat currency.  (Id. at 7.)  Digital assets issued in an ICO entitle their holders to certain rights related to a venture underlying the ICO, including rights to profits, shares of assets, use of certain services provided by the issuer, and voting rights.  (Id. at 7-8.)  Digital assets may also be listed on online trading platforms, and are tradable for virtual or fiat currencies.  (Id. at 8.)  ICOs are typically announced and promoted through public online channels.  (Id.)  Generally, to participate, investors are required to transfer funds to the issuer's address, online wallet, or other account.  (Id.)  After the completion of the ICO, the issuer distributes its unique digital assets ("tokens") to the participants' unique addresses on the blockchain.  (Id.)

"U.S. SEC approved," nor is it approved by any other U.S. financial regulator, the BEC is not affiliated with the SEC, and Blockvest is not affiliated with the name-brand companies whose logos appear in its marketing materials.  (Id. at 2-3.)  Plaintiff contends that investors' assets therefore lack the safety and protections that Defendants are falsely portraying in their scheme to raise money through Blockvest's planned ICO and ongoing pre-sales.  (Id. at 3.)

Plaintiff asserts the following five causes of action:  (1) fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b); (2) fraud in connection with the purchase or sale of securities, in violation of Section 10(b) of the Exchange Act and Rules 10b-5(a) and 10b-5(c); (3) fraud in the offer or sale of securities, in violation of Section 17(a)(2) of the Securities Act of 1933 ("Securities Act"); (4) fraud in the offer or sale of securities, in violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act; and (5) unregistered offer and sale of securities, in violation of Sections 5(a) and 5(c) of the Securities Act.  (Id. at 2, 24-28.)  Plaintiff's Complaint seeks an order temporarily, preliminarily and permanently enjoining Defendants from violating the federal securities laws, and enjoining Defendant Ringgold from participating in an offer or sale of digital or other securities, or making misrepresentations regarding regulatory approval in connection with such offerings; a temporary restraining order and a preliminary injunction freezing Defendants' assets, requiring accounting from each Defendant, and prohibiting destruction of documents; disgorgement of Defendants' ill-gotten gains; and payment of civil monetary penalties.  (Id. at 3, 29-30.)

On October 3, 2018, Plaintiff also filed an *ex parte* application for a temporary restraining order ("TRO").  (ECF No. 3.)  On October 5, 2018, District Judge Curiel granted Plaintiff's *ex parte* application for a TRO, freezing assets, prohibiting destruction of documents, granting expedited discovery, and requiring an accounting.  (ECF Nos. 5 & 6.)  The District Judge found that Plaintiff had made a prima facie showing based on Defendants' marketing and advertising through websites and media posts of Blockvest

18cv2287-GPC (MSB)

1    and its ICO, that BLV tokens were "securities."  (ECF No. 5 at 8-9.)  The District Judge also

2    issued an "Order to Show Cause Re Preliminary Injunction and Orders:  (1) Freezing

3    Assets; (2) Prohibiting the Destruction of Documents; (3) Granting Expedited Discovery;

4    and (4) Requiring Accountings" and set a hearing for October 18, 2018.  (ECF No. 6 at 12-

5    13.)  The District Judge subsequently granted the parties' two joint motions to extend

6    the TRO and the hearing on the order to show cause until November 16, 2018. (ECF Nos.

7    15 & 17.)

8            In support of their opposition to Plaintiff's motion for a preliminary injunction, on

9    November 13, 2018, Defendants filed investor declarations, which included declarations

10   from Chris Russell [ECF No. 32-6 at 67-68], Quintin Dorsey [ECF No. 32-8 at 6], and

11   Jacqueline Wartanian [ECF No. 32-8 at 4]; and on November 20, 2020—a declaration

12   from Amanda Vaculik [ECF No. 40-2 at 2].  On November 16, 2018, District Judge Curiel

13   held a hearing on Plaintiff's motion for a preliminary injunction [ECF No. 37], and on

14   November 27, 2018—issued an order denying Plaintiff's motion [ECF No. 41].  The order

15   cited, among other documents, investor declarations that Defendants filed in support of

16   their opposition to Plaintiff's motion for a preliminary injunction.  (See ECF No. 41.)  The

17   District Judge concluded that in light of the evidence presented by Defendants, there

18   were disputed factual issues as to the nature of investments offered to the alleged

19   investors, and without full discovery, the Court could not determine "whether the BLV

20   token offered to the 32 test investors was a 'security'" and "whether the 17 individuals

21   who invested in Rosegold purchased 'securities' as defined under the federal securities

22   law." (Id. at 13-14.)  The District Judge also found that Plaintiff failed to show a

23   reasonable likelihood that Defendants would repeat their violations because "it is

24   disputed whether there have been past violations."  (Id. at 15-16.)

25           Defendants filed an Answer on December 14, 2018.  (ECF No. 43.)  On

26   December 17, 2018, Plaintiff moved for partial reconsideration of the District Court's

27   November 27, 2018 order.  (ECF No. 44.)

28

1    On February 14, 2019, the District Judge granted in part Plaintiff's motion and

2 preliminarily enjoined Defendants' violations of the antifraud provisions of the

3 Securities Act.  (ECF No. 61.)  In the order, the District Judge cited Defendants' evidence

4 concerning the Rosegold investors and testers to conclude that there was a factual

5 dispute about whether those individuals purchased securities.  (Id. at 13-14.)  The

6 District Judge "denie[d] Plaintiff's motion for reconsideration as to the offers or

7 promises made to the 32 test investors and 17 individual investors."  (Id. at 14.)

8    On December 27, 2018, Corrigan & Morris LLP, moved to withdraw as counsel for

9 Defendants Blockvest and Ringgold.  (ECF No. 47.)  District Judge Curiel granted defense

10 counsel's request to withdraw as counsel on February 14, 2019, and gave Defendants

11 until March 15, 2019, to obtain substitute counsel.  (ECF No. 62.)  In the order, Judge

12 Curiel noted that as a limited liability corporation, Defendant Blockvest could not

13 proceed in federal court without counsel, and expressly cautioned Blockvest "that if it

14 fails to obtain new counsel and have counsel file a notice of appearance, it may be

15 subject to default proceedings."  (Id. at 3-4.)  On March 18, 2019, Judge Curiel granted

16 Defendants' *ex parte* request for additional time to obtain counsel and continued the

17 deadline until March 29, 2019.  (ECF No. 64.)  To date, no counsel has entered an

18 appearance on behalf of Defendants.  (See Docket.)

19    On February 11, 2019, this Court held an Early Neutral Evaluation Conference, and

20 on April 22, 2019–a follow-up Settlement Conference.  (ECF Nos. 59 & 71.)  On April 24,

21 2019, the Court issued a scheduling order that set, among other deadlines,

22 September 9, 2019, as the deadline for fact discovery, December 26, 2019, as the

23 deadline for expert discovery, and January 27, 2020, as the deadline to file pretrial

24 motions.  (ECF No. 72 at 1, 3.)

25    On January 10, 2020, Plaintiff filed the instant *ex parte* motion for terminating

26 sanctions, which was referred to this Court.  (ECF Nos. 93 & 94.)  On January 24, 2020,

27 Plaintiff filed a motion for summary judgement, which is currently pending before the

28 District Judge.  (ECF No. 96.)

1    In the instant motion, Plaintiff SEC moves for terminating sanctions against

2    Defendants Blockvest and Ringgold pursuant to the Court's inherent authority.  (Pl.'s

3    Mot. for Terminating Sanctions ("Mot") 13-14, 20, ECF No. 93-1.)

4                                **II.  APPLICABLE LAW**

5    District courts have inherent power to impose sanctions for "conduct which

6    abuses the judicial process."  Chambers v. NASCO, Inc., 501 U.S. 32, 44-45 (1991); see

7    also Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006) ("There are two sources of

8    authority under which a district court can sanction a party who has despoiled evidence:

9    the inherent power of federal courts to levy sanctions in response to abusive litigation

10   practices, and the availability of sanctions under Rule 37 . . . .").   District courts have

11   inherent power to impose sanctions, including default or dismissal, when a party has

12   "willfully deceived the court and engaged in conduct utterly inconsistent with the

13   orderly administration of justice."  Fjelstad v. Am. Honda Motor Co., Inc., 762 F.2d 1334,

14   1338 (9th Cir. 1985); see also TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 916 (9th

15   Cir. 1987) ("Courts have inherent equitable powers to dismiss actions or enter default

16   judgments[.]").

17   Terminating sanctions are a severe remedy, and should be imposed only in

18   extreme circumstances, "where the violation is 'due to willfulness, bad faith, or fault of

19   the party.'"  In re Exxon Valdez, 102 F.3d 429, 432 (9th Cir. 1996) (quotation omitted);

20   see also Anheuser-Busch, Inc. v. Natural Beverage Distribs., 69 F.3d 337, 348 (9th Cir.

