1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                    Plaintiff,<br><br>v.<br><br>BLOCKVEST, LLC and REGINALD BUDDY RINGGOLD, III a/k/a RASOOL ABDUL RAHIM EL,<br><br>                                    Defendants. | Case No.:  18CV2287-GPB(MSB)<br><br>**ORDER ADOPTING REPORT AND RECOMMENDATION AND GRANTING PLAINTIFF'S MOTION FOR TERMINATING SANCTIONS AS TO DEFENDANT RINGGOLD**<br><br>**[Dkt. No. 93.]** |

Before the Court is Plaintiff Securities and Exchange Commission's ("SEC" or "Plaintiff") motion for terminating sanctions seeking entry of default judgment against Defendants Blockvest LLC and Reginald Buddy Ringgold (collectively "Defendants") on all claims in the complaint.  (Dkt. No. 93.)  Defendant Reginald Buddy Ringgold III ("Ringgold" or "Defendant") filed an opposition and the SEC filed its reply.  (Dkt. Nos. 99, 102.)

On April 20, 2020, pursuant to 28 U.S.C. § 636(b)(1), the Honorable Michael S. Berg, United States Magistrate Judge ("Magistrate Judge"), submitted a Report and Recommendation ("R&R") to this Court recommending that terminating sanctions be

imposed and default judgment entered against Defendants.  (Dkt. No. 113.)  Ringgold filed an objection to the R&R and the SEC filed a reply.  (Dkt. No. 1115, 116.)

The motion raises three questions: (1) whether Defendants submitted false declarations to defend against the SEC's case; (2) if so, were false declarations submitted willfully; and (3) if so, whether a terminating sanction is the appropriate remedy for presenting the false declarations in this litigation.  The Court finds that the evidence establishes that Defendants willfully filed false declarations to defend against the SEC allegations, and, in so doing, willfully deceived the Court and adversely affected the administration of justice.  For the reasons stated below, the Court ADOPTS the R&R and GRANTS the SEC's motion for terminating sanctions as to Defendant Ringgold.

**Procedural Background**

On October 3, 2018, the SEC filed a Complaint against Defendants Blockvest, LLC ("Blockvest") and Reginald Buddy Ringgold, III a/k/a Rasool Abdul Rahim El ("Ringgold" or "Defendant") alleging violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5(b); violations under Section 10(b) of the Exchange Act and Rule 10b-5(a) and Rule 10b-5(c); fraud in violation of Section 17(a)(2) of the Securities Act of 1933 ("Securities Act"); fraud in violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act; and violations of Sections 5(a) and 5(c) of the Securities Act for the offer and sale of unregistered securities.  (Dkt. No. 1, Compl.)  Plaintiff also concurrently filed an *ex parte* motion for temporary restraining order seeking to halt Defendants' fraudulent conduct and freezing their assets, prohibiting the destruction of documents, seeking expedited discovery and an accounting of Defendants' assets.  (Dkt. No. 3.)  On October 5, 2018, the Court granted Plaintiff's ex parte motion for temporary restraining order.  (Dkt. Nos. 5, 6.)  In compliance with the temporary restraining order, Defendants filed Ringgold's Declaration of Accounting on October 26, 2018, and a First Supplemental Declaration of Ringgold on November 2, 2018.  (Dkt. Nos. 18, 21.)  Defendants also filed a response to the order to show cause on November 2, 2018.  (Dkt. Nos. 23, 24, 25.)  On November 7, 2018, Plaintiff filed a reply.

18CV2287-GPB(MSB)

(Dkt. Nos. 27, 28.)  A hearing on the order to show cause was held on November 16, 2018, (Dkt. No. 37), and on November 27, 2018, the Court denied a preliminary injunction.  (Dkt. No. 41.)

On December 17, 2018, the SEC filed a motion for reconsideration.  (Dkt. No. 44.) Subsequently, defense counsel filed a motion to withdraw as counsel on December 27, 2018, and, among other things, cited attempts by defendants to file documents without counsel's knowledge or signature.  (Dkt. No. 47 at 5-6.)  On February 14, 2019, the Court granted Plaintiff's motion for partial reconsideration of the denial of a preliminary injunction against Defendants for future violations of Section 17(a) of the Securities Act and issued an order preliminarily enjoining Defendants from violating Section 17(a). (Dkt. No. 61.)  However, relying on the declarations filed by Defendants, the Court found disputed issues of fact precluded the issuance of a preliminary injunction as to the 32 test investors and 17 individual investors.  On the same day, the Court also granted defense counsel's motion to withdraw as counsel.  (Dkt. No. 62.)  Although Blockvest, as an LLC, was given leave to obtain substitute counsel until March 29, 2019, (Dkt. No. 64), it has not retained counsel.[1]  Defendant Ringgold has been proceeding without counsel since his counsel's withdrawal.

_____

[1] The SEC has not sought default proceedings against Blockvest.  Blockvest LLC was dissolved in Wyoming as of March 19, 2019.  *See* https://wyobiz.wyo.gov/Business/FilingDetails.aspx?eFNum=2331060110190691821491662302031061 93101100185208 (last visited 5/13/20).  According to Ringgold, because it has no interests, no assets, no bank account, no EIN or TIN or employees, Blockvest does not need any representation and can answer on its own.  Further, citing California law, Ringgold argues that because Blockvest, as a dissolved LLC, has no assets or shareholders, it does not need to respond.  (Dkt. No. 99-1 at 5.)  Despite its dissolution, Plaintiff seeks terminating sanctions against Blockvest LLC without providing legal authority as to its capacity to be sued.  Under Federal Rule of Civil Procedure 17(b), the capacity to sue or be sued in federal court is determined by the law under which the corporation was organized.  Fed. R. Civ. P. 17(b).  Whether an LLC is treated the same as a corporation is also subject to state law.  *See First American Mortg. Inc. v. First Home Builders of Fla*, Civil Action No. 10–CV–0824–RBJ–MEH, 2011 WL 4963924, at *12 (D. Colo. 2011) (while Michigan law gives limited liability companies "all powers granted to corporations", such a provision is not provided in Colorado law).  Ringgold's reliance on California law is misplaced.  Also, because the SEC has not provided legal authority whether Blockvest LLC can be sued in its capacity as a dissolved LLC, the Court declines to address the motion as it

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Factual Background

The Complaint alleges that Defendants offered and sold alleged unregistered securities in the form of digital assets called BLV's through an initial coin offering ("ICO").  (Dkt. No. 1, Compl. ¶¶ 1-4, 6.)  According to the Complaint, Blockvest conducted pre-sales of BLVs in March 2018 in several stages: 1) a private sale (with a 50% bonus) that ran through April 30, 2018; 2) a "pre-sale" (with a 20% bonus) from July 1, 2018 through October 6, 2018; and 3) the $100 million ICO launch on December 1, 2018.  (*Id.* ¶ 30.)  According to the SEC, Blockvest and Ringgold falsely claim their ICO has been "registered" and/or "approved" by the SEC, the Commodity Futures Trading Commission ("CFTC") and the National Futures Association ("NFA"), when in fact, it has not.  (*Id.* ¶¶ 77-88.)  Defendants further falsely assert they are "partnered" with and "audited by" Deloitte Touche Tohmatsu Limited ("Deloitte) but that is also not true.  (*Id.* ¶¶ 89-93.)  Finally, in order to create legitimacy and an impression that their investment is safe, Defendants created a fictitious regulatory agency, the Blockchain Exchange Commission ("BEC"), creating its own fake government seal, logo, and mission statement that are nearly identical to the SEC's seal, logo and mission statement. (*Id.* ¶¶ 112-28.)