21   1995) (terminating sanctions are warranted where "a party has engaged deliberately in

22   deceptive practices that undermine the integrity of judicial proceedings.").   "The most

23   critical criterion for the imposition of a dismissal sanction is that the misconduct

24   penalized must relate to matters in controversy in such a way as to interfere with the

25   rightful decision of the case.  This rule is rooted in general due process concerns.  There

26   must be a nexus between the party's actionable conduct and the merits of his case."

27   Tripati v. Corizon Inc., 713 F. App'x 710, 711 (9th Cir. 2018) (quoting Halaco Eng'g Co. v.

28   Costle, 843 F.2d 376, 381 (9th Cir. 1988)).

In deciding whether to impose terminating sanctions, courts must weigh the following factors:  "(1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to the party seeking sanctions; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions." Leon, 464 F.3d at 958 (quoting Anheuser–Busch, 69 F.3d at 348).  In most cases, the first two factors weigh in favor of the imposition of sanctions, and the fourth factor typically weighs against a default or dismissal sanction. Stars' Desert Inn Hotel & Country Club, Inc. v. Hwang, 105 F.3d 521, 524 (9th Cir. 1997). "Thus the key factors are prejudice and availability of lesser sanctions." Id. (quotation omitted); see also Valley Eng'rs Inc. v. Elec. Eng'g Co., 158 F.3d 1051, 1057 (9th Cir. 1998) (when considering evidentiary, issue or terminating sanctions, factors three and five "are decisive.").

While the district court need not make explicit findings regarding each of the five factors, a finding of "willfulness, fault, or bad faith" is required for dismissal or default judgment to be proper.  See Leon, 464 F.3d at 958; Anheuser–Busch, 69 F.3d at 348. "Where a party so damages the integrity of the discovery process that there can never be assurance of proceeding on the true facts, a case dispositive sanction may be appropriate." Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 482 F.3d 1091, 1096 (9th Cir. 2007) (quoting Valley Eng'rs, 158 F.3d at 1058).

### III.  ANALYSIS

Plaintiff moves for terminating sanctions against Defendants pursuant to the Court's inherent authority, arguing that Defendants willfully and in bad faith deceived the Court by filing forged and false declarations in support of their opposition to Plaintiff's motion for a preliminary injunction.  (Mot. at 5, 13-14, 20.)  Plaintiff asserts that subsequent discovery revealed that the filed declarations "obscured critical details" that the declarants were unaffiliated individuals who were provided Blockvest's fraudulent promotional materials by Defendants and their commissioned sales agents

1   before their investments, and that at least four of the declarations were knowingly

2   deceptive or forged.  (Id. at 7-8.)

3          Specifically, Plaintiff contends that the declaration of an alleged Rosegold

4   investor, Christopher Russell, was filed with the Court with a forged signature of the

5   declarant and contained numerous false statements.  (See id. at 5, 8-9.)  Plaintiff further

6   states that Defendant Ringgold asked at least two supposed testers, Quintin Dorsey and

7   Jacqueline Wartanian, to sign false declarations, concealing that they had trusted

8   Ringgold with their money because they were his former Online Trading Academy

9   students, and expected a return from real Blockvest tokens that they purchased after

10  reviewing Blockvest's promotional materials Ringgold provided.  (Id. at 5-6.)  Plaintiff

11  also contends that Ringgold directed his affiliate, Amanda Vaculik, to lie during her

12  interview with SEC, and to submit a false declaration to support a fabricated story about

13  a $147,000 payment allegedly made for Blockvest's development.  (Id. at 6.)

14         Plaintiff argues that because Defendants willfully misled the Court concerning a

15  central legal issue in this case through the submission of knowingly false and forged

16  declarations, the "false materials so tainted the credibility of any defense evidence, that

17  there is no reason for the Court to review this evidence for a triable issue of fact."  (Id.

18  at 6.)  Plaintiff therefore asks the Court to impose terminating sanctions in the form of

19  default judgement against Defendants.  (Id. at 13-14, 20.)  If the Court is not willing to

20  impose terminating sanctions, Plaintiff seeks an order of preclusion and adverse

21  inference, precluding Defendants from relying on any of the investor declarations, and

22  to draw adverse inferences concerning whether Defendants sold those investors

23  Blockvest securities.  (Id. at 6, 20.)

24         In his Opposition, Defendant Ringgold asks the Court to deny Plaintiff's motion.

25  (Opp'n ("Opp'n") 13, ECF No. 99-1.)  Ringgold argues that terminating sanctions are not

26  warranted, because Defendants did not destroy or withhold evidence, and did not

27  disobey a discovery order; rather, Defendants acted under "intense time constraints"

28

1  imposed by this litigation, and Ringgold was not accountable for any alleged misconduct

2  of non-parties.  (See id. at 6-8, 11-13).

3       Ringgold initially contends that Defendants were deprived of "due process" when

4  Plaintiff seized their cash, "depriv[ed] them of counsel, and order[ed] them to conduct

5  no further business."  (Id. at 5.)  He further asserts that Plaintiff employed coercion

6  tactics to induce Dorsey, Wartanian, and Vaculik to perjure themselves.  (Id. at 11.)

7  Ringgold states that his former counsel did their best to "draft the declarations correctly

8  under intense time constraints," but acknowledges that "it is highly possible that the

9  [defense] counsel inaccurately carried over statements from the prior drafted

10 declarations to those of the Russell, Dorsey & Wartani[a]n[.]"  (Id.)  Ringgold maintains

11 that if the Court is inclined to impose sanctions, it should issue an order precluding him

12 from "offering the forged Declaration at trial."  (Id. at 12.)  In the alternative, Ringgold

13 seeks an order allowing him to "resubmit the declarations in the form of Notarized

14 Affidavit of Facts form Quint[i]n Dorsey, Jackie Wartanian & Christopher Russel in lieu of

15 sanctions."  (Id. at 13.)

16      Plaintiff replies that Defendants submitted four knowingly forged or false

17 declarations to the District Court, and Judge Curiel relied on this false evidence when he

18 initially denied Plaintiff's request for a preliminary injunction, which resulted in

19 protracted litigation, delayed relief for the victims of the Blockvest digital asset scheme,

20 and caused irreparable harm to the Court, Plaintiff, and Blockvest investors.  (Pl.'s Reply

21 ("Reply") 2, ECF No. 102.)  Plaintiff asserts that Defendants have not submitted any

22 evidence to refute the falsity of the declarations at issue, admitted that "it is highly

23 possible that the [defense] counsel inaccurately carried over statements from the prior

24 drafted declarations," and have not taken any steps to withdraw the false evidence.  (Id.

25 (citing Opp'n at 11-12).)  Plaintiff also contends that Defendants' misconduct was willful,

26 and Defendants' continued failure to accept responsibility for their actions warrants

27 terminating sanctions.  (Reply at 2.)  Plaintiff further argues that at this stage of the

28 proceedings, after discovery closed and its motion for summary judgment has been

1  filed, the only "meaningful sanction" is an order of default liability against Defendants

2  Blockvest and Ringgold.  (Id. at 2, 10.)

3  **I.      Declarations at Issue**

4          **A.  Declaration of Christopher Russell**

5              **1.  Version of the declaration filed by Defendants**

6          On November 13, 2018, Defendants filed Christopher Russell's declaration in

7  support of their opposition to Plaintiff's motion for a preliminary injunction.  (ECF No.

8  32-6 at 67-68; see also Decl. of Brent W. Wilner in Supp. of Pl.'s SEC's Mot. for

9  Terminating Sanctions ("Wilner Decl.") 2, ECF No. 93-2; id., Ex. 3.)  Russell's declaration

10  was signed under the penalty of perjury.  (ECF No. 32-6 at 68.)  The declaration stated,

11  *inter alia*, the following:

12      • Russell considers himself a "sophisticated investor."  (Id. at 67.)

13      • "Before I sent any money to Rosegold Investments LLP, I did not  review or rely

14  on Rosegold Investments LLP's website or any offering documents or anything on the

15  internet about Rosegold Investments LLP."  (Id.)

16      • "Before sending any money to Rosegold Investments LLP, I did not review or

17  rely on the Blockvest Website or Whitepaper or anything else on the internet about

18  Blockvest."  (Id.)

19      • "Before sending my money to Rosegold Investments, I did not review or rely

20  on Reginald Ringgold's web page, LinkedIn page, or anything else on the internet having

21  to do with Mr. Ringgold."  (Id. at 68.)

22      • Russell sent his money to Rosegold based "solely" on his personal relationship

23  with his friend Michael Sheppard, and "not based on any specific representation about

24  anything specific on the internet or otherwise."  (Id.)