In response, Ringgold asserted that there had not been any actual investors in Blockvest's sale of digital "BLV" tokens.  Instead, Defendants claimed that dozens of "friends and family" paid money: (1) to an affiliated entity without expecting to receive Blockvest tokens (the "Rosegold investors"), or (2) to help develop the Blockvest platform without expecting to receive real tokens (the "testers").  Ringgold declared that Blockvest had never sold any tokens to the public and had only one investor, Rosegold Investments LLP, ("Rosegold") which is run by him and in which he has invested more than $175,000 of his own money.  (Dkt. No. 24, Ringgold Decl. ¶ 5.)  During the testing

---

concerns Blockvest.  However, if legally supported, the SEC may seek default proceedings against Blockvest.

18CV2287-GPB(MSB)

and development phase prior to the anticipated ICO, 32 testers put a total of less than $10,000 of Bitcoin and Ethereum onto the Blockvest Exchange.  (*Id.* ¶ 6.)  Ringgold further claimed that the BLV tokens were only designed for testing the platform and no tokens were released to the 32 testing participants.  (*Id.*)  In addition, 17 individuals loaned or invested money in Rosegold Investments who are Ringgold's friends and family and Michael Sheppard's, Blockvest's CFO, friends and family.  (*Id.* ¶ 12.)  These investors loaned Ringgold or Sheppard money personally and they in turn, invested the money into Rosegold as their personal investment.  (*Id.* ¶ 11.)  Declarations from nine individuals affirm they did not buy BLV tokens or rely on any of the representations the SEC has alleged were false.  (*Id.* ¶ 13; Dkt. No. 24-2, Ringgold Decl., Ex. 2.)  Each of the individuals declared under oath that they did not rely on any specific representation when investing.  (Dkt. No. 24, Ringgold Decl. ¶ 13.)

At the preliminary injunction stage, Defendants solely challenged the SEC's claims arguing that the test BLV tokens were not "securities".  Under the *Howey*[2] test defining a security, the Court, relying on Ringgold's declaration and nine investor declarations, concluded there was a disputed issue of fact whether the BLV token offered and sold to the 32 testers was a "security" and whether the 17 identified individuals who invested in Rosegold purchased "securities."  (Dkt. No. 41 at 13-14.)

On November 13, 2018, Defendants filed the declarations of Christopher Russell ("Russell"), Jacquelin Wartanian ("Wartanian"), Quintin Dorsey ("Dorsey"), and Amanda Vaculik ("Vaculik") in opposition to the motion for preliminary injunction. (Dkt. Nos. 32-6; 32-8; 40-2.)

During discovery, it was revealed that the declaration of Russell was forged, misrepresentations were made in Wartanian's declaration, and false statements were

---

[2] *SEC v. W.J. Howey Co*., 328 U.S. 293, 298-99 (1946).  *Howey*'s three-part test requires "(1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others."  *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003) (internal quotation marks omitted).

18CV2287-GPB(MSB)

made in Dorsey and Vaculik's declarations.  The SEC moves for terminating sanctions seeking default judgment against Defendant for his fraudulent conduct in submitting these forged and false declarations.  Ringgold opposes without presenting any contradicting evidence and does not dispute the evidence submitted by the SEC.  Instead, he presents denials and argument in his opposition and Objections.

**A.    Quintin Dorsey**

On November 13, 2018, Defendants filed Quintin Dorsey's declaration, as a tester, in support of their opposition to Plaintiff's motion for a preliminary injunction.  (Dkt. No. 32-8 at 6; *see also* Dkt. No. 93-2, Wilner Decl., Ex. 8.)  Dorsey was deposed on July 15, 2019 and testified he was a former student of Ringgold at the Online Trading Academy.  Wilner Decl., Ex. 23, Dorsey Depo. at 37:14-25.)

In conversations, Ringgold represented to Dorsey that he could double his money within two to three months after the ICO.  (*Id.* at 71:5-72:5.)  Contrary to his declaration, Ringgold never told Dorsey that the purchase of BLV tokens were fake or "test tokens." (*Id.* at 73:16-74:8.)  He stated that he bought $5,000 of BLV tokens and hoped to profit once the ICO was complete.  (*Id.* at 71:8-74:8.)  He additionally testified that he made the investment decision relying on Ringgold's representations and representations contained in promotional materials, including the website, Whitepaper, promotional videos, the pitch deck and Ringgold's and Blockvest's social media accounts.  (*Id.* at 191:3-21; *see also* Dkt. No. 93-2, Wilner Decl., Exs. 10, 11.)

Ringgold called Dorsey to ask about signing a declaration and emailed a draft declaration through DocuSign.  (Dkt. No. 93-2, Wilner Decl., Ex. 23, Dorsey Depo. at 169:16-170:4.)  After persistent requests by Ringgold to sign the declaration, Dorsey testified that he signed his declaration without reviewing it so he could get Ringgold "out of [his] hair . . . because he was dealing with [his] family."  (*Id.* at 173:14-174:23.)  At that time, his wife had recently given birth to a baby, his wife was in serious medical condition, and he was also working.  (*Id.* at 172:4-173:6; *see also* Dkt. No. 93-2, Wilner Decl., Exs. 13, 14.)  Dorsey did not draft the declaration, did not read the declaration and

was given no information or explanation as to the purpose of the declaration or the existence of the litigation.  (Dkt. No. 93-2, Wilner Decl., Ex. 23, Dorsey Depo. at 170:2-14.)  Dorsey was not aware that his declaration had been filed for the SEC litigation until June 2019 when he was served with a subpoena.  (*Id.* at 177:22-178:8.)  He testified that his declaration is 100% false except for his signature.  (*Id.* at 197:3-16.)  He also testified he did not know who drafted the declaration but assumed it was someone at Blockvest.  (*Id.* at 197:20-24.)

At his deposition, Ringgold stated that he did not solicit Dorsey to invest, did not recall if Dorsey purchased $5,000 worth of BLVs in April 2018 through Blockvest's website, denied talking to Dorsey on the phone before he invested, and did not recall whether Ringgold sent Dorsey the Whitepaper, the pitch deck and website by email.  (Dkt. No. 93-2, Wilner Decl., Ex. 28, Ringgold Depo. at 450:9-455:20.)  He explained that Dorsey dealt with Mike Sheppard.  (*Id.* at 450:9-16; 453:17-25.)

**B.      Jacqueline Wartanian**

On November 13, 2018, Defendants filed Jacqueline Wartanian's declaration, as a tester, in support of their opposition to Plaintiff's motion for a preliminary injunction.  (Dkt. No. 32-8 at 4; *see also* Dkt. No. 93-2, Wilner Decl., Ex. 9.)  Wartanian was a former student of Ringgold at the Online Trading Academy.  (Dkt. No. 93-2, Wilner Decl., Ex. 24, Wartanian Depo. at 27:4-16.)

She testified that she and her mother purchased $3,000 of Blockvest tokens in 2018.  (*Id.* at 15:17-16:14.)  She gave $3,000 for the Blockvest ICO presale with the expectation that she would receive issued tokens once the ICO was complete and make money from it.  (*Id.* at 58:22-59:4.)  She believed that she purchased Blockvest tokens based on her account statement on the Blockvest Website.  (*Id.* at 114:4-118:5; Dkt. No. 93-2, Wilner Decl., Ex. 16 at 130.)  She also testified that she helped test the functionality of the Blockvest platform but that was "separate" from her investment.  (*Id.* at 59:5-20; 154:21-155:18.)  She stated that the "Deloitte" account firm's logo as well as SEC approval gave her confidence to invest in Blockvest.  (*Id.* at 85:20-87:5; 88:5-16.)