25  / / /

26  / / /

27  / / /

28  / / /

## 2. Evidence obtained during the course of discovery

On November 13, 2018, Russell's friend, Blockvest sales agent Chase Pfohl, e-mailed Russell a proposed version of his declaration drafted by Defendants. (Wilner Decl. at 2, Ex. 4 at 100-02; Ex. 22 at 181-83.) On the same day, November 13, 2018, Defendants filed a declaration with an electronic signature bearing Russell's name. (See ECF No. 32-6 at 67-68.) Russell testified that on November 14, 2018, <u>one day after his alleged declaration was filed with the Court</u>, he sent Sheppard, Blockvest's CFO, his actual signed declaration. (See Wilner Decl. at 2-3; Ex. 5 at 104; Ex. 22 at 197-200.) Russell sent the declaration as a PDF file so that nobody could change the declaration afterwards. (Wilner Decl., Ex. 5 at 104; Ex. 22 at 197.)

The declaration Russel <u>authorized and signed</u> [ECF No. 93-2 at 106-107; <u>see also</u> Wilner Decl. at 3, Ex. 4] drastically differed from the declaration Defendants filed on his behalf:

- Russell omits the word "sophisticated" from "I consider myself a sophisticated Investor." (ECF No. 93-2 at 106.)

- Russell omits the statement that he did not review or rely on Rosegold's website, or anything on the internet or other documents about Rosegold. (See <u>id.</u> at 106-07.)

- Russell omits the statement that he did not rely on Blockvest's website or anything else on the internet about Blockvest. (See <u>id.</u>)

- Russell omits the statement that he did not review or rely on Reginal Ringgold's web page, LinkedIn page, or anything else on the internet concerning Mr. Ringgold. (See <u>id.</u>)

- Russell omits the statement that he sent money to Rosegold based <u>solely</u> on his personal relationship with his friend Michael Sheppard, and not based on any specific representation about anything specific on the internet or otherwise; Russell says it was the "primary reason" he invested. (See <u>id.</u> at 106.)

1    Accordingly, in his authorized declaration, Russell omitted the word
2  "sophisticated" from "I consider myself a sophisticated investor," which appear in the
3  Court-filed version of the declaration.  (Wilner Decl., Ex. 22 at 183-85, 204-05; see also
4  ECF No. 32-6 at 67.)  Further, according to Russell's deposition testimony, the
5  Defendants' version of the declaration contained statements that Russell had never
6  seen, including the statement that he had never reviewed or relied on Blockvest's
7  promotional materials or website.  (Wilner Decl., Exs. 3, 4 & 6; Ex. 22 at 165-68; see also
8  ECF No. 32-6 at 67-68.)  After his investment, Russell continued to believe he had
9  acquired BLV tokens based on his account statement available on Blockvest's website.
10  (Wilner Decl., Ex. 22 at 176-78.)  Based on Blockvest's promotional materials and other
11  representations by the company's personnel, Russell expected to profit from those
12  tokens based on the efforts of Ringgold and Blockvest's management to make the
13  company successful.  (Id. at 179-80, 192-94.)

14    With respect to the paragraph in the version of the declaration Defendants filed
15  with the Court, stating that Russell sent his money to Rosegold based solely on his
16  personal relationship with his friend Sheppard, "and not based on any specific
17  representation about anything specific on the Internet or otherwise," Russell testified
18  that he did not authorize anybody to make that representation on his behalf because it
19  was false.  (Id. at 209; see also ECF No. 32-6 at 68.)  He testified that he reviewed
20  numerous marketing materials and information about Blockvest on the Internet, and
21  those materials and information influenced his decision to make the $3,000 purchase of
22  Blockvest tokens.  (Id. at 191, 209.)

23    Russell also stated the following during his testimony:

24    Q.  So someone under your name adds this paragraph that you had
      never reviewed the Blockvest website or white paper or anything else on
25    the Internet about Blockvest, right?
26    A.  Correct.
27    Q.  That's false, right?
      A.  Yes.
28

Q.  Because you did, in fact, review the Blockvest website before you decided to purchase, right?

A.  Yes.

Q.  And you did review other materials about Blockvest before you decided to purchase, right?

A.  Yes.

Q.  <u>So someone added a completely fabricated statement under your name to the Court; is that right?</u>

A.  <u>Yes.</u>

(<u>Id.</u> at 206-07 (emphasis added).)  Russell also testified as follows:

Q.  And, in fact, what you testified to earlier is that there was information about Mr. Ringgold in some of the materials you reviewed about Blockvest, right?

A.  Yes.

Q.  And you reviewed those in connection with—prior to your purchase of Blockvest tokens, correct?

A.  Yes.

Q.  So this paragraph's false also, right?

A.  Yes.

Q.  <u>And, again, somebody added a false paragraph under your name to the Court?</u>

A.  <u>Yes.</u>

Q.  And it wasn't you, right?

A.  Yes.

Q.  <u>And you didn't authorize them to do that, right?</u>

A.  <u>Correct.</u>

(<u>Id.</u> at 208 (emphasis added).)

Russell testified that he did not authorize Blockvest or Ringgold to file his signed declaration with the Court <u>one day before he provided his actual signed declaration to them</u>.  (<u>Id.</u> at 197, 201-05.)  Russell also testified that no one from Blockvest told him that they were going to make changes to his authorized declaration.  (<u>Id.</u> at 200.)  When asked whether he has "<u>ever seen a version of the declaration that Blockvest and Mr. Ringgold filed on [Russell's] behalf with the Court?  Did they ever send you a copy of that?</u>," Russell answered, "<u>No.</u>"  (<u>Id.</u> (emphasis added).)  Notably, Russell testified that

1   the version of the declaration filed with the Court is "false." (Id. at 205 (emphasis

2   added).)

3       Defendant Ringgold testified that he did not personally forge Russell's signature.

4   (Wilner Decl., Ex. 28 at 373-83.)  When Ringgold was asked during his deposition

5   whether he "ha[d] a concern that the [Russell declaration] that was filed with the court

6   might have been a forgery," Ringgold answered "Correct."  (Id. at 383.)

7       **B. Declaration of Quintin Dorsey**

8           **1. Declaration filed by Defendants**

9       On November 13, 2018, Defendants filed Quintin Dorsey's declaration in support

10  of their opposition to Plaintiff's motion for a preliminary injunction.  (See Wilner Decl. at

11  3, Ex. 8 at 11; see also ECF No. 32-8 at 6.)  The declaration, *inter alia*, contained the

12  following statements:

13          •  "I never intended to make an investment and made no investment

14  decision, but wanted to help test the exchange for future use and believed I would get

15  my money back, less the transaction fees charged by third-parties."  (ECF No. 32-8 at 6.)

16          •  "I knew I could not receive BLV token because they could not be removed

17  from the platform and had no value."  (Id.)

18          **2. Evidence obtained during the course of discovery**

19      On July 15, 2019, Dorsey was deposed and testified that he was a former student

20  of Ringgold at the Online Trading Academy.  (Wilner Decl., Ex. 23 at 212, 214.)  In a

21  March 1, 2018 e-mail, Sheppard sent Dorsey promotional materials providing "an

22  overview of the Blockvest cryptocurrency token," which Sheppard claimed was a

23  "[g]reat investment opportunity to make a quick 100% return on your investment."

24  (Wilner Decl., Ex. 10 at 115.)  In an April 22, 2018 e-mail, Ringgold wrote to Dorsey, "I

25  want to thank personally for you investment interest in the project," attaching links to

26  Blockvest's materials, including the website, whitepaper, ICO video, and Form D notice

27  of exempt offering of securities filed with the SEC.  (Wilner Decl., Ex. 11 at 117

28  (emphasis added).)  Ringgold added, "[f]or your investment you will receive 10,000 BLV

1   tokens." (Id.)  Four days later, Dorsey made a $5,000 credit card purchase for a

2   "BlockVest ICO-Order."  (Wilner Decl., Ex. 23 at 121, 213.)