As to her declaration, she testified that she was asked to send a declaration which she asked Ringgold to draft. (*Id.* at 149:12-22.) Ringgold did not go over what he wrote in the declaration but she read it stating "I read it and, you know, I understood what I understood." (*Id.* at 150:1-2.) He emailed her the declaration and told her to look at it and sign it. (*Id.* at 150:15-17.) Although Ringgold gave her an opportunity to make changes to the declaration he drafted, she did not. (*Id.* at 151:4-8.) She had not read the SEC's complaint prior to signing her declaration. (*Id.* at 152:1-16.) As to the content of her declaration, she testified that the contents were correct as to her role as tester but that it omitted material information that she also invested in Blockvest. (*Id.* at 153:9-165:3.) At his deposition, Ringgold testified he did not recall Wartanian, did not remember if she invested in Blockvest and whether she was a tester. (Dkt. No. 93-2, Wilner Decl., Ex. 28, Ringgold Depo. at 548:15-549:5.) He did not recall Wartanian's declaration and whether he had any involvement in obtaining her declaration. (*Id.* at 608:12-14; 609:4-6.) He testified that if Wartanian invested money, she probably drafted another declaration as his attorney wanted separate declarations from testers even if they were investors and testers. (*Id.* at 608:19-609:3.) However, in stark contrast to his deposition, Ringgold states, in his Objections, that even before Blockvest, he had a longstanding relationship with Wartanian because her brother in-law, Munir Koja, was the Senior Network Developer. (Dkt. No. 115-1 at 7.) Similarly, in a declaration filed in support of his opposition to Plaintiff's pending motion for summary judgment, Ringgold states that he was a close friend and mentor to Wartanian. (Dkt. No. 109-1, Ringgold Decl. ¶ 24.) He also noted that Wartanian's brother-in-law, Munir Koja, worked for Blockvest as Senior Network Developer. (*Id.*)

## C.   Christopher Russell Declaration

On November 13, 2018, Defendants filed Christopher Russell's declaration, as a Rosegold investor, in support of their opposition to Plaintiff's motion for a preliminary

injunction. (Dkt. No. 32-6 at 67-68[3]; *see also* Dkt. No. 93-2, Wilner Decl., Ex. 3 at 97-98.)  However, Russell did not submit his edited, final, approved version until November 14, 2018 which contains materially different statements than the one filed on November 13, 2018.  The parties do not dispute that his declaration was forged but it is unknown who forged Russell's declaration.

On November 13, 2018, at 1:38 p.m., Russell's friend, Blockvest sales agent Chase Pfohl, emailed Russell a proposed version of his declaration drafted by Defendants in Word format.  (Dkt. No. 93-2, Wilner Decl., Ex. 4 at 100-02.)  Russell reviewed the declaration and made changes to it.  (Dkt. No. 93-2, Wilner Decl., Ex. 22, Russell Depo. at 118:5-14.)  At his deposition, Russell stated he changed the statement that claimed he was a sophisticated investor as he did not have the income nor the years of experience to fall in the category of a sophisticated or accredited investor.  (*Id.* at 118:12-119:1.)  He recalled telling Chase he would not sign the declaration as provided and Chase responded that it was completely fine to make whatever changes he wanted.  (*Id.* at 118:21-119:5.)  Later that evening on November 13, 2018 at 8:36 p.m., Mike Sheppard emailed Russell requesting that he send in the investor declaration, stating "[o]ur defense attorney is almost certain we will receive a settlement offer if we advise that we have 100% of all investors with a signed declaration.  The only one we need is yours to be 100% complete. . . .We will get 100% of your investment back to you when this is over."  (Dkt. No. 93-2, Wilner Decl., Ex. 5 at 104.)  The next day, November 14, 2018 at 2:34 p.m., Russell responded to Sheppard's email apologizing for the delay and attached his actual signed and edited investor declaration.  (*Id; see also* Dkt. No. 93-2, Wilner Decl., Ex. 6 at 106-07.)  Russell testified that he sent his declaration in PDF format so that it could not be changed by anyone.  (Dkt. No. 93-2, Wilner Decl., Ex. 22, Russell Depo. at 156:2-19.)

---

[3] Unless otherwise noted, page numbers are based on the CM/ECF pagination.

The version of Russell's declaration filed with the Court on November 13, 2018 was not approved by him and his signature was forged.  (*Id.* at 160:23-161:14; 162:13-19.)  The declaration Russell authorized and signed differed significantly from the declaration Defendants filed on his behalf.  (*Compare* Dkt. No. 93-2, Wilner Decl., Ex. 3 *with* Dkt. No. 93-2, Wilner Decl., Ex. 6.)  For example, Russell omitted the word "sophisticated" from "I consider myself a sophisticated investor," which appears in the Court-filed version of the declaration.  (Dkt. No. 93-2, Wilner Decl., Ex. 22, Russell Depo. at 126:18-128:1; 163:14-18.)  Further, according to Russell's deposition testimony, Defendants' version of the declaration contained statements that Russell had never seen, including the statement that he had never reviewed or relied on Blockvest's promotional materials or website.  (*Id.* at 164:14-168:22.)  However, he testified that he had reviewed numerous marketing materials and information about Blockvest on the Internet, and those materials and information influenced his decision to make the $3,000 purchase of Blockvest tokens.  (*Id.* at 168:3-22.)  After reviewing Blockvest's promotional materials and other representations by the company's personnel, Russell expected to profit from those tokens based on the efforts of Ringgold and Blockvest's management to make the company successful.  (*Id.* at 77:6-78:4; 140:7-142:17.)  After his investment, Russell continued to believe he had acquired BLV tokens based on his account statement available on Blockvest's website.  (*Id.* at 70:3-72:16.)  He stated that the version of the declaration filed with the Court is "false."  (*Id.* at 164:11-13.)

At his deposition, Ringgold testified that he did not forge Russell's signature on the declaration and he did not know who forged it.  (Dkt. No. 93-2, Wilner Decl., Ex. 28, Ringgold Depo. at 529:20-23.)  When asked whether Russell had sent his signed declaration after Ringgold had already filed one with the Court, Ringgold testified that he had no idea about it until then.  (*Id.* at 519:13-20.)  Yet, when asked why he did not take any steps to inform the Court after he received Russell's signed declaration, he responded that he did not know how to do so and was bombarded with numerous filings as he was proceeding pro per.  (*Id.* at 525:21-25; 529:20-530:5.)  He also explained that there were

18CV2287-GPB(MSB)

several signed versions of the declarations and each investor probably signed about two or three different versions because there were corrections and errors. (*Id.* at 519:21-25; 520:13-17.) Then he testified that he was under the impression that Chase forged Russell's signature. (*Id.* at 520:1-6.) Ringgold explains that if Chase submitted the Russell declaration, he would not have any way of knowing if Chase forged Russell's signature. (*Id.* at 525:8-16.) He has no idea what happened except that the declaration came from Chase. (*Id.* at 525:17-20.) He further states that he had no way of knowing at the time the declaration was sent to him whether it was accurate or not. (*Id.* at 529:14-19.)