3        Dorsey testified that Ringgold told him he could easily double or triple Dorsey's

4   money within two to three months after the ICO opened.  (Id. at 215.)  Dorsey believed

5   that he could then take his initial capital out "in real money" and leave whatever was

6   left over to continue gain profit.  (Id.)  According to Dorsey's deposition testimony,

7   Ringgold never stated that the BLV tokens Dorsey invested in were just "test" tokens;

8   the first time Dorsey heard the word "test" was when he read the declaration

9   Defendants submitted on his behalf.  (Id. at 218, 228-29.)  Dorsey further testified that

10  he made the purchase expecting to receive BLV tokens from which he would profit, and

11  that he was not giving his $5,000 just to make a contribution to Blockvest.  (Id. at 215-

12  21, 223-24.)  Dorsey also testified that he made his "investment decision" relying on

13  representations from Ringgold, as well as representations in Blockvest promotional

14  materials, including the website, white paper, pitch deck, promotional video, and

15  Ringgold's and Blockvest's social medial account.  (Id. at 242.)

16       Dorsey agreed to sign the declaration drafted on his behalf after "pressure" from

17  Ringgold, including numerous text messages and e-mails sent during Dorsey's wife's

18  recovery from life-threatening pregnancy complications and Dorsey taking care of a

19  three-week old baby.  (Wilner Decl., Exs. 13 & 14; Ex. 23 at 169-75, 232-35.)  Dorsey

20  testified that Ringgold "called me . . . to ask me to sign [the declaration]."  (Wilner Decl.,

21  Ex. 23 at 230.)  Dorsey was neither aware of the purpose of the declaration, nor of the

22  instant lawsuit.  (Id. at 234-39.)  Dorsey testified that he did not write the declaration

23  and did not have any discussions with Ringgold regarding what Dorsey would state if he

24  were to draft the declaration.  (Id. at 231.)  Ringgold did not give Dorsey an opportunity

25  to edit the declaration he sent to Dorsey, and Dorsey did not read or look at the

26  declaration; he just hit "sign" button on the DocuSign document.  (Id. at 230-31; see also

27  id. at 237 (containing Dorsey's explanation that "when you hit the button on the

28

DocuSign, it takes you straight to where they want you to sign.").  Notably, Dorsey

testified as follows:

> Q.  During any of those text messages, one or two phone calls, and
> the DocuSign link, did Mr. Ringgold ever ask you what you would want to
> say to a court?
> A.  Not at all.
> Q.  [] And what did Mr. Ringgold say was the purpose of the
> declaration?
> A.  He wasn't specific at all.  He just said, "<u>This would help me out.  I
> need you to sign it.  This would really help me out.</u>  This is—this will blow
> over very quickly."
> Basically, minimizing the seriousness of it, and he caught me at a very
> good time where I—good time in the sense of, like, I was completely
> distracted.  My focus, like I said, was strictly on the very new baby, my very
> sick wife, and just all the life events that had happened that had gotten
> me—I, basically, was very stressed and completely unfocused.

(<u>Id.</u> at 232-33 (emphasis added).)

 Dorsey further testified that he did not know that his declaration had been filed

in court before June 2019, when he was served with a subpoena in connection with this

litigation.  (<u>Id.</u> at 239.)  Dorsey added that "[p]rior to June '19, I didn't even know what a

declaration was."  (<u>Id.</u>)  When Dorsey read the document Defendants filed on his behalf,

he realized it was entirely false:  "<u>it's basically all a complete lie except for my name.</u>

<u>That's—I mean, that's the only thing that's true is my name.  Otherwise, almost every</u>

<u>word on here is a lie.</u>"  (<u>Id.</u> at 244 (emphasis added).)

During his deposition, Ringgold claimed that he did not solicit Dorsey to invest,

did not send the April 22, 2018 e-mail, and stated that Dorsey was a "sophisticated"

"Rosegold" investor, not merely a "tester."  (Wilner Decl., Ex. 28 at 367-72, 385-91.)

Additionally, in a declaration filed in support of Defendants' opposition to Plaintiff's

pending motion for summary judgment, Ringgold stated under the penalty of perjury

that "[e]ach investor or associate of Blockvest that was provided a declaration to sign

was instructed to read the declaration carefully and make sure that it was true and

correct and to make any changes needed before signing and sending the declarations

1 back."  (Decl. of Reginald Buddy Ringgold, III ("Ringgold Decl. in Opp'n of MSJ") 7, ECF

2 No. 109-1.)

3     **C. Declaration of Jacqueline Wartanian**

4         **1. Declaration filed by Defendants**

5     On November 13, 2018, Defendants filed with the District Court Jacqueline

6 Wartanian's declaration.  (<u>See</u> Wilner Decl. at 3, Ex. 9; <u>see also</u> ECF No. 32-8 at 4.)  The

7 declaration, *inter alia*, contained the following statements:

8        • "I never intended to make an investment and made no investment

9 decision, but wanted to help test the exchange for future use and believed I would get

10 my money back, less the transaction fee charged by third-parties."  (ECF No. 32-8 at 4.)

11        • "I knew I could not receive BLV token because they could not be removed

12 from the platform and had no value."  (<u>Id.</u>)

13         **2. Evidence obtained during the course of discovery**

14     Wartanian testified on August 22, 2019, that she was a former student of

15 Ringgold at the Online Trading Academy, and that Ringgold was her "mentor."  (Wilner

16 Decl., Ex. 24 at 248, 251, 260.)  According to Wartanian's deposition testimony, prior to

17 her initial investment, she discussed Blockvest with Ringgold and reviewed the

18 company's website, videos about Blockvest posted on YouTube, and social media

19 accounts.  (<u>Id.</u> at 252-55, 261.)  Wartanian stated that the "Deloitte" accounting firm's

20 logo, as well as SEC's logo, on the Blockvest website gave her the confidence to invest in

21 Blockvest.  (<u>Id.</u> at 262-64.)

22     Wartanian further testified that she believed that her $3,000 investment was for

23 a purchase of Blockvest tokens.  (<u>Id.</u> at 250.)  She expected that once the company had

24 its ICO, she would actually receive BLV tokens, hoped to make a profit off of the $3,000

25 investment in the future, and considered herself to be a "presale investor."  (<u>Id.</u> at 256-

26 58.)  Wartanian invested on behalf of her mother "[f]or her medical bills and she's 79.

27 So [Wartanian] figured, you know, the investment will help pay for that."  (<u>Id.</u> at 259-

28 60.)

1    Wartanian also testified that she helped test the functionality of the Blockvest

2    platform, but that was "separate" from her investment.  (<u>Id.</u> at 257-58; <u>see also</u> <u>id.</u> at

3    283-84.)  Wartanian believed that she had purchased Blockvest tokens based on her

4    account statement on the Blockvest website.  (<u>See</u> <u>id.</u> at 270-75; <u>see also</u> Wilner Decl.,

5    Ex. 16.)

6        When questioned during her deposition about the declaration Defendants

7    submitted on her behalf to the Court, Wartanian testified that <u>Ringgold drafted the</u>

8    <u>declaration</u>, that Ringgold chose the specific wording used in the declaration, and told

9    her the following:  "I will send [the declaration] to you.  Just look at it, and all you need

10   to do is sign it."  (Wilner Decl., Ex. 24 at 276-77.)  Wartanian testified that she only

11   "skimm[ed]" the declaration drafted by Ringgold, and did not make any changes or

12   review Plaintiff's Complaint filed in this case before signing the declaration.  (<u>Id.</u> at 276-

13   79.)  She further testified that the declaration had numerous false statements, including

14   the statement that she only performed testing services, because she made investments

15   expecting to profit from the purchase of BLV tokens.  (<u>Id.</u> at 279-92.)

16       When confronted with Wartanian's testimony during his deposition, Ringgold

17   denied any role in drafting Wartanian's declaration and testified that he did not

18   remember who Wartanian was.  (Wilner Decl., Ex. 28 at 392-97.)  In a declaration filed in

19   support of Defendants' opposition to Plaintiff's pending motion for summary judgment,

20   Ringgold stated that he "ha[s] been <u>close friend and mentor to</u> Dorsey and <u>Wartanian</u>

21   <u>for years</u>."  (Ringgold Decl. in Opp'n of MSJ at 7 (emphasis added).)

22   **D. Declaration of Amanda Vaculik**

23       **1. Declaration filed by Defendants**

24       On November 20, 2018, Defendants filed Amanda Vaculik's declaration.[2]  (Wilner

25

26   _____

27   [2]  The Court notes that Vaculik's declaration was subsequently stricken by the District Court in its order
     denying Plaintiff's motion for a preliminary injunction.  (ECF No. 41 at 17.)

28

18

Decl. at 4, Ex. 17; <u>see also</u> ECF No. 40-2 at 2.)  In her declaration, Vaculik made the following statements:

- In April 2018, Vaculik entered into a lease for a condo on 5th street in Santa Monica.  (ECF No. 40-2 at 2.)

- Vaculik's boyfriend, Christopher Black, paid rent on the condo that she leased for one year in advance.  (<u>Id.</u>)

- Black worked in Blockchain exchange software development area.  (<u>Id.</u>)

- Black told Vaculik that "Reginald Ringgold agreed to pay Mr. Black $147,000 in exchange for Mr. Black's software development services.  Mr. Black told me that he asked Mr. Ringgold to make payment for Mr. Black's services to my landlord, '5th ST LLC'" on April 18, 2018.  (<u>Id.</u>)

## 2.  Evidence obtained during the course of discovery

On November 6, 2018, Ringgold testified during his initial deposition, which was conducted during the expedited discovery phase, that a $147,000 payment from his personal account for a Santa Monica apartment for Vaculik was compensation to "Chris" and his company for "development" of Blockvest's platform, and the source of funds was "my money that I had I just had in my safe."  (Wilner Decl. at 6, Ex. 27 at 351-57.) On November 15, 2018, Plaintiff conducted a telephonic interview of Vaculik.  (Wilner Decl. at 4-5; <u>see also</u> <u>id.</u>, Ex. 21.)  Vaculik answered the call, but asked the SEC interviewers to call her back in thirty minutes.  (<u>Id.</u>)  During the subsequent call, Vaculik told the SEC interviewers that Black was her boyfriend, that he was involved with technology, and that the payment was for Black's services for an apartment in which Vaculik would live.  (<u>Id.</u> at 5.)  She then repeated the above statements in her declaration filed with the District Court on November 20, 2018.  (ECF No. 40-2 at 2.)