**D.    Amanda Vaculik Declaration**

On November 19, 2018, the SEC filed a supplemental declaration of David S. Brown regarding a $147,000 wire transfer. (Dkt. No. 39.) Ringgold was questioned regarding this wire transfer and the source of the monies at his deposition on November 6, 2018. (Dkt. No. 39-8.) Thereafter, on November 20, 2018, Defendants filed Amanda Vaculik's declaration.[4]  (Dkt. No. 40-2 at 2; *see also* Dkt. No. 93-2, Wilner Decl., Ex. 17.) In the declaration, Vaculik stated that, in April 2018, she entered into a lease for a condo located on 5th Street in Santa Monica, California. (Dkt. No. 40-2 at 2.) She claimed that her boyfriend, Christopher Black, paid rent on the 5th Street condo for a year in advance. (*Id.*) Black worked in Blockchain exchange software development. (*Id.*) Black told Vaculik that "Reginald Ringgold agreed to pay Mr. Black $147,000 in exchange for Mr. Black's software development services. Mr. Black told me that he asked Mr. Ringgold to make payment for Mr. Black's services to my landlord, '5th ST LLC'" on April 18, 2018. (*Id.*) The contents of Vaculik's declaration was later discovered to be false.

---

[4] As noted by the SEC, Vaculik's declaration was stricken and not considered by the Court in its denial of preliminary injunction. (Dkt. No. 41 at 17.)

In line with Vaculik's declaration, on November 6, 2018, Ringgold testified during his initial deposition, which was conducted during the expedited discovery phase, that a $147,000 payment from his personal account for a Santa Monica apartment for Vaculik was compensation to "Chris" and his company for "development" of Blockvest's platform, and the source of funds was "my money that I had I just had in my safe." (Dkt. No. 93-2, Wilner Decl., Ex. 27, Ringgold Depo. at 357:17-361:16.)

On November 15, 2018, Plaintiff conducted a telephonic interview of Vaculik. (Dkt. No. 93-2, Wilner Decl. ¶ 23.)  Vaculik answered the call but asked the SEC interviewers to call her back in thirty minutes.  (*Id.*)  During the subsequent call, Vaculik told the SEC interviewers that Black was her boyfriend, that he was involved with technology, and that the payment was for Black's services for an apartment in which Vaculik would live.  (*Id.*)  She then repeated the above statements in her declaration filed with the District Court on November 20, 2018.  (Dkt. No. 40-2 at 2.)

On April 24, 2019, Vaculik gave a proffer to the Department of Justice that was attended by two SEC attorneys.  (Dkt. No. 93-2, Wilner Decl. ¶ 25.)  During the proffer, Vaculik told the interviewers that: (1) Black was not her boyfriend; (2) she did not live in the Santa Monica apartment; (3) she did not know the source or purpose of the funds for the apartment, and (4) she became involved because Ringgold and his affiliates paid her $10,000 to put the apartment application in her name.  (*Id.*)  Vaculik also stated that on November 15, 2018, she spoke to Ringgold during the intervening thirty minutes between phone calls with the SEC, and Ringgold instructed her to tell the false story about the apartment transaction to the SEC staff.  (*Id.*)  During her subsequent deposition on September 9, 2019, Vaculik asserted her Fifth Amendment right as to all questions concerning the transaction, the declaration, and the SEC interview.  (Dkt. No. 93-2, Wilner Decl., Ex. 25, Vaculik Depo. at 18-61.)

At a later deposition on October 22, 2019, Ringgold testified that he did not know or recall Vaculik or Black and did not recall any transaction with her or Black related to

supposed development services or the apartment.  (Dkt. No. 93-2, Wilner Decl., Ex. 28, Ringgold Depo. at 394:23-399:4; 611:21-631:12.)

## Discussion

### A.    Legal Standard of Magistrate Judge's Report and Recommendation

In reviewing a magistrate judge's report and recommendation, a district court "must make a de novo determination of those portions of the report . . . to which objection is made," and "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate."  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  A district court is not required to review a magistrate judge's report and recommendation where no objections have been filed.  *See United States v. Reyna–Tapia*, 328 F.3d 1114 (9th Cir. 2003).  While "the [§ 636(b)(1)(C)] does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard."  *Thomas v. Arn*, 474 U.S. 140, 154 (1985).

Here, Defendant filed an Objection to the R&R; therefore, the Court conducts a *de novo* review of the portions of the R&R that Defendant objects.  Defendant objects contending that the R&R fails to identify or apply a legal standard and the Magistrate Judge substituted his own discretion for the Sheriff's without identifying a violation of law.  (Dkt. No. 115 at 2.)   Further, without legal authority, Ringgold argues that terminating sanctions will violate his Seventh Amendment right to a jury trial.  (*Id.*)

First, the Magistrate Judge correctly identified the legal standard for terminating sanctions under federal law.  In contrast, Ringgold improperly cites to state law cases addressing sanctions for discovery violations.  Second, courts may dismiss matters through pretrial proceedings without violating the Seventh Amendment.  *See In re U.S. Fin. Sec. Litig.*, 609 F.2d 411, 422 & n. 34 (9th Cir. 1979) ("Several procedural devices developed and expanded since 1791 have infringed upon the civil jury's historic role; nevertheless, they have been found consistent with the Seventh Amendment."); *Newton v. Poindexter*, 578 F. Supp. 277, 283 (E.D. Cal. 1984) (motion to dismiss for lack of subject

matter jurisdiction did not violate right to jury trial) (quoting *Gasoline Prods. Co. v. Champlin Refining Co*., 283 U.S. 494 (1931) ("[The Seventh Amendment] does not prohibit the introduction of new methods for ascertaining what facts are in issue . . . ."). Therefore, Ringgold's Objections are without merit.  Nonetheless, the Court conducts a review of the R&R on the merits.

**B.     Legal Standard on Terminating Sanctions**

A court has the inherent authority to issue sanctions in response to abusive litigation practices.  *Leon v. IDX Sys. Corp*., 464 F.3d 951, 958 (9th Cir. 2006).  One such sanction is the authority to dismiss a case when "a party has engaged deliberately in deceptive practices that undermine the integrity of judicial proceedings" because "courts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice." *Id.* (quoting *Anheuser–Busch, Inc. v. Natural Beverage Distribs*., 69 F.3d 337, 348 (9th Cir. 1995)).  "It is firmly established that the courts have inherent power to dismiss an action or enter a default judgment to ensure the orderly administration of justice and the integrity of their orders."  *Phoceene Sous-Marine, S.A. v. U.S. Phosmarine, Inc*. 682 F.2d 802, 806 (9th Cir. 1982) (citations omitted).  "Because of their very potency, inherent powers must be exercised with restraint and discretion."  *Chambers v. NASCO, Inc*., 501 U.S. 32, 44 (1991); *Wyle v. R.J. Reynolds Indus., Inc*., 709 F.2d 585, 589 (9th Cir. 1983) ("[B]ecause dismissal is so harsh a penalty, it should be imposed only in extreme circumstances.").  Terminating sanctions may issue only upon a finding of willful disobedience or bad faith.  *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996); *Wyle,* 709 F.2d at 589 (the violations must be "due to willfulness, bad faith, or fault of the party").  In addition, the Ninth Circuit has identified five factors that a court must consider before dismissing an action as a sanction:

> (1) the public's interest in expeditious resolution of litigation;
> (2) the court's need to manage its docket;
> (3) the risk of prejudice to the other party;
> (4) the public policy favoring disposition of cases on their merits; and

(5) the availability of less drastic sanctions.