On April 24, 2019, Vaculik gave a proffer to the Department of Justice that was attended by two SEC attorneys, Amy Longo and Brent Wilner.  During the proffer, Vaculik told interviewers that:  (1) Black was not her boyfriend; (2) she did not live in the Santa Monica apartment; (3) she did not know the source or purpose of the funds for

19

the apartment, and (4) she became involved because Ringgold and his affiliates paid her $10,000 to put the apartment application in her name.  (Wilner Decl. at 5.)  Vaculik also stated that on November 15, 2018, she spoke to Ringgold during the intervening thirty minutes between phone calls with the SEC, and Ringgold instructed her to tell the false story about the apartment transaction to the SEC staff.  (Id.)  During her subsequent deposition on September 9, 2019, Vaculik asserted her Fifth Amendment right as to all questions concerning the transaction, the declaration, and the SEC interview.  (Wilner Decl. at 6, Ex. 25 at 259-339.)

Ringgold was deposed on October 22, 2019, and testified that he did not know Vaculik or Black, and did not recall any transaction with her or Black related to supposed development services or the apartment.  (Wilner Decl. at 6, Ex. 28 at 361-66, 398-418.)

Defendants were served notices of depositions of each of the above declarants, but Defendants did not attend any of those depositions.  (Supplemental Decl. of Brent W. Wilner ("Supp. Wilner Decl.") 2-3, ECF No. 102-1; id., Exs. 29-32.)  In his opposition to the instant motion for terminating sanctions, Defendant Ringgold has not provided any declarations or any other evidence contradicting the evidence presented by Plaintiff. (See Opp'n.)

## II.   **Plaintiff's Motion for Terminating Sanctions**

### A.   **Bad faith, willfulness, or fault**

Plaintiff argues that Defendants' misconduct was willful and in bad faith because they knew the declarations at issue were false and forged, but Defendants did not correct the declarations and attempted to conceal the wrongdoing with further false deposition testimony.  (Mot. at 15.)  Ringgold asserts that Defendants did not act in bad faith because they did not intentionally destroy or withhold evidence; rather, they might have made mistakes while acting under "intense time constraints" imposed by this litigation.  (See Opp'n at 10-13).  He states that "it is highly possible that the [defense] counsel inaccurately carried over statements from the prior drafted declarations to

1  those of [] Russell, Dorsey & Wartani[a]n." (Id. at 11.)  Ringgold also claims that he is

2  not accountable for any alleged misconduct of non-parties.  (See id. at 11-13.)

3      The imposition of terminating sanctions requires a finding that a litigant's conduct

4  was the result of "willfulness, bad faith, or fault."  See Leon, 464 F.3d at 958 (quoting

5  Anheuser-Busch, Inc., 69 F.3d at 348).  It is well-established that fabricating and

6  submitting knowingly false evidence amounts to willful and bad faith conduct.  See

7  Englebrick v. Worthington Indus., Inc., 944 F. Supp. 2d 899, 910 (C.D. Cal. 2013) (finding

8  that plaintiffs acted willfully and in bad faith, where they lied during depositions and

9  discovery, did not file any corrections to the deposition transcripts, and did not file any

10  amended discovery responses); Sun World, Inc. v. Lizarazu Olivarria, 144 F.R.D. 384, 389-

11  91 (E.D. Cal. 1992) (finding that plaintiff acted in bad faith by submitting a forged

12  document and committed perjury in furtherance of the fraud on the court).

13      Plaintiff brought this action alleging that Defendants were offering and selling

14  unregistered securities in the form of digital assets (BLVs), and sought to stop

15  investment fraud involving ICO by Defendants.  (See Compl., ECF No. 1.)  In their

16  opposition to Plaintiff's motion for a preliminary injunction, Defendants argued that

17  there were no actual investors in Blockvest's sale of digital BLV tokens.  (See i.e., ECF

18  Nos. 23 & 32.)  Defendants alleged that various "friends and family" paid money to an

19  entity affiliated with Ringgold without expecting to receive Blockvest tokens (the

20  "Rosegold investors"), or to help develop the Blockvest platform without expecting to

21  receive real Blockvest tokens (the "testers").  (See id.)  To support these contentions,

22  Defendants submitted a declaration under the penalty of perjury from Defendant

23  Ringgold, and as exhibits to Ringgold's declaration—declarations from individuals

24  supposedly in both categories.  (See ECF No. 32; ECF Nos. 32-6 & 32-8; see also Wilner

25  Decl. at 2, Exs. 1 & 2.)

26      In his declaration, Ringgold stated that the Rosegold investors "attested under

27  penalty of perjury that before [] they sent money to Rosegold Investments LLP, they did

28  not review or rely on Rosegold Investments LLP's website or any offering documents or

anything on the internet about Rosegold Investments." (Decl. of Reginald Buddy Ringgold, III ("Ringgold Decl.") 5, ECF No. 32.) Ringgold also declared that:

> [e]ach of the Rosegold Investors also attested under penalty of perjury that before sending any money to Rosegold Investments LLP, they never listened to any webinar or video, or attended any seminars on Blockvest LLC. They did not review or rely on the Blockvest website[,] Whitepaper, Facebook page, and or LinkedIn page referencing Blockvest or anything else on the internet about Blockvest.

(Id. at 5-6.) The declarations Defendants filed in support of their opposition to Plaintiff's motion for a preliminary injunction included the declarations from Russell [ECF No. 32-6 at 67-68], Dorsey [ECF No. 32-8 at 6], Wartanian [ECF No. 32-8 at 4], and Vaculik [ECF No. 40-2 at 2].

As detailed above, discovery has revealed that Defendants filed Russell's declaration one day before they received Russell's actual signed declaration, and the version of Russell's declaration Defendants filed with the Court contained numerous false statements and a forged signature of the declarant. Defendant Ringgold does not dispute that the declaration was forged. (See Opp'n at 12 (containing Ringgold's argument that if the Court is inclined to impose sanctions, it should issue an order precluding him from "offering the forged Declaration at trial."). Despite receiving Russell's authorized declaration, Defendants neither withdrew the forged declaration, nor filed the actual signed version of Russell's authorized declaration. (See Docket.) Defendant Ringgold, nevertheless, continues to cite the forged declaration in his opposition to Plaintiff's pending motion for summary judgement. (See ECF No. 109.)

Discovery also established that Defendant Ringgold had direct communications, including e-mail communications, with Wartanian and Dorsey, his former Online Trading Academy students, and sent them numerous Blockvest's promotional materials. Ringgold directed Dorsey and Wartanian to sign declarations he drafted on their behalf containing false statements. Notably, although Dorsey and Wartanian were expecting to profit from their BLV purchases, Ringgold directed them to sign declarations

1  containing the false "testing" narrative.  Ringgold also coached Vaculik what to tell

2  Plaintiff about her relationship with a supposed developer and a $147,000 payment for

3  an apartment she never lived in.  Defendants subsequently filed Vaculik's declaration

4  repeating those falsehoods.  Ringgold later testified that he neither recalled the

5  transaction, nor who Vaculik or her boyfriend were.

6        As an initial matter, Ringgold's argument that Defendants did not act in bad faith

7  because they did not destroy or withhold evidence lacks merit.  The misconduct at issue

8  concerns Defendants' fabrication of evidence material to the key issues in this case and

9  the submission of that evidence to the Court.  Further, the testimony of the declarants,

10  the documentary evidence produced during the course of discovery, the fact that the

11  declarations were filed as exhibits to Ringgold's declaration, the sheer volume of false

12  statements in the declarations at issue, and Ringgold's conduct, contradict his assertion

13  that he was not responsible for the misconduct.

14        Although Defendant Ringgold is now litigating pro se, Defendants were

15  represented by counsel at the time they filed the declarations at issue on November 13,

16  2018.  (See Docket.)  The District Judge granted defense counsel's motion to withdraw

17  on February 14, 2019.  (ECF No. 62.)  More than sixteen months have elapsed since

18  Defendants filed the false and forged declarations at issue.  Nevertheless, Defendants

19  did not correct or withdraw the declarations during the three-month period after the

20  filing of the declarations while Defendants were represented by counsel, and during the

21  period exceeding one year following defense counsel's withdrawal from the case.  (See

22  Docket.)

23        The declarations at issue that Defendants filed with the Court contained

24  numerous false statements, and one declaration was forged.  The declarations were

25  filed in support of Defendants' opposition to Plaintiff's motion for a preliminary

26  injunction and concerned key issues in this case.  "When a party falsifies evidence of

27  central importance to a case, this shows bad faith, willfulness, or fault[.]"  Vogel v.