*Malone v. U.S. Postal Serv.*, 833 F.2d 128, 130 (9th Cir. 1987) (quoting *Thompson v. Housing Auth. of City of Los Angeles*, 782 F.2d 829, 831 (9th Cir. 1986)).  "The first two of these factors favor the imposition of sanctions in most cases, while the fourth cuts against a . . . dismissal sanction.  Thus the key factors are prejudice and the availability of lesser sanctions." *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir. 1990).  This five factor test is not a rigid, mechanical test but "a way for a district judge to think about what to do, not a series of conditions precedent before the judge can do anything, and not a script for making what the district judge does appeal-proof." *Valley Engineers Inc. v. Elec. Eng'g Co.*, 158 F.3d 1051, 1057 (9th Cir. 1998).

## C.    Bad Faith, Willfulness or Fault

Plaintiff argues that Defendant's misconduct was willful and in bad faith because he knew the declarations were forged or false and yet took no action to correct them and he further attempted to conceal the wrongdoing with false deposition testimony.  (Dkt. No. 93-1 at 11.)  Ringgold responds with numerous explanations.  Ringgold claims his retained counsel "carefully drafted" each declaration and each declarant was instructed to read it carefully and make sure it was true and correct and to make any corrections before sending it back.  (Dkt. No. 99-1 at 11; Dkt. No. 115 at 7.)  Moreover, his counsel drafted the declarations under intense time constraints opposing the motion for preliminary injunction and "it is highly possible that the defendants counsel inaccurately carried over statements from the prior drafted declarations to those of the Russell, Dorsey & Wartanian . . . ."  (Dkt. No. 99-1 at 11.)  Ringgold claims he never pressured the investors, or testers to sign the declarations and they were signed of their own free will.  (Dkt. No. 115 at 7.)  He states that the SEC used coercion tactics employed by FBI agents and DOJ to get Dorsey, Wartanian and Vaculik to perjure themselves.  (Dkt. No. 99-1 at 11; Dkt. No 115 at 7.)  Finally, since he is proceeding pro se and unschooled in the law, he was unable or did not know how to correct the forged declaration that was filed with

the Court.  (Dkt. No. 115 at 7.)  Ringgold argues that he did not destroy any evidence in bad faith and did not alter or hide evidence; therefore, terminating sanctions are not warranted.

Terminating sanctions may issue only upon a finding of willful disobedience or bad faith.  *In re Exxon Valdez*, 102 F.3d 429, 432 (9th Cir. 1996); *Wyle*, 709 F.2d at 589 (the violations must be "due to willfulness, bad faith, or fault of the party").  In *Combs* the Ninth Circuit held that "dismissal is an appropriate sanction for falsifying a deposition."  *Combs v. Rockwell Int'l Corp.,* 927 F.2d 486 (9th Cir.) *cert. denied* 502 U.S. 859 (1991).  In *Combs*, after the deposition of the plaintiff, the parties agreed that the transcript would be forwarded to plaintiff's counsel in order to have the plaintiff review it and make any changes to correct transcribing errors.  *Id.* at 488.  The plaintiff stated he was satisfied that his testimony was correct and truthful, but he gave counsel permission to alter any of his responses.  *Id.*  Counsel made thirty-six changes many of which materially altered the substance of the plaintiff's testimony.  *Id.*  Despite Plaintiff's sworn statement, he never reviewed either the original or the altered deposition transcripts.  *Id.*  The Ninth Circuit affirmed the district court's dismissal of the complaint for falsifying a deposition by authorizing counsel to alter a deposition in material respects and then signing the revised deposition and swearing, under penalty of perjury, that the plaintiff had reviewed the transcript and made the changes personally.  *Id.* at 488-89 ("[t]he mendacity of the client and the combined fraud and incompetence of his counsel are so egregious that there is no need to reach the merits of the motion for summary judgment. The case was properly dismissed.").

In *Vogel*, the district court granted dismissal of the case where an ADA plaintiff and his attorney were sanctioned for acting in bad faith and making material misrepresentations to the court about when he encountered barriers at the defendant's place of business.  *Vogel v. Tulaphorn,* No. CV 13-464 PSG (PLAX), 2014 WL 12629679, at *6 (C.D. Cal. Jan. 30, 2014) ("Only one thing matters at this late date: Plaintiff and Counsel falsely represented to this Court and Defendant, over many months

of litigation, that Plaintiff encountered access barriers during a prefiling visit to the restaurant that he never actually made.").

"To permit the fabrication of spurious corroborating evidence without the imposition of a harsh responsive sanction would constitute an open invitation to abuse of the judicial system of the most egregious kind." *Asia Pac. Agr. & Forestry Co. v. Sester Farms*, No. 3:12–cv–00936–PK, 2013 WL 4742934, *11 (D. Or. Sept. 3, 2013); *see also Arnold v. Cnty. of El Dorado*, No. 2:10–cv–3119 KJM GGH PS, 2012 WL 3276979, at *4 (E.D. Cal. Aug. 9, 2012) ("[P]erjury on any material fact strikes at the core of the judicial function and warrants a dismissal of one's right to participate at all in the truth seeking process . . . . If one can be punished for perjury with up to five years imprisonment, 18 U.S.C. § 1621, it should not seem out of place that a civil action might be dismissed for the same conduct.").

Based upon its review of the subject declarations, subsequent deposition testimony of the declarants, and Ringgold's declarations and deposition testimony, the Court concludes that Ringgold willfully deceived the Court in defending against the SEC allegations. The deception, which began shortly after this litigation commenced in 2018, has impacted the Court's rulings to date and resulted in the abuse and corruption of the judicial process.

The R&R found that Ringgold's conduct was willful and in bad faith and the Court agrees. (Dkt. No. 113 at 20-25.) Early in the litigation, Ringgold filed a declaration in opposition to the motion for preliminary injunction and stated there were a total of 17 individuals that had loaned or invested money in Rosegold Investments but did not purchase securities. These 17 investor individuals attested under oath that they did not buy BLV tokens and did not rely on any specific representations when investing. (Dkt. No. 24, Ringgold Decl. ¶ 12.) In addition, Ringgold stated there were 32 testers involved in the Blockvest testing and development phase where they put a total of less than $10,000 of Bitcoin and Ethereum onto the Blockvest Exchange. (*Id.* ¶¶ 5-6.) BLV

Tokens were never released from the BlockVest platform to the 32 testing participants because they were only designed for testing the platform.  (*Id.* ¶ 6.)

In a supplemental declaration filed in opposition to the motion, Ringgold declared that the "16[5] Private Rosegold Investors Have Attested Under Oath that They Did Not Rely on Any of the Alleged Misrepresentations or Omissions and Their Purchases were Not in Connection with Those Alleged Misrepresentations and Omissions."  (Dkt. No. 32, Ringgold Decl. at 5.)  These 16 investors "also attested that they authorized Michael Sheppard to use his unfettered discretion to us the money in any good manner, provided that he exercises reasonable business judgment. . . that before that they sent money to Rosegold Investments LLP, they did not review or rely on Rosegold Investments LLP's website or any offering documents or anything on the internet about Rosegold Investments . . . that before sending any money to Rosegold Investments LLP, they never listened to any webinar or video, or attended any seminar on Blockvest LLC . . . [and] did not review or rely on the Blockvest website[] Whitepaper, Facebook page, and or LinkedIn page referencing Blockvest or anything else on the internet about Blockvest."  (*Id.* ¶¶ 18-20.)  He also attached "true and correct copies of declarations from nine of the [32] Blockvest authorized testers that the SEC falsely presented to this Court as an investor."  (*Id.* ¶ 28.)  The Blockvest Exchange was never operational and was a work-in progress, as was its website, White Paper and entire exchange platform itself.  (*Id.* ¶ 32.)  The supplemental declarations included the declarations of Russell as a Rosegold investor, and Dorsey and Wartanian, as testers.