28  Tulaphorn, Inc., CV 13-464 PSG (PLAx), 2013 WL 12166212, at *4 (C.D. Cal. Nov. 15,

1 | 2013) (citing <u>Anheuser-Busch, Inc.</u>, 69 F.3d at 352) ("It is well settled that dismissal is

2 | warranted where . . . a party has engaged deliberately in deceptive practices that

3 | undermine the integrity of judicial proceedings[.]").  The Court finds that Defendants'

4 | submission and reliance on the false and fraudulent declarations at issue was willful and

5 | constitutes bad faith.  The filing of the forged declaration, the breadth of the falsehoods

6 | in the declarations, Defendants' failure to correct or withdraw the declarations, and

7 | Ringgold's attempt to conceal the wrongdoing, demonstrate that Defendants

8 | intentionally presented false evidence to the District Court.

9 | While Defendant Ringgold asserts that his prior counsel might have made

10 | mistakes to respond to Plaintiff's motion for a preliminary injunction, defense counsel's

11 | declaration filed in support of his motion to withdraw,[3] as well as Defendants'

12 | continuous reliance on the declarations containing false evidence, demonstrate that

13 | Defendants did not merely made a mistake, but rather, intended to deceive the Court.

14 | <u>See</u> <u>Coulter v. Baca</u>, CASE NO. 13-cv-6090-CBM (AGRx), 2014 WL 12589652, at *3-4 (C.D.

15 | Cal. May 23, 2014) (finding bad faith, where the party knowingly submitted a document

16 | with a forged signature to the court; reasoning that the "conduct cannot be attributed

17 | to mere inadvertence, and [the party's] filing of documents and behavior were within

18 | [the party's] control."); <u>Newman v. Brandon</u>, No. 1:10–CV–00687 AWI JLT (PC), 2012 WL

19 | 4933478, at *3-5 (E.D. Cal. Oct. 16, 2012) (finding that plaintiff acted willfully and

20 | in bad faith, where the plaintiff submitted falsified declarations to the court, which

---

[3]  Defense counsel, Stanley C. Morris, stated the following in his declaration filed on December 27, 2018, in support of his motion to withdraw:

> Defendants have instructed counsel to file certain documents that such clients prepared without the benefit of counsel, and that, upon review, fall far short of the professional standards required by the Court of my firm.  I have not and would not sign and file these papers with the Court and could not certify them as appropriate papers in compliance with my duties under Rule 11.

(ECF No. 47-1 at 4.)

concerned material issues in the case); <u>Uribe v. McKesson</u>, No. 08-cv-01285-SMS PC, 2011 WL 3925077, at *4 (E.D. Cal. Sep. 7, 2011) (finding bad faith, where the declarant "never saw or read the declaration" before plaintiff forged the declarant's signature and "attempted to 'teach' [the declarant] what to say to help [p]laintiff win his lawsuit").  As a result, the Court **RECOMMENDS** finding that Defendants Blockvest and Ringgold acted willfully and in bad faith.

### B.  Five-factor test

The Court next evaluates the five factors considered in this circuit in determining whether to impose terminating sanctions.  For the reasons described below, the Court finds that nearly every factor weighs in favor of imposing terminating sanctions.

#### 1.  The public's interest in expeditious resolution of litigation

Plaintiff alleges that the false declarations "influenced the Court's evaluation of the SEC's request for a preliminary injunction," which "resulted in the need for a reconsideration motion, and has necessitated protracted litigation to adjudicate whether defendants sold Blockvest securities to presale investors—an issue that was only in dispute due to defendants' fraud on the Court."  (Mot. at 16.)  Defendants do not address this factor.  (<u>See</u> Opp'n.)

The public has an overriding interest in securing "the just, speedy, and inexpensive determination of every action."  <u>In re Phenylpropanolamine (PPA) Prods. Liab. Litig.</u>, 460 F.3d 1217, 1227 (9th Cir. 2006); <u>see also</u> Fed. R. Civ. P. 1.  "The public's interest in expeditious resolution of litigation always favors dismissal."  <u>Nourish v. Cal. Amplifier</u>, 191 F.3d 983, 990 (9th Cir. 2002).

This action has been pending since October 3, 2018, and Plaintiff SEC and the Court dedicated substantial public resources to this case.  Defendants' misconduct caused unnecessary delay and expense for Plaintiff, and the public it seeks to protect. The Court thus finds that this factor weighs in favor of imposing terminating sanctions.

/ / /

/ / /

## 2.  The Court's need to manage its docket

Plaintiff argues that Defendants' misconduct "undermined the integrity of these proceedings, and any remedy short of default would not adequately deter future fraudsters from producing false declarations to manufacture contested issues in litigation." (Mot. at 17.)  Defendants do not address this factor.  (See Opp'n.)

"District courts have an inherent power to control their dockets," and "dismissal must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent."  In re Phenylpropanolamine, 460 F.3d at 1227 (quoting Nat'l Hockey League v. Metro. Hockey Club, Inc., 427 U.S. 639, 643 (1976)); see also Fed. R. Civ. P. 16 (authorizing district courts to manage cases so that disposition is expedited, wasteful pretrial activities are discouraged, and the quality of the trial is improved).

The Court initially notes that pursuant to Civil Local Rule 83.3(j) "[o]nly natural persons representing their individual interests in propria persona may appear in court without representation by an attorney permitted to practice pursuant to Civil Local Rule 83.3," and that "[a]ll other parties, including corporations, partnerships and other legal entities, may appear in court only through an attorney permitted to practice pursuant to Civil Local Rule 83.3."  The District Court gave Blockvest ample time to obtain substitute counsel and have counsel file a notice of appearance in light of the withdrawal of Defendants' counsel on February 14, 2019.  (See ECF No. 62.)  The District Court also explicitly warned Blockvest that "if it fails to obtain new counsel and have counsel file a notice of appearance, it may be subject default proceedings."  (Id. at 3-4.)  To date, no counsel has appeared on Defendant Blockvest's behalf.  (See Docket.)  As a limited liability corporation, Blockvest "may not proceed in federal court without counsel."  (ECF No. 62 at 3 (citing Rowland v. California Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 201-02 (1993); United States v. High Country Broadcasting Co., Inc., 3 F.3d 1244, 1245 (9th Cir. 1993); Civil Local Rule 83.3).)

1    The District Court has expended tremendous amount of resources on this

2  litigation that could have been devoted to other cases on its docket.  (See Docket.)

3  Further, Defendants have not withdrawn or corrected the false and forged declarations

4  since they were filed over a year-and-a-half ago, and Ringgold continues to cite the

5  declarations in his opposition to Plaintiff's motion for summary judgement.  (See ECF

6  No. 109.)  Defendants' misconduct has greatly impeded the resolution of the case by

7  obscuring critical facts, and Plaintiff expended a substantial amount of time and

8  resources obtaining discovery relating to the false declarations at issue.  "As such,

9  Defendant[s'] obstructive conduct poses a genuine threat to the expeditious resolution

10 of this litigation and the Court's need to manage its docket."  Bump Babies Inc. v. Baby

11 The Bump, Inc., No. CV 09–06747 GHK (SSx), 2011 WL 5037070, at *6 (C.D. Cal. Sept. 7,

12 2011).  This factor therefore also weighs in favor of imposing terminating sanctions.

13             **3.  The risk of prejudice to Plaintiff**

14    Plaintiff contends that the fraudulent evidence Defendants filed with the Court

15 "has exacted meaningful and lasting prejudice on the SEC and the investors it seeks to

16 protect."  (Mot. at 17.)  Plaintiff argues that the declarations at issue created factual

17 disputes that precluded the District Court from finding that there had been presale

18 investors in the Blockvest offering.  (Id.)  Plaintiff claims that, as a result, Defendants

19 have not been enjoined from all of the charged misconduct (including Exchange Act

20 antifraud violations and Securities Act registration violations), thereby exposing

21 investors to an ongoing risk of harm, and Defendants' assets have not been frozen,

22 making any recovery of lost investor funds unlikely.  (Id.)  Plaintiff further maintains that

23 given the scope of Defendants' misconduct, any evidence they present in response to

24 Plaintiff's summary judgment motion or at trial will not be credible.  (Id.)  Defendants do

25 not address this factor.  (See Opp'n.)