Dorsey Declaration

Discovery has revealed that Ringgold's declarations filed in opposition to the preliminary injunction contain false statements.  Dorsey was not a tester, as stated in his

---

[5] While the initial declaration states there were 17 Rosegold investors, the supplemental declaration states there are technically 18 Rosegold investors but 2 of them are minors and not involved in the investment decision.  (Dkt. No. 32. Ringgold Decl. ¶ 16.)

declaration, and believed he was investing in Blockvest.  Contrary to Ringgold's supplemental declaration, Dorsey testified that he invested $5,000 to purchase BLV tokens and hoped to profit once the ICO was complete.  (Dkt. No. 93-2, Wilner Decl., Ex. 23, Dorsey Depo. at 71:8-14:8.)  He relied on representations made by Ringgold as well as representations made in Blockvest's promotional materials, which included the website, Whitepaper, promotional videos, the pitch deck and Ringgold's and Blockvest's social media accounts.  (*Id.* at 191:3-21.)  In an email dated April 22, 2018, Ringgold personally thanked Dorsey for his investment interest and provided document links on the Blockvest project and private sale.  (Dkt. No. 93-2, Wilner Decl., Ex. 11 at 117.)  The email also stated "For your $5,000 investment you will receive 10,000 BLV Tokens at $.50 per.  This offer is only valid through May 1, 2018."  (*Id.*)  Dorsey believed the BLV tokens were real and not test tokens.  (Dkt. No. 93-2, Wilner Decl., Ex. 23, Dorsey Depo. at 161:13-17.)

Dorsey also testified that Ringgold contacted him asking him to sign a declaration and emailed a draft declaration.  (*Id.* at 169:16-170:4.)  Ringgold directed Dorsey to sign the declaration without providing an explanation as to the purpose of the declaration, the contents of the declaration or the pending SEC litigation.  Dorsey regrettably testified that he did not read the declaration and wished he had not signed the declaration.  (*Id.* at 170:10-11; 197:9-19.)

Later, at his deposition, Ringgold stated that he did not solicit Dorsey to invest, did not recall if Dorsey purchased $5,000 worth of BLVs in April 2018 through Blockvest's website, denied talking to Dorsey on the phone before he invested, and did not recall whether Ringgold sent Dorsey the Whitepaper, the pitch deck and website by email. (Dkt. No. 93-2, Wilner Decl., Ex. 28, Ringgold Depo. at 450:9-455:20.)

Dorsey's undisputed testimony and the emails sent by Ringgold to Dorsey reveal that Ringgold solicited Dorsey to invest, was aware of the $5,000 investment and emailed Dorsey promotional materials about the BLV tokens.  Dorsey's declaration stating that he was a tester is false.  Thus, Ringgold's declaration stating the testers did not purchase

BLV tokens because the Blockvest platform was not operational is false.  Ringgold's subsequent deposition testimony misrepresenting that Dorsey did not invest and that he had no knowledge about his communications with Dorsey reveals Ringgold's willful conduct in an attempt to obscure and conceal the facts surrounding the offer and sale of BLV tokens to Dorsey.

Wartanian Declaration

Next, Wartanian was also described as a tester in Ringgold's initial declarations filed with the Court.  Wartanian testified she was both a tester and also an investor of Blockvest.  (Dkt. No. 93-2, Wilner Decl., Ex. 24, Wartanian Depo. at 58:22-59:4; 59:5-20; 154:21-155:18.)  Yet, her declaration omits the investment part of her relationship with Blockvest.  At his deposition, Ringgold testified that he did not recall who Wartanian was and whether she invested in Blockvest or whether she was a tester.  (Dkt. No. 93-2, Wilner Decl., Ex. 28, Ringgold Depo. at 548:15-549:5.)  He also had no recollection whether he was involved in procuring her declaration.   (*Id.* at 608:12-14; 609:4-6.)  However, in his Objections and also in his declaration in opposition to motion for summary judgment, he declares that he is a close friend and mentor to Wartanian that pre-dates Blockvest, and her brother-in-law was the Senior Network Developer at Blockvest.  (Dkt. No. 115-1 at 7; Dkt. No. 109-1, Ringgold Decl. ¶ 24.)

While Wartanian was a tester of the Blockvest website, she also invested $3,000 in purchasing BLV tokens.  She believed she would make money from the investment and she was able to see her account statement on the Blockvest website.  Again, Ringgold hid the truth by testifying that he does not recall who Waratanian is and what role she played with Blockvest even though, in fact, he is a close friend and mentor of Wartanian.

The Court agrees with the R&R that the evidence surrounding the false declaration of Dorsey and misrepresentations in Wartanian's declarations reveal that Ringgold was involved in drafting these declarations that were submitted to the Court and, as such, his

conduct was willful and in bad faith.[6]  Moreover, review of the evidence concerning these declarations reveals that Ringgold also provided false statements in his own declarations with the Court.

Vaculik Declaration

Next, Ringgold coached Vaculik to provide false statements to the SEC in a telephonic interview on November 15, 2018.  The false statements related to Vaculik's relationship with Chris Black, a supposed developer, and a $147,000 payment for an apartment she never lived in.  Ringgold included the false statements in a declaration filed on November 20, 2018, (Dkt. No. 93-2, Wilner Decl. ¶ 23; Dkt. No. 93-2, Wilner Decl., Ex. 17), and testified to similar facts at his initial deposition on November 6, 2018. (Dkt. No. 93-2, Wilner Decl., Ex. 27, Ringgold Depo. at 357:17-361:16.)  However, on April 24, 2019, Vaculik gave a proffer to Plaintiff's attorney and essentially stated that Ringgold paid her $10,000 to make statements in her declaration.  (Dkt. No. 93-2, Wilner Decl. ¶ 25.)  Then, on October 22, 2019, Ringgold testified he did not have any recollection of Vaculik or Black, or any transaction related with her or Black.  (Dkt. No. 93-2, Wilner Decl., Ex. 28, Ringgold Depo. at 394:23-399:4; 611:21-631:12.)  Again, Ringgold's conflicting accounts as to Vaculik's role further demonstrates that his conduct was dishonest and willful.

Russell Declaration

Finally, Ringgold does not dispute that the signature on the Russell declaration was forged but there is an issue of fact whether Ringgold was responsible or involved in the

---

[6] Sanctions without an evidentiary hearing is warranted where Ringgold does not "argue or provide evidence challenging the authenticity of [SEC's] evidence, particularly the falsified evidence at issue." *See American Rena Int'l Corp. v. Sis–Joyce Int'l Co., Ltd..* Case No. CV 12–6972 FMO (JEMx), 2015 WL 12732433 at*7 n. 6 (C.D. Cal. Dec. 14, 2015) (citing *Prof'l Seminar Consultants, Inc. v. Sino Am. Tech. Exch. Council, Inc.*, 727 F.2d 1470, 1472-73 (9th Cir. 1984) (no abuse of discretion in ordering sanctions without an evidentiary hearing where district court ruled such a hearing was unnecessary; party did not contest the authenticity of falsified evidence, and district court made findings of fact on the record when ordering sanctions)).

forgery of Russell's signature.  However, despite learning about the forged declaration prior to his deposition in October 2019, (Dkt. No. 93-2, Wilner Decl., Ex. 28, Ringgold Depo. at 526:6-21), Defendant has not withdrawn the forged declaration and continues to cite the declaration in opposition to his pending motion for summary judgment.  (*See* Dkt. No. 109.)   This is some evidence of Ringgold's bad faith.