26    When assessing prejudice, courts consider whether the other party's actions

27 "impair" the ability of the party seeking sanctions "to go to trial or threaten to interfere

28 with the rightful decision of the case."  In re Phenylpropanolamine, 460 F.3d at 1227

1  (quotations omitted).  In examining this factor, courts consider whether the party's

2  misconduct "make[s] it impossible for a court to be confident that the parties will ever

3  have access to the true facts."  Conn. Gen. Life Ins. Co., 482 F.3d at 1097; see also

4  Whitewater West Indus., Ltd. v. Pacific Surf Designs, Inc., Case No: 17cv1118-BEN (BLM),

5  2018 WL 4199232, at *6 (S.D. Cal. Aug. 31, 2018) (quoting Leon, 464 F.3d at 959)

6  ("When the spoiling party's actions force the non-spoiling party 'to rely on incomplete

7  and spotty evidence' at trial, dismissal is proper.").

8         The false evidence produced by Defendants precluded Plaintiff from timely

9  ascertaining evidence central to its claims, and forced Plaintiff to engage in extensive,

10  costly, and lengthy discovery to uncover key facts and the extent of Defendants' deceit.

11  Defendants' misconduct therefore "threaten[s] to interfere with the rightful decision of

12  the case," and may force Plaintiff "to rely on incomplete and spotty evidence at trial."

13  See Leon, 464 F.3d at 959 (quotation omitted).  Accordingly, the Court finds that Plaintiff

14  has been prejudiced by Defendants' misconduct, and this factor weighs in favor of

15  imposing terminating sanctions.  See CrossFit, Inc. v. Nat'l Strength and Conditioning

16  Ass'n, Case No.: 14-CV-1191 JLS (KSC), 2019 WL 6527951, at *19 (S.D. Cal. Dec. 4, 2019)

17  (finding prejudice and imposing terminating sanctions pursuant to the court's inherent

18  power; reasoning, *inter alia*, that "[g]iven the extensive perjury to date, the evidence

19  supplied by the [party to be sanctioned] will also be inherently untrustworthy.").

20         **4.  The public policy favoring disposition of cases on their merits**

21         Plaintiff argues that the presumption is outweighed in this case because

22  Defendants engaged in a pattern of fraud.  (Mot. at 17.)  Defendants do not address this

23  factor.  (See Opp'n.)

24         The public policy in favor of disposition of cases on their merits always weighs

25  against dismissal.  See Pagtalunan v. Galaza, 291 F.3d 639, 643 (9th 2002).

26  Nevertheless, this factor "lends little support" to a party whose conduct impeded

27  progress toward disposition on the merits.  In re Phenylpropanolamine, 460 F.3d at

28  1228.

1    Defendants filed the false and forged declarations at the outset of this case, did

2    not withdraw or correct the declarations, impeded Plaintiff's efforts to timely ascertain

3    critical facts, and Defendant Ringgold continues to cite the declarations in his opposition

4    to a case dispositive motion.  Because of Defendants' extensive misconduct and

5    deception concerning key issues in this litigation, this factor is neutral.  See id. at 1237

6    (the party whose misconduct is at issue "bear[s] responsibility for halting movement

7    toward a merits resolution," which "neutralizes the negative effect of this factor.").

8              **5.  Efficacy of lesser sanctions**

9    Plaintiff argues that Defendants' deception directly relates to the legal issues

10   central to this litigation, pro se Defendant Ringgold will likely not pay monetary

11   sanctions, and evidence preclusion sanctions will merely place Ringgold in the same

12   position in which he was before filing the false and forged declarations, and will not

13   deter him from further deception.  (Mot. at 18.)  Plaintiff also asserts that at this stage

14   of the proceedings, after discovery closed and its motion for summary judgment was

15   filed, only a terminating sanction will provide a meaningful remedy.  (Reply at 17.)

16   Defendant Ringgold argues that terminating sanctions are not appropriate in this case

17   because there was no "disobedience of a prior court order compelling a response to the

18   discovery request."  (Opp'n at 6-8.)  Ringgold asks the Court to allow him to "resubmit

19   the declarations in the form of Notarized Affidavit of Facts from Quint[i]n Dorsey, Jackie

20   Wartanian & Christopher Russel in lieu of sanctions."  (Id. at 13.)  Alternatively,

21   Defendant asks the Court to issue an order precluding him from "offering the forged

22   Declaration at trial."  (Id. at 12 (emphasis added).)

23   A district court is generally required to consider whether a lesser sanction could

24   adequately address a party's misconduct.  Malone v. U.S. Postal Serv., 833 F.2d 128, 131

25   (9th Cir. 1987).  Reviewing courts consider whether the district court (1) discussed the

26   feasibility of less severe sanctions, (2) imposed alternative sanctions prior to ordering

27   dismissal, or (3) warned the party that dismissal was a potential sanction prior to

28   ordering the same.  Anheuser-Busch, Inc., 69 F.3d at 352.  In egregious circumstances,

however, "it is unnecessary (although still helpful) for a district court to discuss why alternatives to dismissal are infeasible." Dreith v. Nu Image, Inc., 648 F.3d 779, 788-89 (9th Cir. 2011) (quoting Malone, 833 F.2d at 132).  "[B]ecause bad faith behavior poses such a serious threat to the authority of a district court, the existence of bad faith constitutes egregious circumstances which can warrant dismissal even without the explicit consideration of alternative sanctions and relative fault." In re Fitzsimmons, 920 F.2d 1468, 1474 (9th Cir. 1990).

The Ninth Circuit has recognized that "dismissal is appropriate where a 'pattern of deception and discovery abuse made it impossible' for the district court to conduct a trial 'with any reasonable assurance that the truth would be available." Valley Eng'rs Inc., 158 F.3d at 1057 (quoting Anheuser-Busch, Inc., 69 F.3d at 352).  Terminating sanctions may also be applied when lesser sanctions would not deter future wrongdoing. See Computer Task Group, Inc. v. Brotby, 364 F.3d 1112, 1116-17 (9th Cir. 2004) ("[I]t is appropriate to reject lesser sanctions where the court anticipates continued deceptive misconduct."); see also Sun World Inc., 144 F.R.D. at 391 (imposing terminating sanctions because plaintiff's track record indicated that any lesser sanction would be an exercise in futility).

As an initial matter, Ringgold's argument that terminating sanctions are not available in this case because Defendants have not disobeyed any discovery orders is unavailing.  Plaintiff moves for terminating sanctions for Defendants' willful deceit of the Court pursuant to the Court's inherent powers, and not for discovery violations pursuant to Federal Rule of Civil Procedure 37.  (See Mot.)

Turning to monetary sanctions, Defendant Blockvest has not been represented by counsel for over a year, and Defendant Ringgold is proceeding pro se and does not appear to have the financial resources to pay monetary sanctions.  (See Opp'n at 5 (stating that due to "extreme financial hardship, [Defendants] could no longer afford counsel" and that "Blockvest LLC has no assets").  The Court therefore finds that monetary sanctions will not be effective in this case.

1    Discovery has closed and deponents whose declarations are at issue have been

2    deposed.  Defendants had an opportunity to cross-examine those dependents during

3    their depositions, but chose not to do so.  Defendants' proposals to resubmit the

4    declarations of Russell, Dorsey, and Wartanian,[4] or not "offer the <u>forged</u> Declaration at

5    trial" [<u>see</u> Opp'n at 12-13 (emphasis added)] do not provide an adequate remedy.  The

6    Court "need not order [a party] to refrain from submitting false documents or perjuring

7    himself in order for those acts to be punishable by dismissal and the entry of default

8    judgment.  The legal obligation to refrain from committing such acts is imposed upon

9    every party to a lawsuit."  <u>Sun World, Inc.</u>, 144 F.R.D. at 389-90; <u>see also</u> <u>Am. Rena Int'l</u>

10   <u>Corp. v. Sis–Joyce Int'l Co., Ltd.</u>, Case No. CV 12–6972 FMO (JEMx), 2015 WL 12732433,

11   at *30 (C.D. Cal. Dec. 14, 2015) ("a party has no right to simply abandon false evidence

12   and promise to be honest going forward.").

13   The Court also finds that evidentiary and issue preclusion sanctions would not be

14   appropriate in this case.  "The most critical factor to be considered in case-dispositive

15   sanctions is whether 'a party's [misconduct] make[s] it impossible for a court to be

16   confident that the parties will ever have access to the true facts.'"  <u>Conn. Gen. Life Ins.</u>

17   <u>Co.</u>, 482 F.3d at 1097 (quotation omitted).  Terminating sanctions are warranted where

18   the party's deception is directly pertinent to the legal issues being litigated.  <u>TeleVideo</u>

19   <u>Sys., Inc.</u>, 826 F.2d at 917 (affirming terminating sanctions, where the party's perjury

20   "infected all of the pretrial procedures and interfered egregiously with the court's

21   administration of justice.").

22   In this case, evidence preclusion sanctions would not deter Defendants'

23   misconduct and would place Defendants in the same position they were in before filing

24   the false and forged declarations.  <u>See</u> <u>Anheuser-Busch, Inc.</u>, 69 F.3d at 354 (9th Cir.