Ringgold's misconduct concerns the fabrication of evidence material to key issues in this case.  Having suborned perjury and coached witnesses to lie, Defendant denies responsibility and, instead, blames the SEC investigators for coercing these witnesses to lie.  Ringgold's conduct as to procuring Vaculik, Wartanian and Dorsey's declarations and subsequent testimonies denying knowledge about his relationship and/or communications with them demonstrate bad faith and willful misconduct in order to conceal and obscure the truth and has resulted in protracted litigation by SEC to arrive at the truth.  Even now, Ringgold continues his willful misconduct by relying on false declarations in opposing the pending summary judgment motion.  (*See* Dkt. No. 109.) Given the above facts, the Court does not have the confidence that "it can accept defendant['s[] account of either the law or the facts in this matter" as to the remaining 7 tester declarations.  *See American Rena Int'l Corp.,* 2015 WL 12732433 at *32. (citing *Newman v. Brandon*, No. 1:10–cv–00687 AWI JLT (PC), 2012 WL 4933478, at *4 (E.D. Cal. Oct. 16, 2012) (submission of perjured testimony going to material issues in the case "was an act of bad faith which undermines the confidence placed in our system of justice")).   The Court agrees with the R&R and finds that Ringgold's misconduct was willful and in bad faith.

**D.**    ***Malone's* Five Factor Test**

**1.    Public's Interest in Expeditious Resolution of Litigation**

The SEC contends that the false declarations has necessitated protracted litigation to resolve whether Defendant sold Blockvest securities to presale investors which was the only issue in dispute at the motion for preliminary injunction.  (Dkt. No. 92-1 at 16.) Defendant did not address this factor.  The Magistrate Judge concluded that the

misconduct caused unnecessary delay and expense for the SEC and the public it seeks to protect and is a factor that supports sanctions.  (Dkt. No. 113 at 25.)

"The public's interest in expeditious resolution of litigation always favors dismissal." *Nourish v. Cal. Amplifier,* 191 F.3d 983, 990 (9th Cir. 2002).  The public has an overriding interest in securing "the just, speedy, and inexpensive determination of every action."  *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.,* 460 F.3d 1217, 1227 (9th Cir. 2006); *see also* Fed. R. Civ. P. 1.

The Court agrees that the false declarations submitted created additional and unnecessary expense for the SEC in discovery in order to obtain the truth.  This factor favors dismissal.

## 2.     The Court's Need to Manage Its Docket

Plaintiff argues that Defendant's conduct undermined the integrity of the proceedings and if default judgment is not entered, it would not deter future fraudulent conduct.  (Dkt. No. 93-1 at 16-17.)  Ringgold did not address this factor.  The Magistrate Judge concluded that the Court expended an enormous amount of resources on this case; Defendant has not withdrawn or corrected the false and forged declarations since they were filed over a year and a half ago; and Ringgold continues to cite them in his opposition of Plaintiff's pending motion for summary judgment.  (Dkt. No. 113 at 27.) Moreover, Defendant's conduct has impeded the resolution of the case by obscuring critical facts and Plaintiff has expended a substantial amount of time and resources obtaining discovery relating to the false declarations.  (*Id.*)

"District courts have an inherent power to control their dockets," and "dismissal must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *In re Phenylpropanolamine*, 460 F.3d at 1227 (quoting *Nat'l Hockey League v. Metro. Hockey Club, Inc*., 427 U.S. 639, 643 (1976)); *see also* Fed. R. Civ. P. 16 (authorizing district courts to manage cases so that disposition is expedited, wasteful pretrial activities are

discouraged, and the quality of the trial is improved).

The Court recognizes that submitting false declarations has needlessly protracted litigation and impeded prompt resolution of this case; thus, this factor weighs in favor of dismissal.

### 3.   Risk of Prejudice to the Other Party

Plaintiff argues that Defendant's fraudulent conduct has caused meaningful and lasting prejudice to the SEC and the investors it seeks to protect because the investor declarations were the primary evidence cited by the Court in deciding if there were factual disputes as to whether investors were offered securities.  Initially, the Court denied the preliminary injunction, and, on reconsideration, only imposed a subset of the relief requested by the SEC.  (Dkt. No. 93-1 at 17.)  Further, Plaintiff asserts that given the scope of Defendants' misconduct, any evidence they present in opposition to summary judgment or at trial will not be credible.  (*Id.*)  Defendant does not specifically address this factor but argues that he was not aware of the false declarations of Dorsey and Wartanian until the instant motion was filed.  (Dkt. No. 115-1 at 5.)  He claims he did not engage in bad faith conduct, did not alter or hide evidence and the extraordinary sanction of terminating sanctions is not warranted.  The R&R concluded that the false evidence precluded the SEC from timely assessing evidence central to its claims and forced it to engage in extensive, costly and lengthy discovery to uncover key facts and the extent of Ringgold's deceit.  (Dkt. No. 113 at 28.)  As a result, the SEC has been prejudiced by Defendant's misconduct and this factor supports terminating sanctions. (*Id.*)

A plaintiff "suffers prejudice if [a party's] actions impair the [opposing party's] ability to go to trial or threaten to interfere with the rightful decision of the case." *Adriana Int'l Corp v. Thoren*, 913 F.2d 1406, 1412 (9th Cir. 1990).  For example, a failure to produce documents as ordered establishes sufficient prejudice.  *Id.* (citing *SEC v. Seaboard Corp.*, 666 F.2d 414, 417 (9th Cir. 1982)).  In *Adriana*, the Ninth Circuit concluded that "the repeated failure of Adriana to appear at scheduled dispositions

compounded by their continuing refusal to comply with court-ordered production of documents constitutes an interference with the rightful decision of the case." *Id.* "The law also presumes prejudice from unreasonable delay." *In re Phenylpropanolamine,* 460 F.3d at 1227. But "[d]elay alone, without a focus on its effects, will not justify dismissal or default." *Wanderer*, 910 F. 2d at 656. In *Wanderer*, prejudice was satisfied "due to failure of the defendants to appear at their depositions and repeated noncompliance with court orders to produce documents [and] constituted a clear interference with the plaintiffs' ability to prove the claims and to obtain a decision in the case." *Id.* at 656.

The Court agrees with the R&R that Plaintiff has suffered prejudice in its ability to ascertain facts to support its claims. The false declarations have protracted the length of discovery as the SEC has had to unpack the extent of the false statements committed by Ringgold.

However, the Court notes that the four declarations of Russell, Dorsey, Wartanian and Vaculik did not impact the Court's original ruling on the motion for preliminary injunction. (*See* Dkt. No. 41.) Because the four declarations were submitted in supplemental filings outside the Court ordered briefing schedule, the Court specifically denied Defendants' request for leave to file supplemental declarations, that include Dorsey, Wartanian and Russell's declaration, as moot. (Dkt. No. 41 at 17.) The Court also struck Plaintiff's supplemental declaration which included Vaculik's declaration. (*Id.*) Instead, the Court relied on Ringgold's declaration and the 9 Rosegold investor declarations attached to Ringgold's declaration filed in opposition to the motion for preliminary injunction filed on November 2, 2018. (Dkt. No. 24-2.) None of the four false declarations were included in this declaration. (*See id.*) On reconsideration, however, the Court relied on the additional 9 tester declarations which included Jackie Wartanian and Quentin Dorsey's declarations. (Dkt. No. 61 at 13 (citing Dkt. No. 32-8).) In addition, these declarations have been employed to oppose the SEC's case and are being used to oppose the motion for summary judgment by Ringgold. As a result, these

declarations have and would interfere with "the rightful decision of the case."  *See Adriana Int'l Corp*, 913 F.2d at 1412.