25   1995) (affirming terminating sanctions imposed by the district court where "the court

26

27   _____

28   [4] Notably, Ringgold is not asking to "resubmit" Vaculik's declaration.  (<u>See</u> Opp'n.)

1   anticipate[d] continued deceptive misconduct" and there was no "reasonable assurance

2   that the truth would be available."); <u>Sun World, Inc.</u>, 144 F.R.D. at 390-91 (concluding

3   that a non-case dispositive sanction "would be an exercise in futility and operate as an

4   ill-gotten reward for [defendant's] despicable behavior," where defendant committed a

5   fraud on the court by submitting a fraudulent document); <u>see also</u> <u>CrossFit, Inc. v. Nat'l</u>

6   <u>Strength and Conditioning Ass'n</u>, Case No.: 14cv1191 JLS (KSC), 2017 WL 2298473, at *5

7   (S.D. Cal. May 26, 2017) (imposing terminating sanctions; reasoning that "the sheer

8   breadth of the misconduct means that terminating the case would essentially be a

9   cleaner and more expedient disposal given the high number of issue and evidentiary

10  sanctions the Court [would need to] award.").

11          As discussed above, the false and forged declarations filed by Defendants concern

12  key issues in this litigation.  Further, Defendants' misconduct was willful and in bad faith,

13  and Defendant Ringgold continues to cite the false and forged declarations in opposition

14  to Plaintiff's motion for summary judgement.  Ringgold's conduct throughout the course

15  of discovery, as well as his numerous filings under the penalty of perjury, demonstrate

16  that he has no sense or remorse for the gravity of his misconduct, and does "not take

17  [his] oath to tell the truth seriously and . . . will say anything at any time in order to

18  [advance his agenda] in this litigation[.]"  <u>See</u> <u>Anheuser–Busch</u>, 69 F.3d at 352.  The

19  Ninth Circuit has repeatedly stated "<u>[t]here is no point to a lawsuit, if it merely applies</u>

20  <u>law to lies.  True facts must be the foundation for any just result.</u>"  <u>Valley Eng'rs Inc.</u>, 158

21  F.3d at 1058 (emphasis added); <u>Conn. Gen. Life Ins. Co.</u>, 482 F.3d at 1097 (same).  Less

22  drastic sanctions would not be appropriate here because Defendants have "willfully

23  deceived the court and engaged in conduct utterly inconsistent with the orderly

24  administration of justice."  <u>Anheuser-Busch</u>, 69 F.3d at 348.

25          Further, "it is not always necessary for the court to impose less serious sanctions

26  first, or to give any explicit warning."  <u>Valley Eng'rs Inc.</u>, 158 F.3d at 1057.  Here,

27  Defendants filed the declarations at issue before the Court had any opportunity to

28  impose lesser sanctions.  <u>See</u> <u>Leon</u>, 464 F.3d at 960 ("The second [<u>Anheuser–Busch</u>]

1    criterion is inapplicable here because [the party's misconduct occurred] before the

2    district court had an opportunity to . . . order 'lesser sanctions.'")  Additionally, because

3    Defendants filed the forged and false declarations at the outset of this litigation, the

4    Court could not have warned Defendants that such misconduct may result in the

5    imposition of terminating sanctions.  See Leon, 464 F.3d at 960 ("[T]he third criterion,

6    which examines whether the district court warned the party, is inapplicable here

7    because the [party's misconduct] occurred before the court had any opportunity to

8    warn [the party].");  see also Am. Rena Int'l Corp., 2015 WL 12732433, at *32 ("A court

9    should not have to warn a party to refrain from inventing phantom witnesses [], forging

10   declarations [], falsifying and fraudulently procuring declarations[, and] filing false

11   declarations with various federal courts[.]").  Notably, Defendant Ringgold was put on

12   notice of the possibility of terminating sanctions when Plaintiff filed its motion for

13   terminating sanctions; nevertheless, Ringgold continues to cite the false and forged

14   declarations in his subsequent court filing.

15          The Court has considered alternative monetary, evidentiary, and issue preclusion

16   sanctions, and concludes that, under the facts of this case, even broad sanctions would

17   not adequately redress Defendants' egregious misconduct and deceit.  See Conn. Gen.

18   Life Ins. Co., 482 F.3d at 1097 (rejecting lesser sanctions, where defendants' "pattern of

19   deception and discovery abuse made it impossible for the district court to conduct [a]

20   trial with any reasonable assurance that the truth would be available.  It is appropriate

21   to reject lesser sanctions where the court anticipates continued deceptive misconduct.")

22   (emphasis added); Greenburg v. Roberts Props., Ltd., No. CV–04–0001–PHX–SRB, 2006

23   WL 7345628, at *1, *7 (D. Ariz. Feb. 21, 2006) (imposing terminating sanctions pursuant

24   to the court's inherent authority, where a pro se litigant forged material documents,

25   submitted them to the court, and repeatedly lied to the court about whether he had

26   committed forgery; reasoning that "[a]n attempt to excise the fraudulent aspects of

27   Plaintiff's case from the non-fraudulent ones through some lesser sanction is an

28   impossibility," because "even assuming there are non-fraudulent ones (a fact about

1   which the Court has considerable doubt), those aspects are premised upon and

2   hopelessly bound up with the fraudulent aspects.").  The Court therefore finds that this

3   factor weighs in favor of imposing terminating sanctions.

4         **6.  Conclusion**

5         In sum, four factors considered by courts in deciding whether to impose

6   terminating sanctions, including the third and fifth "determinative" factors, weigh in

7   favor of imposing terminating sanctions; and one factor is neutral.  Additionally, the

8   Court's bad faith determination also supports the imposition of terminating sanctions.

9         The Court is mindful that terminating sanctions are a hash remedy, however,

10  Defendants' egregious misconduct and willful deception concerning key issues in this

11  litigation justifies the imposition of terminating sanctions requested by Plaintiff.  See

12  Conn. Gen. Life Ins. Co., 482 F.3d at 1094, 1097 (upholding the district court's imposition

13  of default judgment as a terminating sanction, where defendants "knowingly deceived

14  the [district] court and acted in bad faith" by submitting "perjured declarations,

15  fabricated evidence and frivolous pleadings"); Anheuser–Busch, 69 F.3d at 352

16  (terminating sanction is appropriate where a "pattern of deception and discovery abuse

17  ma[kes] it impossible" for a district court to conduct a trial "with any reasonable

18  assurance that the truth would be available."); TeleVideo Sys., Inc., 826 F.2d at 916-17

19  (affirming the entry of default judgment as a sanction for the defendant's perjury during

20  depositions and filing of false pleadings; finding that default judgment was warranted

21  despite defendant's admission of perjury because such a recantation would only be a

22  mitigating factor where the falsehoods "have not tainted the entire pretrial process.");

23  Sun World, Inc., 144 F.R.D. at 389 (concluding that where "fraud has been committed

24  upon the court, both Rule 11 and the inherent powers of the court support the sanction

25  of dismissal and the entry of default judgment."); see also Sec. & Exch. Comm'n v. Lee,

26  CASE NO. 14cv347-LAB (BGS), 2017 WL 127977, at *2 (S.D. Cal. Jan. 12, 2017) (imposing

27  terminating sanctions of default against defendants in the case arising out of fraudulent

28  investment scheme by defendants; noting that defendants' "bad faith and willful

1   misbehavior have successfully delayed the SEC's recovery, and imposed costs on the

2   SEC.  Denying relief or giving them another chance would simply reward [defendants']

3   misconduct.  The interests of justice forbid granting [defendants] any more

4   opportunities to engage in any more of the same misbehavior."); <u>Am. Rena Int'l Corp.</u>,

5   2015 WL 12732433, at *1-34 (imposing terminating sanctions pursuant to the court's

6   inherent powers, where defendants, *inter alia*, filed false and fabricated declarations,

7   did not withdraw the declarations, and continued to rely on those declarations in their

8   subsequent filings).  The Court therefore **RECOMMENDS** that the District Court find that

9   the five factors considered in this circuit in determining whether to impose terminating

10  sanctions weigh in favor of imposing terminating sanctions.

### IV.  CONCLUSION AND RECOMMENDATION

12          For the reasons set forth above, the Court **RECOMMENDS** that Plaintiff's motion

13  for terminating sanctions be **GRANTED**.

14          **IT IS ORDERED** that no later than **April 30, 2020**, any party to this action may file

15  written objections with the Court and serve a copy on all parties.  The document should

16  be captioned "Objections to Report and Recommendation."

17          **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

18  Court and served on all parties no later than **May 7, 2020**.  The parties are advised that

19  failure to file objections within the specified time may waive the right to raise those

20  objections on appeal of the Court's order.  <u>See</u> Turner v. Duncan, 158 F.3d 449, 455 (9th

21  Cir. 1998).

22          **IT IS SO ORDERED.**

23  Dated:  April 17, 2020

24

25                                          Honorable Michael S. Berg
                                            United States Magistrate Judge
26

27

28