As to Vaculik's declaration, the SEC asserts that it is pertinent as to the issue of disgorgement as a remedy for a securities violation.  (Dkt. No. 116 at 7.)  Accordingly, the declaration is not peripheral to the merits of the case.  *Cf. Phoceene Sous–Marine, S.A.*, 682 F.2d at 806 (noting "[i]t is firmly established that the courts have inherent power to dismiss an action or enter a default judgment to ensure the orderly administration of justice and the integrity of their orders [,]" but reversing entry of default because the deception was "peripheral" to the merits of the controversy).  Moreover, the content of the Vaculik declaration and its creation is relevant in demonstrating the extent of Defendant's efforts to defeat the SEC action through artifice.  It further proves that Defendant's actions in presenting false declarations was willful.

The Court concludes the SEC has suffered prejudice as the subject declarations have or will impact and affect key issues in this case.

### 4.      Public Policy Favoring Disposition of Cases on their Merits

Plaintiff argues that this factor is outweighed because Defendant engaged in fraudulent conduct.  (Dkt. No. 93-1 at 17-18.)  Defendant does not address this factor.  The R&R found that this factor was neutral because Defendants, by filing false declarations, impeded the SEC's efforts to ascertain critical facts.  (Dkt. No. 113 at 28-29.)

The factor "resolution of cases on their merits, always weighs against dismissal." *Dreith v. Nu Image, Inc.*, 648 F.3d 779, 788 (9th Cir. 2011) (citing *Adriana,* 913 F.2d at 1412).  However, this factor "lends little support" to a party that unreasonably delays or impedes progress toward disposition of the case on the merits.  *See In re Phenylpropanolamine,* 460 F.3d at 1227.  Accordingly, the Court agrees with the Magistrate Judge that Ringgold's willful conduct causing delays and impeding progress makes this factor neutral.

### 5.      Availability of Less Drastic Sanction

The SEC argues that because Defendant's fraud relates to the legal issues central to this litigation, Ringgold will not likely pay monetary sanctions and evidence preclusion will only place him in the same position in which he was before he filed the false and forged declarations and will not deter him from further deception.  (Dkt. No. 93-1 at 18.) Ringgold responds that terminating sanctions are not appropriate because he has not disobeyed any prior court orders requiring a response and cites to numerous state court cases and well as statutory provisions.  (Dkt. No. 99-1 at 6.)  Ringgold is amenable to alternative relief where the court could order that he be precluded from "offering the forged Declaration at trial . . . and should be allowed to submit the declaration that has been confirmed as signed by Christopher Russell."  (*Id.* at 12-13.)  Ringgold is also amenable to alternative relief of allowing him to "resubmit the declarations in the form of Notarized Affidavit of Facts from Quinten Dorsey, Jackie Wartanian & Christopher Russell in lieu of sanctions." (*Id.* at 13.)  The Magistrate Judge considered alternative sanctions in lieu of dismissal but concluded that alternative sanctions would not adequately redress Defendant's egregious misconduct and deceit.  (Dkt. No. 113 at 33.) The R&R explained that monetary sanctions would not be effective because Ringgold does not appear to have financial resources to pay monetary sanctions.  (*Id.* at 30.) Evidentiary and issue preclusion sanctions would not deter Ringgold's misconduct but would place him in the same position he was in before filing the false and forged declarations.  (*Id.* at 31.)

The fifth *Malone* factor asks the Court to determine the viability of less drastic sanctions by considering three sub-factors: (1) the availability of lesser sanctions; (2) the use of lesser sanctions before termination; and (3) the adequate warning of the possibility of termination.  *See Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 482 F.3d 1091, 1096 (9th Cir. 2007).  To satisfy this factor, a court should consider lesser sanctions, order them, and give adequate warning of impending termination.  *Id*. However, in egregious cases such an inquiry is not necessary.  *Malone*, 833 F.2d at 132; *Hester v. Vision Airlines, Inc.,* 687 F.3d 1162, 1170 (9th Cir. 2012) (if the court

18CV2287-GPB(MSB)

anticipates continued deceptive misconduct and lesser sanctions would be useless, the district court need not consider them) (citing *Computer Task Grp., Inc. v. Brotby,* 364 F.3d 1112, 1116–17 (9th Cir. 2004)).  "What is most critical for case-dispositive sanctions, regarding risk of prejudice and of less drastic sanctions, is whether the discovery violations 'threaten to interfere with the rightful decision of the case.'"  *Valley Engineers Inc.*, 158 F.3d at 1057 (quoting *Adriana*, 913 F.2d at 1412).  In other words, "[d]ismissal is appropriate where a "pattern of deception and discovery abuse made it impossible" for the district court to conduct a trial "with any reasonable assurance that the truth would be available."  *Id.* at 1057-58 (quoting *Anheuser–Busch, Inc.,* 69 F.3d at 352); *Conn. Gen. Life Ins. Co.*, 482 F.3d at 1097 ("It is appropriate to reject lesser sanctions where the court anticipates continued deceptive conduct.").  Further, where lesser sanctions would not deter a defendant's repetition of misconduct and lesser sanctions would simply place defendants back in the same position they were in prior to submitting the false declarations and false complaints, alternative sanctions are not warranted.  *See Uribe v McKesson,* No. 1:08–cv–01285–SMS PC, 2011 WL 3925077, at *5 (E.D Cal. Sept. 7, 2011) ("[T]o continue this action would not deter repetition of such conduct or comparable conduct.  Such a course would simply place [party] back in the same position he was in, without the false declaration.").

Here, there was not an opportunity to impose less drastic sanctions because the fraudulent conduct occurred early in the litigation and was not discovered until the parties were engaged in discovery.  However, given his pattern of artifice, the Court anticipates that Ringgold will not be truthful in upcoming court proceedings as he has failed to explain the inconsistencies in his deposition testimony and declarations as well as the inconsistencies in Wartanian and Dorsey's declaration and their deposition testimonies.  He also continues to cite to their declarations in opposing the SEC's summary judgment motion.  Moreover, alternative sanctions of evidence preclusion as suggested by the SEC or resubmitting the declarations in a "Notarized Affidavit", as Ringgold suggests, will only place Ringgold in the same position in which he was before he filed the false

declarations.  Therefore, having considered less drastic sanctions, the Court concludes that none will deter Defendant's continued misconduct.

In conclusion, the Court finds that terminating sanctions in the form of default judgment is warranted as Defendant has engaged in willful misconduct and the five *Malone* factors support such sanctions.  Thus, the Court GRANTS Plaintiff's motion for terminating sanctions as to Defendant Ringgold.

## Conclusion

Based the reasoning above, the Court ADOPTS the report and recommendation and GRANTS the SEC's motion for terminating sanctions as to Defendant Ringgold and default judgment shall be entered against Defendant Ringgold as to all claims in the Complaint.

IT IS SO ORDERED.

Dated:  May 29, 2020

Hon. Gonzalo P. Curiel
United States District Judge

18CV2287-GPB(MSB)